No: 22-35832

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DICKINSON FROZEN FOODS, INC.,

*Plaintiff/Appellant,*

v.

FPS FOOD PROCESS SOLUTIONS CORPORATION,

*Defendant/Appellee.*

On Appeal from the United States District Court
for the District of Idaho
D.C. No. 1:17-cv-00519-MMB
Hon. Chief Dist. Judge David Nye
Hon. Dist. Judge M. Miller Baker

---

## APPELLANT'S OPENING BRIEF

---

Dane A. Bolinger
HAWLEY TROXELL ENNIS &
HAWLEY LLP
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000

John F. Kurtz, Jr.
KURTZ LAW PLLC
910 W. Main Street, Suite 364
Boise, ID 83702
Telephone: (208) 287-8167
*Attorneys for Plaintiff/ Appellant
Dickinson Frozen Foods, Inc.*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Dickinson Frozen Foods, Inc. is wholly owned by its parent corporation Oregon Potato Company, a Washington corporation, and there are no publicly held corporations that own 10% or more of its stock.

# <u>TABLE OF CONTENTS</u>

Page

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED.......................................................................... 1

STATEMENT OF THE CASE............................................................... 2

       A.    The Parties' Negotiations and Agreement. ............................. 2

       B.    Immediately Upon Delivery, the Freezer Fails to Perform as Promised. .......................................................................... 4

       C.    At the June 2017 First Engineering Summit Involving All Stakeholders, Nestlé Engineers Eliminate the Refrigeration System as a Possible Cause of the Freezer's Performance Problems. ............................................................................... 5

       D.    Both Dickinson and FPS Involve Attorneys in the Dispute Regarding the Freezer's Performance Failures.................... 6

       E.    Dickinson, Nestlé, Kemper, Colmac, and FPS/Peterson Conduct a Second Engineering Summit. ............................... 8

       F.    Dickinson Notifies FPS and Its Counsel, Twice More, that It Will Disassemble the Defective FPS Freezer. ...................... 9

       G.    FPS's Motion for Spoliation Sanctions, Related Briefing, and the Court's Mandatory and "Non-Rebuttable" Jury Instruction. ......................................................................... 12

       H.    Dickinson's Repeated but Unsuccessful Attempts to Reconcile the Jury Instruction. ........................................... 14

SUMMARY OF THE ARGUMENT ................................................... 17

STANDARDS OF REVIEW.............................................................. 18

ARGUMENT .................................................................................... 19

   I.    THE DISTRICT COURT ERRED IN HOLDING THAT DICKINSON SPOLIATED EVIDENCE, GIVEN THAT DICKINSON DISCHARGED ITS DUTY TO PRESERVE. ......................... 20

       A.    Dickinson provided more than adequate notice of the Freezer's disassembly. ........................................................ 23

B.      The district court erred in applying an unrecognized pre-litigation versus post-litigation distinction for notice. ..........................25

C.      Far beyond the minimum legally-required opportunity to inspect, FPS actually thoroughly inspected the Freezer and Refrigeration System Prior to Disassembly. .........................................28

II.     THE DISTRICT COURT'S SPOLIATION SANCTION SHOULD BE REVERSED. ..........................................................................................31

A.      The Jury Instruction is vague, illogical, and presents an unresolvable paradox. ..........................................................................31

B.      Under binding Ninth Circuit law, case-terminating sanctions are improper absent a culpable state of mind akin to bad faith. ....................................................................................................35

C.      The Jury Instruction impermissibly terminated Dickinson's case. ....................................................................................................36

1.      In three separate orders, the district court stated the Jury Instruction was not case-terminating. ...............................36

2.      Every attempt by Dickinson to resolve the inherent paradox of the Jury Instruction was rebuffed. .........................38

D.      Regardless, the "non-rebuttable" and "mandatory" Jury Instruction was not the least harsh sanction available to cure the purported prejudice. ......................................................................40

1.      The district court erred in evaluating the degree to which FPS was prejudiced by the Freezer's disassembly. ...........................................................................41

2.      The district court's sanction was unduly harsh, as a lesser sanction than the Jury Instruction would avoid substantial unfairness to FPS. ....................................................52

III.    THE DISTRICT COURT ERRED IN AWARDING FEES AND COSTS TO FPS ON ITS DISCOVERY MOTION. .........................................54

CONCLUSION......................................................................................................56

45670.0013.15530949.1

# TABLE OF AUTHORITIES

Page

**Cases**

*Am. Fam. Mut. Ins. Co. v. Golke*,
2009 WI 81, 319 Wis. 2d 397, 768 N.W.2d 729 ........................................ 22, 24, 25, 26, 28, 29

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) .................................................................................. 52

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) ...................................................... 20, 26, 40, 43, 52, 53

*Armstrong v. Michaels Stores, Inc.*,
59 F.4th 1011 (9th Cir. 2023) ................................................................................................ 34

*BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*,
332 F.3d 333 (5th Cir. 2003) ................................................................................................. 19

*Brackett v. Walmart Inc.*,
No. 20-CV-01304-KLM, 2021 WL 1749975 (D. Colo. May 4, 2021) .................................. 46

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
769 F. Supp. 2d 269 (S.D.N.Y. 2011) ................................................................................... 26

*City of Livonia v. Aquatic Renovation Sys., Inc.*,
No. 20-10737, 2022 WL 1651655 (E.D. Mich. May 24, 2022) ........................................ 28, 29

*Do Sung Uhm v. Humana, Inc.*,
620 F.3d 1134 (9th Cir. 2010) ............................................................................................... 19

*Flagg v. City of Detroit*,
715 F.3d 165 (6th Cir. 2013) ................................................................................................. 32

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001) .................................................................................................. 26

*Garcia v. Vitus Energy, LLC*,
600 F. Supp. 3d 975 (D. Alaska 2022) ................................................................................. 45

*Glover v. BIC Corp.*,
6 F.3d 1318 (9th Cir. 1993) .................................................................................................. 19

*Guzman v. Polaris Indus. Inc.*,
49 F.4th 1308 (9th Cir. 2022) ............................................................................................... 19

*Herrmann v. Rain Link, Inc.*,
No. 11-1123-RDR, 2013 WL 4028759 (D. Kan. Aug. 7, 2013) ........................................... 46

*Hynix Semiconductor Inc. v. Rambus Inc.*,
645 F.3d 1336 (Fed. Cir. 2011) ........................................................................................ 43, 44

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
591 F. Supp. 2d 1038 (N.D. Cal. 2006) ............................................................................... 43

45670.0013.15530949.1

*In re Kessler*,
   No. 05-CV-6056-SJFAKT, 2009 WL 2603104 (E.D.N.Y. Mar. 27, 2009) ...................... 21, 29

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .................................................................................. 53

*Johnson v. Zerbst*,
   304 U.S. 458 (1938) ............................................................................................... 34

*Landis v. Galarneau*,
   2:05-CV-74013, 2010 WL 446445 (E.D. Mich. Jan. 28, 2010) ............................. 55

*Leon v. IDX Sys. Corp.*,
   464 F.3d 951 (9th Cir. 2006) ............................................................................. 19, 35

*LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*,
   957 F.3d 943 (9th Cir. 2020) .................................................................................. 19

*Lofton v. Verizon Wireless LLC*,
   308 F.R.D. 276 (N.D. Cal. 2015) ............................................................................ 20

*MCC-Marble Ceramic Ctr., Inc., v. Ceramica Nuova d'Agostino, S.p.A.*,
   144 F.3d 1384 (11th Cir. 1998) .............................................................................. 33

*MDB Trucking, LLC v. Versa Prod. Co., Inc.*,
   136 Nev. 626, 475 P.3d 397 (2020) ........................................................................ 36

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*,
   306 F.3d 806 (9th Cir. 2002) .................................................................................. 51

*Mezu v. Morgan State Univ.*,
   CV WMN-09-2855, 2014 WL 12734011 (D. Md. May 13, 2014) ......................... 55

*Micron Tech., Inc. v. Rambus Inc.*,
   645 F.3d 1311 (Fed. Cir. 2011) .................................................................. 27, 44, 45

*Micron Tech., Inc. v. Rambus Inc.*,
   917 F. Supp. 2d 300 (D. Del. 2013) ................................................................ 44, 45

*Milke v. City of Phoenix*,
   497 F. Supp. 3d 442 (D. Ariz. 2020), aff'd, No. 20-17210, 2022 WL 259937 (9th Cir. Jan. 27,
   2022) ...................................................................................................................... 27

*Miller v. Lankow*,
   801 N.W.2d 120 (Minn. 2011) ......................................................................... 22, 26

*Nutrition Distrib. LLC v. PEP Research, LLC*,
   16CV2328-WQH-BLM, 2018 WL 6323082 (S.D. Cal. Dec. 4, 2018) ................... 32

*Pettit v. Smith*,
   45 F. Supp. 3d 1099 (D. Ariz. 2014) ...................................................................... 35

*Reinsdorf v. Skechers U.S.A., Inc.*,
   296 F.R.D. 604 (C.D. Cal. 2013) ............................................................................ 20

*S.E.C. v. Mercury Interactive LLC*,
   3:07-CV-02822-WHA, 2012 WL 3277165 (N.D. Cal. Aug. 9, 2012) ................... 42

45670.0013.15530949.1

*Santiago v. Select Portfolio Servicing*,
　No. CV 07-262-S-EJL, 2008 WL 130922 (D. Idaho Jan. 10, 2008) ........................................ 55

*Schmid v. Milwaukee Elec. Tool Corp.*,
　13 F.3d 76 (3d Cir. 1994) .................................................................. 40, 42, 44, 51

*Sharp v. Hylas Yachts, LLC*,
　872 F.3d 31 (1st Cir. 2017) .................................... 21, 24, 25, 29, 30, 42, 45, 46, 51

*Sherwood v. BNSF Ry. Co.*,
　No. 2:16-CV-00008-BLW, 2019 WL 1413747 (D. Idaho Mar. 28, 2019) ............................ 36

*State Farm Mut. Auto. Ins. Co. v. BMW of N. Am., LLC*,
　No. 08-12402, 2009 WL 2447612 (E.D. Mich. Aug. 7, 2009) ................................................ 28

*Stengel v. Medtronic Inc.*,
　704 F.3d 1224 (9th Cir. 2013) ......................................................................... 19

*Turner v. Pub. Serv. Co. of Colo.*,
　563 F.3d 1136 (10th Cir. 2009) ........................................................................ 46

*U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.*,
　857 F.2d 600 (9th Cir. 1988) ........................................................................... 41

*Ulrich v. Schweiker*,
　548 F. Supp. 63 (D. Idaho 1982) ..................................................................... 55

*Yan Fang Du v. Allstate Ins. Co.*,
　697 F.3d 753 (9th Cir. 2012) ........................................................................... 19

*Zubulake v. UBS Warburg LLC*,
　220 F.R.D. 212 (S.D.N.Y. 2003) ...................................................................... 20

## Statutes and Rules

18 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1331 ...................................................................................... 1, 20

28 U.S.C. § 2107 ............................................................................................. 1

Fed. R. App. P. 4 ............................................................................................. 1

Fed. R. Civ. P. 16 ......................................................................................... 42

Fed. R. Civ. P. 30 ......................................................................................... 58

Fed. R. Civ. P. 37 .................................................................................... 39, 43

Fed. R. Civ. P. 59 ......................................................................................... 41

## Other Authorities

Collen L. Steffen, *The Duty Dilemma: When the Duty to Mitigate Damages and the Duty to Preserve Evidence Collide*, 71 Okla. L. Rev. 923 (2019) ...................................................... 30

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331(a), as Plaintiff/Appellant Dickinson Frozen Foods, Inc.'s ("Dickinson's") claims arise under the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), a federal treaty. (13-ER-3593.) This Court has jurisdiction under 18 U.S.C. § 1291 because on October 17, 2022, the district court entered final judgment following its grant of summary judgment to Defendant/Appellee FPS Food Process Solutions Corp. ("FPS") on all of Dickinson's claims. (1-ER-2.) Dickinson timely appealed on October 20, 2022. 28 U.S.C. § 2107(a); FED. R. APP. P. 4(a)(1)(A); 13-ER-3610–16.

## ISSUES PRESENTED

1. Whether the district court erred in holding that Dickinson failed to discharge its duty to preserve evidence despite Dickinson's three advance notices to FPS of its intent to disassemble the FPS Freezer[1] and FPS's extensive inspections and testing of the Freezer prior to its disassembly?

2. Whether the district court erred in issuing a mandatory and non-rebuttable jury instruction that operated as a *de facto* case-terminating spoliation sanction, despite repeatedly and paradoxically holding that a case-terminating sanction would be inappropriate due to Dickinson's lack of bad

---

[1] "Freezer" is defined in the second paragraph of the Statement of the Case.

45670.0013.15530949.1

faith, that the jury instruction was not case-terminating, and that Dickinson would be allowed to present evidence to the jury at trial?

3.    Whether the district court erred in awarding attorneys' fees and costs to FPS on a discovery motion?

## STATEMENT OF THE CASE

### A.    THE PARTIES' NEGOTIATIONS AND AGREEMENT.

Dickinson owns a large potato processing facility in Sugar City, Idaho where it cooks and freezes diced and shredded potatoes (the "Facility"). (*See* 3-ER-785.) In 2014, Dickinson needed to replace one of its industrial freezers because the freezer's "throughput"—the number of pounds/hour of cooked potato product the freezer could safely freeze—could not keep up with demand. (4-ER-1093–96.)

Dickinson negotiated with FPS, a Canadian corporation, for FPS to design, manufacture, and sell Dickinson a new industrial tunnel freezer (the "Freezer"). (*See* 13-ER-3559–61.) During negotiations, Dickinson explained the freezer needed a throughput capacity of 8,000 pounds/hour, with minimal downtime. (3-ER-786; 4-ER-1098–99; 5-ER-1156–57; 5-ER-1177–79.). In an email, FPS's vice-president of marketing and sales Justin Lai promised Dickinson's manager Todd Campbell that FPS's Freezer "is designed with all the freezer coils on sequential hot gas defrost[2] **to allow for continuous operation for up to 20–22 hours per**

---

2 Industrial tunnel freezers inherently accumulate ice and frost on their internal equipment during operation, which can create an "igloo effect" where the ice

**day.**" (3-ER-753–59; 5-ER-1162–65; 5-ER-1211–14 (emphasis added).) This promise assuring continuous operation for 20–22 hours/day was essential to Dickinson, which would not have contracted with FPS absent that promise. (3-ER-753–59.)

In March 2016, Dickinson signed FPS Order Confirmation 81100/Purchase Order X11082 (the "Order Confirmation") reflecting *some* of the terms of FPS's and Dickinson's agreement. (*See* 5-ER-1183–84; 5-ER-1246–53). For instance, the Order Confirmation identifies that Dickinson, not FPS, was responsible for providing an external refrigeration system to power the Freezer capable of producing 210 "Tons of Refrigeration" ("TR")[3] of cooling capacity (the "Refrigeration System").[4] (*Id.*) However, the Order Confirmation contains no

---

insulates the internal equipment and reduces cooling efficiency. (4-ER-814–15; 4-ER-917). One way to prevent this is a "sequential hot gas defrost system," which cyclically heats the internal equipment in alternating sequences to defrost the freezer continuously without shutting down the freezer or slowing production. (*Id.*) However, the defrost system must be designed properly so the additional heat generated by the system is accounted for in the overall freezer design. (4-ER-814–18.). Here, the defrost system in the FPS Freezer was defectively designed and could not perform as promised. (*Id.*)

[3] A "ton of refrigeration" ("TR") is a measurement of energy used in the freezing industry to describe both the "Heat Load" on a freezer (including heat from the product plus heat produced by the freezer's own operation) and the corresponding "Cooling Capacity" to *remove* that Heat Load and thus to adequately cool/freeze a product. (3-ER-808–09).

[4] Unlike consumer freezers, an industrial freezer relies on a separate refrigeration system to provide the cooling "power" for the freezer to function. (*See* 3-ER-796–98). Dickinson hired refrigeration contracting company Kemper Northwest, Inc. ("Kemper") to design and to build the refrigeration system to support the Freezer.

45670.0013.15530949.1

"integration" or "merger" clause, and both parties concur there were agreed contract terms that are not contained in that document. (*See Id.*; 3-ER-761; 5-ER-1241–43.) Dickinson contends that Justin Lai's email promise that the FPS Freezer would operate continuously for 20–22 hours/day is a binding term of the parties' bargain.

### B.    IMMEDIATELY UPON DELIVERY, THE FREEZER FAILS TO PERFORM AS PROMISED.

FPS delivered and installed the Freezer on July 13, 2016. (5-ER-1192–95). From the outset, the Freezer failed to produce 8,000 pounds/hour of potato product for 20–22 hours/day. (5-ER-1115–20; 5-ER-1195–96; 5-ER-1362–1367). Instead, the Freezer would operate for no more than 6 hours consecutively before the product exiting the Freezer would begin to rise above 0°F, resulting in too hot or only partially frozen product (violating food-safety and quality standards). (4-ER-1104–09; 5-ER-1201–04). The Freezer would then have to be shut-down and a manual defrost initiated. (*See Id.*)

Dickinson immediately notified FPS that the Freezer failed to perform. (5-ER-1195–98). For more than six months, FPS sent personnel onsite to evaluate, test, and collect data regarding both the Freezer and the Refrigeration System, and to modify the Freezer to try to reach the promised throughput capacity, but the Freezer never performed properly. (5-ER-1111-14; 5-ER-1199-1200).

---

(*See* 5-ER-1180–84, 5-ER-1188–89; 5-ER-1246–53; 5-ER-1277–82, 5-ER-1325–28).

Due to the Freezer's defects, Dickinson was unable to fulfill its customers' demands. (5-ER-1372–75.) One such customer was Nestlé USA ("Nestlé"). Around April 2017, after learning of the Freezer's defects, Nestlé volunteered, at its expense, to send its own experts to investigate the Freezer and the Refrigeration System. (*See Id.*) By May 2017, Nestlé suspected that the Freezer's failure was due to design flaws in the Freezer's sequential hot gas defrost system and *not* due to the Refrigeration System, which appeared to be functioning properly.[5] (4-ER-831–34; 4-ER-848; 5-ER-1284–86; 5-ER-1292–1301; 5-ER-1383–84; 5-ER-1394–99; 6-ER-1492–93.)

### C. AT THE JUNE 2017 FIRST ENGINEERING SUMMIT INVOLVING ALL STAKEHOLDERS, NESTLÉ ENGINEERS ELIMINATE THE REFRIGERATION SYSTEM AS A POSSIBLE CAUSE OF THE FREEZER'S PERFORMANCE PROBLEMS.

FPS requested that its component-manufacturer Colmac Coil Manufacturing, Inc. ("Colmac") send its refrigeration engineers to collect data regarding the performance of the Refrigeration System, including measuring whether it was providing at least the contractually-specified 210 TR in Cooling Capacity. (6-ER-1498–99; 6-ER-1501–08; 6-ER-1522–26). On June 20–22, 2017 (the "First Engineering Summit"), engineers from Nestlé, Colmac, Kemper, and FPS, along with Dickinson employees, met at the Facility to collaboratively gather data and

---

[5] Significantly, FPS designed the Freezer for Dickinson based on similar freezers it had designed to freeze room-temperature blueberries rather than hot potatoes. (5-ER-1223–28.)

conduct tests. (2-ER-272; 5-ER-1304–16; 6-ER-1500–04; 6-ER-2345–48.) After reviewing performance data from the First Engineering Summit, Nestlé's engineer concluded that the Refrigeration System was working properly and providing at least 210 TR in Cooling Capacity, and that since the Freezer was still failing to produce 8,000 pounds/hour for 20–22 hours/day, the only other potential source of that malfunction was the Freezer itself. (5-ER-1377–80; 6-ER-1529–33).

Nestlé's engineer discussed his conclusions with FPS's president Jeffrey Chang, who disagreed with those conclusions, specifically denying that the Freezer's design was causing the Freezer's performance problems and insinuating that the cause was some other unspecified problem with the Refrigeration System. (5-ER-1317–20; 5-ER-1381–82; 5-ER-1385–86; 6-ER-1535). In response, Nestlé's engineer told Mr. Chang that if FPS was concerned about the accuracy of the performance data and the conclusions derived from it, FPS should collect its own data and "provide proof to us that our data and conclusion[s] [are] wrong." (5-ER-1381–82.)

### D. BOTH DICKINSON AND FPS INVOLVE ATTORNEYS IN THE DISPUTE REGARDING THE FREEZER'S PERFORMANCE FAILURES.

By Summer 2017, the parties' anticipation of litigation over the non-performing Freezer was apparent. Dickinson involved its General Counsel, Steven Schossberger, and FPS involved its outside counsel, James Shewfelt of the

45670.0013.15530949.1

Vancouver, Canada law firm Miller Thompson.[6] (2-ER-276–78; 6-ER-1589; 10-ER-2815–17; 10-ER-2834–43.). On July 13, 2017, Mr. Schossberger sent FPS a letter rejecting and revoking Dickinson's acceptance of the Freezer and asserting a claim for damages. (*Id.*) The letter expressly stated that Dickinson would continue to operate the Freezer for the time-being "***in order to mitigate Dickinson's damages, until a new replacement Tunnel Freezer can be ordered and fully operational***[.]*"* (10-ER-2816, 10-ER-2834–35) (emphasis added).

Shortly after the First Engineering Summit, FPS asked its previously retained third-party refrigeration engineering expert, James Peterson of Cold Solutions, LLC, to assess whether the Refrigeration System was in fact functioning properly. (2-ER-276–78; 6-ER-1537–39; 6-ER-1546–49; 6-ER-1554–55; 6-ER-1570–71; 6-ER-1586–87; 6-ER-1631–38.) On July 17, 2017, four days after Mr. Schossberger's letter, Mr. Peterson completed his initial report, and FPS sent that report to Mr. Shewfelt. (*See Id.*) One week later, Mr. Shewfelt wrote to Mr. Schossberger and, in reliance on Mr. Peterson's report, disputed whether

---

[6] FPS's immediate involvement of Mr. Shewfelt objectively demonstrates FPS anticipated litigation with Dickinson. In this same time period Mr. Shewfelt had been and was FPS's litigation counsel of record defending against claims brought by GEA Refrigeration Canada, Inc., and he served as FPS's appellate counsel. (6-ER-1698–1699 (district court order taking judicial notice of the existence of the Canadian court decisions); 6-ER-1702; 6-ER-1706 to 7-ER-1743 (Dec. 14, 2020 appellate decision); 7-ER-1744–1956 (Jan. 8, 2018 trial court decision)).

Dickinson's Refrigeration System was adequate. (5-ER-1387–88; 6-ER-1591–99; 6-ER-1623–29.)

Mr. Schossberger disagreed with Mr. Shewfelt's contention that the Refrigeration System was inadequate. (10-ER-2816–17.) By then, the Refrigeration System had already been investigated thoroughly by Nestlé, Kemper, Colmac, and FPS itself and ruled-out as a potential cause. (10-ER-2816–18.) Mr. Schossberger stated in correspondence to Mr. Shewfelt that "because Jim Peterson authored his [initial report] based upon second hand information from FPS which we know is faulty", Mr. Peterson should visit the Facility himself to assess the Refrigeration System. (10-ER-2844–45.) Mr. Shewfelt accepted Mr. Schossberger's invitation, and an onsite meeting was arranged.

## E. DICKINSON, NESTLÉ, KEMPER, COLMAC, AND FPS/PETERSON CONDUCT A SECOND ENGINEERING SUMMIT.

This "Second Engineering Summit" occurred at the Facility from September 20–22, 2017 and included FPS's application engineer Jason Kwok and its third-party refrigeration engineer Jim Peterson, plus engineers from Nestlé, Colmac, and Kemper. (2-ER-279–81; 5-ER-1334–36; 5-ER-1388–90; 6-ER-1558–66; 6-ER-1601–02.). At the outset, the attendees discussed the Refrigeration System and the Freezer's performance problem, and they agreed upon the scope, purpose, and parameters of their testing and data collection, including to assess whether the Refrigeration System was providing at least 210 TR in Cooling Capacity. (2-ER-279–81; 5-ER-1334–38; 6-ER-1513–15; 6-ER-1558–61.). The attendees approved

8

a data-collection plan and testing protocols where Colmac, *in conjunction with FPS*, would install sensors and data-gathering equipment to collect additional performance data on both the Refrigeration System and the Freezer. (5-ER-1339–44; 6-ER-1558–61; 6-ER-1513–15). Kemper gathered additional data regarding the performance of the Refrigeration System. (5-ER-1302–03). FPS itself gathered data regarding the operation of the Refrigeration System. (14-ER-3659–60.)

Based on data collected during the Second Engineering Summit, Nestlé, Kemper, FPS, and Mr. Peterson all concluded that the Refrigeration System was functioning properly and producing at least *240 TR* of Cooling Capacity, well beyond the 210 TR contractual requirement. (2-ER-283–84; 5-ER-1402–09; 6-ER-1411–12; 5-ER-1314–16, 5-ER-1324; 5-ER-1345–50; 6-ER-1610–21; 6-ER-1552; 6-ER-1562–69.)

## F. DICKINSON NOTIFIES FPS AND ITS COUNSEL, TWICE MORE, THAT IT WILL DISASSEMBLE THE DEFECTIVE FPS FREEZER.

Dickinson needed to replace the Freezer to mitigate the millions of dollars in lost profit damages it was suffering. (10-ER-2820, 10-ER-2823–25.) Thus, consistent with Mr. Schossberger's July 13, 2017 letter, in the Fall of 2017 Dickinson ordered a replacement freezer from a different manufacturer. (10-ER-2823–25.)

On October 17, 2017, Mr. Shewfelt wrote to Mr. Schossberger, offering to refund Dickinson the purchase price of the Freezer, conditioned upon Dickinson releasing FPS from all other claims for damages. (*See* 10-ER-2849–50.) The next

45670.0013.15530949.1

day, Mr. Schossberger rejected the offer in a letter that further stated that Dickinson "*is anticipating having the Freezer removed in January, 2018*." (10-ER-2851–52.) (emphasis added).

Five days later, Mr. Shewfelt emailed FPS's Josephine Leung, stating that Dickinson had rejected FPS's offer and wanted "both a refund and consequential damages." (10-ER-2853–56). Mr. Shewfelt commented that Mr. Schossberger's letter made a good point to pursue an insurance claim regarding Dickinson's claim for consequential loss. (*Id.*)

The same day, Ms. Leung emailed FPS's Jason Kwok informing him that Dickinson had rejected FPS's offer and that Dickinson's claim for damages had been submitted to FPS's insurance company. (*Id.*) Mr. Kwok was instructed to prepare a case file with all relevant correspondence and documents, that neither he nor Mr. Peterson were to communicate directly with Dickinson, and that all communications with Dickinson must come from Mr. Shewfelt. (*Id.*)

On December 21, 2017, Dickinson filed its Complaint against FPS asserting breach of contract under the CISG, breach of warranty, and related claims for the Freezer's defective performance. (13-ER-3592–09.) The next day, Dickinson's outside counsel provided a copy of the Complaint to Mr. Shewfelt and notified him that—consistent with the notice from more than two months earlier—Dickinson would remove the Freezer on *January 13, 2018*. (10-ER-2857–67.)

On January 10, 2018, Dickinson's counsel telephoned Mr. Shewfelt, but at no point in that call did Mr. Shewfelt object to Dickinson's plan to disassemble the Freezer three days later nor make any demand whatsoever that FPS be allowed to further inspect the Freezer or Refrigeration System prior to disassembly. (12-ER-3230; 12-ER-3333–34.) Indeed, after the letters from Dickinson's attorneys on July 13, October 18, and December 22, 2017, neither Mr. Shewfelt nor anyone from FPS *ever* raised any issue with the planned disassembly or asked that it be postponed. (*See* 11-ER-3207; 12-ER-3230; *see also* 10-ER-2830–31.) Consistent with its multiple written notices to FPS, Dickinson disassembled and removed the Freezer on January 13, 2018. (11-ER-3120; 11-ER-3160; 11-ER-3198.)

FPS's current litigation counsel filed their appearance on February 9, 2018. (13-ER-3589–91.) Thereafter, FPS's counsel waited until September 7, 2018—nearly seven months—before requesting to inspect the Facility or the Freezer. (12-ER-3230.) By agreement, on October 16, 2018, the parties, their counsel, and their respective experts inspected the Facility. (12-ER-3231.) Dickinson provided FPS and its second expert, Eduardo Ford,[7] access to everywhere they asked to see, including active operations of the replacement freezer and the Refrigeration System. (*Id.*) FPS was also provided full access to inspect the disassembled

---

[7] Presumably, FPS retained Mr. Ford because its first expert Mr. Peterson—who was extensively involved on FPS's behalf in inspecting and investigating the Freezer and Refrigeration System—had concluded based on the data that the problem was not the Refrigeration System.

45670.0013.15530949.1

Freezer and its component parts. (*Id.*) At *no point* prior to or during this site inspection did FPS or its counsel ever suggest any evidence had been spoliated. (*Id.*)

### G. FPS'S MOTION FOR SPOLIATION SANCTIONS, RELATED BRIEFING, AND THE COURT'S MANDATORY AND "NON-REBUTTABLE" JURY INSTRUCTION.

On October 30, 2018, FPS moved for sanctions, contending that Dickinson's disassembly of the Freezer constituted spoliation of evidence. (12-ER-3394 to 13-ER-3558, 14-ER-3735–3831.) Dickinson opposed the motion. (11-ER-3053 to 12-ER-3393, 14-ER-3682–3734.) On May 21, 2019, the district court issued its Memorandum Decision and Order regarding FPS's sanctions motion (the "First Order"). (1-ER-169–209.) The court found Dickinson had not discharged its duty to preserve the Freezer and that FPS "was not given 'an adequate and meaningful opportunity to inspect' the FPS Freezer and Refrigeration System." (1-ER-186.) The court also shifted the burden of proof from FPS being required to prove what prejudice it suffered from the alleged spoliation to Dickinson being required to disprove that FPS was prejudiced. (1-ER-196–97.)

The court found that Dickinson did not act in bad faith and that a case-terminating sanction would be inappropriate. (1-ER-203 ("[T]he Court does not find Dickinson acted in bad faith."); 1-ER-200, 1-ER-204–05, 1-ER-208.) The court stated that it would be inappropriate to bar Dickinson from presenting evidence about the Freezer and Refrigeration System because that would "negat[e]

45670.0013.15530949.1

the need for a trial" and, "[e]xcluding any evidence regarding the destroyed evidence would thus be tantamount to dismissal, which … is not warranted." (1-ER-205–06.) The court further stated that the jury should be allowed to hear both parties' evidence and decide the case on the merits. (1-ER-198–99 ("***[T]here is also a great deal of data regarding the FPS Freezer and Refrigeration System*** . . . ***Such evidence will undoubtedly be supplemented at trial***.") (emphasis added).)

The court found that FPS's failure to object to the Freezer's disassembly, even after Dickinson provided a copy of the Complaint and advised of the precise date of removal, was a factor in not terminating Dickinson's case. (1-ER-201–02) (". . . ***FPS's failure to request that Dickinson refrain from removal until FPS's expert could conduct an inspection <u>weighs against the harsh sanction of dismissal</u>.***") (emphasis added). The court held that a drastic sanction would be inappropriate under the circumstances. (1-ER-208.)

Despite holding that dismissal was unwarranted and that Dickinson had not acted in bad faith, the court issued a mandatory and "non-rebuttable" adverse inference jury instruction:

> Dickinson has failed to preserve relevant evidence for FPS's use in this litigation. This is known as the "spoliation of evidence." Specifically, Dickinson destroyed the FPS Freezer and Refrigeration System after its duty to preserve this evidence arose. As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the

Parties' Agreement.

(1-ER-207) (the "Jury Instruction").

**H.    DICKINSON'S REPEATED BUT UNSUCCESSFUL ATTEMPTS TO RECONCILE THE JURY INSTRUCTION.**

Dickinson moved the court to reconsider or clarify the apparent paradox of its ruling. (8-ER-2221–34; 8-ER-2261–86; 10-ER-2692–2769; 10-ER-2770–2904.) On one hand, if the Jury Instruction mandated that the jury *must* find that FPS did not breach its promise to Dickinson to provide a freezer with a throughput capacity of 8,000 pounds/hour continuously for 20–22 hours/day and precluded Dickinson from presenting contrary evidence, then the jury would be obligated to find against Dickinson on all its claims—which would render the Jury Instruction tantamount to dismissal (which the court had expressly held it was *not* doing and would be inappropriate under the circumstances). (10-ER-2773–2813.) On the other hand, if the court truly intended that the Jury Instruction was *not* case-dispositive and would not preclude Dickinson from presenting its evidence to the jury, then it was unclear how the case could proceed with the language of the Jury Instruction as ordered. Dickinson therefore asked the court to modify or clarify the Jury Instruction's meaning and scope. (*Id.*)

On June 1, 2020, the court denied Dickinson's Motion for Reconsideration in a Memorandum Decision and Order (the "Second Order") in which it made numerous erroneous findings and holdings. (1-ER-118–66.) In that decision, the court reiterated that its First Order was *not* intended as a case-terminating sanction,

14

that Dickinson did not act in bad faith, and that the jury instruction was not tantamount to dismissal—but it nonetheless refused to explain how Dickinson could possibly avoid the preclusive consequences of the Jury Instruction at trial. (1-ER-124; 1-ER-154–59.)[8]

On August 5, 2020, as suggested by the court,[9] Dickinson filed its Motion for Leave to File Its First Amended Complaint. (8-ER-2190–92). Dickinson sought to specifically allege that the consecutive 20–22 hours/day runtime was a contractual promise that could be enforced against FPS and to expressly plead a design defect claim for relief. (8-ER-2193–2214.)

On June 21, 2021, while Dickinson's motion to amend was pending, the case was reassigned from Chief Judge David C. Nye of the U.S. District Court for the District of Idaho to Judge M. Miller Baker of the U.S. Court of International Trade. (6-ER-1700.) On July 30, 2021, Judge Baker issued an Order denying Dickinson's motion to amend. (1-ER-29–67.) This order contained several errors, including that the motion was untimely, a bad faith attempt to circumvent the Jury Instruction, and futile in light of the Jury Instruction itself. (*Id.*)

---

[8] On June 15, 2021, the court yet again reiterated the same paradox in a "Third Order." (1-ER-68–117.)

[9] The Second Order stated that "unlike dismissal, the Sanctions Order [1-ER-169] allowed Dickinson the opportunity to amend[.]" (1-ER-157.)

45670.0013.15530949.1

On October 1, 2021, FPS moved for summary judgment on all of Dickinson's claims, arguing that the Jury Instruction was a case-terminating sanction[10] and that the Jury Instruction barred Dickinson from offering evidence regarding the performance of the Freezer or the Refrigeration System. (2-ER-228–59; 6-ER-1649–97.) Dickinson cross-moved for summary judgment (3-ER-655 to 6-ER-1648; 14-ER-3653–81), opposed FPS's motion (2-ER-260–509; 3-ER-511–654; 14-ER-3641–52), and introduced an abundance of evidence[11] that the

---

[10] The court had previously described FPS's position as "somewhat disingenuous" for taking inconsistent positions in first arguing that the Jury Instruction was not a case-terminating sanction and then later arguing the exact opposite. (1-ER-110–11.) ("***FPS's contention is … somewhat disingenuous*** since FPS previously argued … that the adverse jury instruction only 'directly impact[ed]' Dickinson's breach of contract claim.… As such, FPS stated Dickinson's case was 'not dead' and that Dickinson was 'also free to try and amend its Complaint.' *Id.* FPS now takes the opposite position and claims the adverse jury instruction bars Dickinson from presenting any evidence or testimony regarding the Freezer's performance at trial. However, the Court has ***twice held Dickinson is not barred from presenting evidence in support of its claims.*** [citing the First the Second Orders.] ***FPS's argument ignores both its own previous interpretation of the Court's adverse jury instruction and the Court's prior rulings.***")

[11] Dickinson recognizes its excerpts of record are voluminous, but it also recognizes that the Ninth Circuit has cautioned litigants to ensure that materials sufficient to demonstrate the error of a summary judgment before the district court should be included in the excerpts of the record. *See, e.g., Dela Rosa v. Scottsdale Mem'l Health Sys., Inc.*, 136 F.3d 1241, 1242 (9th Cir. 1998); *see also Montano v. Brennan*, 718 F. App'x 690, 691 (10th Cir. 2017) (litigant's failure to include all relevant summary judgment materials on appeal as required by Tenth Circuit's local rule, including summary judgment exhibits and submitted evidence, resulted in court being unable to review alleged errors on appeal).

Refrigeration System worked properly and that the Freezer's defective design caused its performance problems.

On August 12, 2022, the court granted FPS summary judgment on all of Dickinson's claims. (1-ER-3–28.) The court refused to consider any of Dickinson's evidence and instead held (inconsistently with the First, Second, and Third Orders) that there was no way Dickinson could introduce evidence regarding the Freezer and the Refrigeration System (including demonstrating that such evidence totally or substantially ameliorated any prejudice to FPS) because the Jury Instruction barred such evidence from ever being presented to the jury (the exact paradox Dickinson had previously raised with the court and sought to avoid). (1-ER-9–15.)

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court committed reversible error both in finding Dickinson spoliated evidence and in issuing an excessively harsh spoliation sanction. After expert engineers (including FPS's in-house and retained outside expert, and third-party engineers with first-hand knowledge) investigated the Freezer's defective performance over a period of many months, Dickinson notified FPS—three separate times—that it would disassemble the Freezer in order to mitigate the millions of dollars in lost profits it was suffering. FPS did not object to the disassembly, which Dickinson carried out as scheduled.

45670.0013.15530949.1

The court erroneously found Dickinson's three separate notices were insufficient to discharge its duty to preserve evidence and it found spoliation had occurred. However, the court correctly found that Dickinson did not act in bad faith in removing the Freezer, that it would therefore be inappropriate to terminate Dickinson's case (as FPS had requested), and that Dickinson should be allowed to present its evidence to the jury. Nonetheless, and despite reiterating repeatedly that a case-terminating sanction would be inappropriate, the court paradoxically and erroneously issued a "mandatory" and "non-rebuttable" adverse Jury Instruction as a sanction against Dickinson. (1-ER-207.)

Even though Dickinson moved for reconsideration pursuant to Federal Rule of Civil Procedure 54(b) to correct this manifest injustice and the court's clear errors of law, the motion was erroneously denied. Thereafter, the case was reassigned to a different judge, who erroneously denied Dickinson's motion for leave to amend and—contrary to the court's prior rulings—granted FPS summary judgment on the basis that the Jury Instruction *was* case-dispositive and *did* preclude Dickinson from presenting evidence to the jury. (1-ER-9–15.) That result rendered the Jury Instruction an inconsistent and reversibly harsh case-terminating sanction. This Court should reverse those improper decisions.

## STANDARDS OF REVIEW

Decisions on spoliation, sanctions issued under Federal Rule of Civil Procedure 37, a motion to reconsider, a motion for leave to amend a pleading, or

imposing a jury instruction are generally reviewed under the "abuse of discretion" standard. *LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 949 (9th Cir. 2020) (motion for leave to amend pleadings); *Yan Fang Du v. Allstate Ins. Co.*, 697 F.3d 753, 757 (9th Cir. 2012) (jury instruction formation); *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1140 (9th Cir. 2010) (motion for reconsideration); *Leon v. IDX Systems Corp.*, 464 F.3d 951, 957–58 (9th Cir. 2006) (spoliation). As to the underlying factual findings on such decisions, this Court reviews them for "clear error." *Leon*, 464 F.3d at 958.

As to legal errors in the challenged decisions, the grant of summary judgment against Dickinson, and the application of the law on a jury instruction, this Court reviews such decisions under the "de novo" standard of review. *See Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013); *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1311 (9th Cir. 2022); *Yan Fang Du*, 697 F.3d at 757.

## <u>ARGUMENT</u>

As an initial matter governing applicable law, Dickinson's claims arise under the CISG, a federal treaty, and accordingly the district court possessed federal question subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331(a). *See BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 336 (5th Cir. 2003). Thus, the case is governed by federal law regarding the spoliation of evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1319 (9th Cir. 1993).

45670.0013.15530949.1

This Court should reverse the district court's erroneous finding that Dickinson spoliated evidence and its paradoxical and reversibly harsh Jury Instruction. This Court should also reverse the district court's award of fees and costs to FPS on its discovery motion.

## I. THE DISTRICT COURT ERRED IN HOLDING THAT DICKINSON SPOLIATED EVIDENCE, GIVEN THAT DICKINSON DISCHARGED ITS DUTY TO PRESERVE.

Before considering whether any spoliation sanction is appropriate, a district court must first address the threshold issue of whether evidence has, in fact, been spoliated. *E.g., Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 989–90 (N.D. Cal. 2012) ("*Apple II*"); *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013). The Ninth Circuit has not expressly articulated the threshold test to determine whether a party has spoliated evidence, but here the district court relied on the three-part test from *Reinsdorf* in assessing spoliation:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

(1-ER-184.); *Reinsdorf*, 296 F.R.D. at 626 (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)). "The party requesting spoliation sanctions bears the burden of proving all three elements of the claim." *Lofton v. Verizon Wireless LLC*, 308 F.R.D. 276, 287 (N.D. Cal. 2015). Here, as to the first

element, the court erred in finding that Dickinson failed to discharge its duty to preserve evidence and therefore erred in finding spoliation occurred.

Federal courts recognize that a custodial party may discharge its duty to preserve evidence (and avoid any spoliation finding) by notifying the non-custodial party of its intent to alter or destroy evidence, sufficient to provide the non-custodial party with an opportunity to inspect the evidence. *E.g., Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 42 (1st Cir. 2017) (neither dismissal nor adverse jury instruction appropriate as spoliation sanction where custodial party provided three-months' notice to non-custodial party of intent to replace yacht's defective equipment, and non-custodial party inspected equipment and failed to request replacement be postponed); *see also In re Kessler*, No. 05-CV-6056-SJFAKT, 2009 WL 2603104, at *15 (E.D.N.Y. Mar. 27, 2009) (discussing that party asserting spoliation inspected the evidence on numerous other occasions and "proffered only speculative assertions that further inspections would have produced a different result").[12] State courts also routinely recognize that a party may avoid spoliation sanctions by notifying the opposing party of an intent to alter or destroy evidence and providing a reasonable opportunity to inspect the

---

[12] The district court here impliedly recognized that a party can discharge its duty to preserve evidence (1-ER-186), but it misapplied this law and erroneously found that FPS lacked an adequate opportunity to inspect the evidence.

45670.0013.15530949.1

evidence. *E.g., Miller v. Lankow*, 801 N.W.2d 120 (Minn. 2011); *Am. Fam. Mut. Ins. Co. v. Golke*, 2009 WI 81, ¶ 27, 319 Wis. 2d 397, 414, 768 N.W.2d 729, 737.

The seminal *Golke* case should control this Court's decision. There, a plaintiff insurance company subrogated on a homeowner's claim regarding fire damage to a home's roof. *Id.* pp. 1–8. The plaintiff investigated the roof and determined that the defendant roofers' negligent work caused the fire. *Id.* The plaintiff sent multiple letters to the roofing defendants, identifying the address of the home, notifying them that plaintiff contended their negligence caused the fire, asking them to notify their insurance carrier(s), and notifying them that the home would be demolished in approximately three-weeks' time. *Id.* pp. 9–12. None of the roofing defendants or their insurers contacted the plaintiff to inspect the home or request that demolition be postponed. *Id.* p. 14. The plaintiff proceeded with the scheduled demolition. *Id.* p. 15. The trial court found the plaintiff spoliated evidence by demolishing the house and dismissed the case as a sanction. *Id.* p. 17.

The Supreme Court of Wisconsin reversed. *Id.* p. 59. Relying in part on federal cases, the court rejected the argument that the duty to preserve evidence could not be discharged until all parties consented to the destruction of the evidence. *Id.* pp. 22–28. The court reasoned that such a rule "is neither practical nor fair" and "would place the party in control of the evidence at the mercy of its adversary who would be indirectly rewarded for withholding its consent to destroy evidence." *Id.* p. 30. It further noted that such a rule would give the non-custodial

45670.0013.15530949.1

party "no incentive to either inspect the evidence or grant its consent to the destruction of evidence," and it highlighted the "unfairness" and "brinkmanship" of putting the custodial party "in limbo" with respect to its duty to preserve. *Id.* Accordingly, the court held that a party may discharge its duty to preserve evidence when it has a legitimate reason to destroy evidence, it provides reasonable notice of a possible claim, it discloses the basis for that claim, it identifies the existence of evidence relevant to the claim, and it provides a reasonable time-frame to inspect the evidence prior to its destruction (even where the defendant never actually conducts any inspection). *Id.* pp. 19, 28. As the plaintiff's multiple notices to the defendants met these requirements, the court reversed the trial court's case-terminating spoliation sanction. *Id.* pp. 52–58.

### A. DICKINSON PROVIDED MORE THAN ADEQUATE NOTICE OF THE FREEZER'S DISASSEMBLY.

Here, Dickinson discharged its duty to preserve evidence by notifying FPS—*three separate times*—that it intended to disassemble the Freezer. Six months before disassembling the Freezer, Dickinson wrote to FPS that it was asserting a claim for damages and would replace the Freezer, but that to mitigate damages it would continue operating the Freezer until a replacement was installed. (10-ER-2834–35.) Three months before the Freezer's disassembly, Dickinson again wrote to FPS and its litigation counsel that it intended to remove the Freezer in January 2018. (10-ER-2851–52.) Then, three weeks before disassembly, Dickinson's counsel wrote FPS's litigation counsel to again provide notice of the

scheduled January 2018 disassembly. (10-ER-2857–67.) The court erred in finding these three separate notices failed to discharge Dickinson's duty to preserve the evidence.

As to the October 2017 letter, the court was apparently persuaded that FPS somehow believed Dickinson had retracted its repudiation of the parties' contract, implying that Dickinson could not possibly discharge its duty unless FPS subjectively anticipated litigation. (1-ER-188–90.) The court cited no evidence for this finding and there was no reasonable basis in the factual record for the court to have made it. But more importantly, the case law looks to whether the custodial party's notice *objectively* contains sufficient information to discharge a duty to preserve evidence, and the court here erred by focusing instead on FPS's *subjective* interpretation of the notice. *See, e.g., Golke*, 2009 WI 81, pp. 52–58 (finding notices discharged duty even where defendants never responded to them).

The court further found that Dickinson's October 2017 notice was somehow inadequate because it discussed coordinating with FPS regarding details of the removal. (1-ER-190.) Why the court found this fact invalidated Dickinson's notice is unclear, given that the letter objectively reiterated Dickinson's damages claim and asked FPS to notify its insurance carriers of the claim (as in *Golke*), and that FPS failed to request either to inspect the Freezer or to postpone its disassembly. *Compare* 12-ER-3421–23 *with Sharp*, 872 F.3d at 42, *and Golke,* 2009 WI 81, pp. 52–58.

24

The court also erroneously found that Dickinson's December 2017 letter, reiterating that disassembly was scheduled for three weeks later, was inadequate because, according to the court, three weeks' notice was too short. (1-ER-190–91.) But this finding improperly discounted the two previous letters Dickinson sent providing as much as *six months'* notice, and it erroneously ignored that in *Golke* three-weeks' notice was sufficient and in *Sharp* three-months' notice was sufficient. 2009 WI 81, pp. 9–15, 52–58; *Sharp*, 872 F.3d at 42. In rejecting Dickinson's three notices to FPS, the court insinuated vaguely that they were all somehow insufficient. This was reversible error because, under the precedent discussed above, Dickinson's notices were more than sufficient to discharge its duty to preserve. Reversal is separately warranted because the court failed to articulate a sufficient evidentiary basis for its finding that the notices were insufficient.

Here, like in *Golke* and *Sharp*, Dickinson discharged its duty to preserve the Freezer by notifying FPS in writing on three separate occasions—six months, three months, and three weeks in advance—that it was asserting a claim for damages against FPS for the Freezer's defective performance and that it intended to disassemble the Freezer. This Court should hold that Dickinson's multiple notices to FPS discharged Dickinson's duty to preserve the evidence.

**B.** **THE DISTRICT COURT ERRED IN APPLYING AN UNRECOGNIZED PRE-LITIGATION VERSUS POST-LITIGATION DISTINCTION FOR NOTICE.**

In rejecting the sufficiency of Dickinson's three notices, the district court

specifically referred to and relied upon a "distinction between a pre-litigation and post-ligation [*sic*] 'opportunity to inspect.'" (1-ER-162). But there is no such legally recognized distinction, and the court's attempt to create one should be reversed. Indeed, relevant cases involve notices provided *prior* to the commencement of litigation. *See, e.g.*, *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 435–36 (2d Cir. 2001) (notice provided after damage was discovered but request for inspection not made until after lawsuit commenced); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 292 (S.D.N.Y. 2011) (in case involving both pre-litigation and post-litigation notice, pre-litigation notices were sufficient to provide an adequate opportunity to inspect); *Miller*, 801 N.W.2d at 129 (criticizing overly technical notice requirement because it would not "reduce uncertainty" but instead "lead to litigation over how much time and opportunity a custodial party must give to noncustodial parties to inspect the evidence"); *Golke*, 2009 WI 81, ¶ 27 (pre-litigation notices sufficient to discharge duty).

Next, the district court improperly considered whether FPS *subjectively* anticipated litigation when it received Dickinson's notices. In assessing anticipation of litigation, federal case law provides that courts should apply an *objective* standard. *Apple II*, 888 F. Supp. 2d at 990 ("This is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen

45670.0013.15530949.1

litigation.") (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("*Micron II*")); *Milke v. City of Phoenix*, 497 F. Supp. 3d 442, 464 (D. Ariz. 2020), aff'd, No. 20-17210, 2022 WL 259937 (9th Cir. Jan. 27, 2022) (holding that party's "subjective intent may not have been objectively reasonable").

Here, the evidence demonstrates that FPS objectively should have anticipated litigation by the Summer of 2017. On July 13, 2017, Dickinson's attorney sent a letter to FPS, and FPS involved its own outside litigation counsel around the same time. (2-ER-279–81; 6-ER-1589; 6-ER-1702; 6-ER-1706 to 7-ER-1743; 7-ER-1744–1956; 10-ER-2815–17; 10-ER-2834–43.) The parties' attorneys corresponded with each other that month *about Dickinson's damages claims*, and they continued to correspond regarding the dispute for the next several months. (10-ER-2834–45; 10-ER-2849–52; 10-ER-2857–67.) Even FPS's internal communications reveal that it anticipated litigation by, at the latest, the Fall of 2017, as it was internally communicating regarding preparing materials for its lawyer and regarding the legal consequences of Dickinson's damages claim. (10-ER-2853–55).

Third, the district court's pre-litigation and post-litigation distinction is poor policy. Arbitrarily requiring a custodial party to wait to discharge its duty to preserve evidence until *after* filing suit is "neither practical nor fair" because it rewards a party that refuses to inspect evidence and imprudently promotes

45670.0013.15530949.1

additional litigation. *Golke*, 2009 WI 81, ¶ 30. This is especially true under circumstances like here, where preserving the evidence causes ongoing and extensive financial damages to the custodial party, who is faced with the "dilemma" of its competing duties to preserve evidence and to mitigate damages. *See* Collen L. Steffen, *The Duty Dilemma: When the Duty to Mitigate Damages and the Duty to Preserve Evidence Collide*, 71 Okla. L. Rev. 923 (2019).

Fourth and finally, the court implicitly suggested a custodial party cannot discharge its duty to preserve until the non-custodial party first retains a "litigation expert." Case law rejects that position. *See City of Livonia v. Aquatic Renovation Sys., Inc.*, No. 20-10737, 2022 WL 1651655, at *4–*5 (E.D. Mich. May 24, 2022) (rejecting non-custodial party's argument that its pre-litigation inspections of allegedly defective pool liner were insufficient because its retained litigation expert did not conduct the inspections); *State Farm Mut. Auto. Ins. Co. v. BMW of N. Am., LLC*, No. 08-12402, 2009 WL 2447612, at *5 (E.D. Mich. Aug. 7, 2009) (no spoliation sanction appropriate where non-custodial party's electrical engineers did not inspect evidence but where that party attended inspection of subject vehicle).

### C. FAR BEYOND THE MINIMUM LEGALLY-REQUIRED OPPORTUNITY TO INSPECT, FPS ACTUALLY THOROUGHLY INSPECTED THE FREEZER AND REFRIGERATION SYSTEM PRIOR TO DISASSEMBLY.

Contrary to the district court's rulings, the case law holds that a custodial party may discharge its duty to preserve evidence by providing appropriate notice *even where the opposing party fails to inspect that evidence at all. E.g., Golke*,

45670.0013.15530949.1

2009 WI 81, ¶¶ 9–15, 52–58; *Sharp*, 872 F.3d at 42; *City of Livonia*, 2022 WL 1651655, at *4–*5 (no spoliation sanctions merited where non-custodial party's employees inspected the allegedly defective pool and liner before removal); *Kessler*, 2009 WL 2603104, at *15 (discussing that party asserting spoliation inspected the evidence on numerous other occasions and "proffered only speculative assertions that further inspections would have produced a different result").

In the First Circuit's *Sharp* decision, the plaintiff purchaser sued the defendant yacht manufacturer regarding a custom-built yacht's defective "boom" (a part of the sail). 872 F.3d at 36–37. After notifying the defendant, the plaintiff arranged for the boom's repair, but over the next two years, it continued to prove defective and required substantial additional repairs. *Id.* at 37–38. The plaintiff subsequently notified the defendant he intended to replace the boom entirely in approximately three months. *Id.* at 37–38, 41. The defendant inspected the vessel, and the plaintiff made it available for a sea trial, but the sea trial could not proceed because the vessel was unsafe to sail. *Id.* at 41. Before the defendant could reschedule the sea trial, the plaintiff replaced the defective boom, and the defendant moved for severe spoliation sanctions—which were denied. *Id.*

On appeal, the First Circuit affirmed that neither dismissal nor an adverse jury instruction would be appropriate under the circumstances. *Id.* at 42. The court noted that the defendant did not ask to postpone the boom replacement, and it

45670.0013.15530949.1

acknowledged that the defendant had several other opportunities to inspect the boom (and in fact did so) before its removal. *Id.* The court also criticized the defendant's claims of prejudice for failing to specify what further inspection would likely have revealed that prior inspections and alternative evidence did not. *Id.*

Applying these principles here, the district court's decision should be reversed. Dickinson's three notices themselves were sufficient to discharge Dickinson's duty, even if FPS had conducted no inspection at all. But FPS conducted literally *weeks'* worth of testing and data collection regarding the Freezer and the Refrigeration System. Indeed, FPS's engineer Jason Kwok (and other FPS employees) participated in both Engineering Summits and gathered voluminous performance data relating to both the Freezer and the Refrigeration System. (*See* Statement of Case, *supra*, at §§ C–E.) Moreover, FPS's third-party expert James Peterson personally attended the Second Engineering Summit and helped the group develop testing and data-gathering protocols. (*See id.* at § E.) Literally gigabytes' worth of accurate and reliable performance data was gathered during those inspections, in which FPS was integrally involved. (*See id.*; *see also* 4-ER-824–74; 4-ER-882; 4-ER-895–97.)

The district court's spoliation orders should be reversed on the sufficiency of Dickinson's advance notices to FPS of the Freezer's removal alone. But even setting the notice issue aside, FPS's extensive pre-disassembly inspections demonstrate that it had an adequate opportunity to inspect the evidence,

30

foreclosing any finding of spoliation.

## II.   THE DISTRICT COURT'S SPOLIATION SANCTION SHOULD BE REVERSED.

The district court erred in issuing the reversibly harsh Jury Instruction as a sanction. First, the court erred in paradoxically ruling that Dickinson's case would not be dismissed (based on a correct finding that Dickinson did not act in bad faith), that the Jury Instruction was not case-terminating, and that Dickinson would be allowed to present its evidence to the jury—while also issuing a non-rebuttable jury instruction that required the jury to find against Dickinson, that precluded Dickinson from ever succeeding on any of its claims, and that ultimately became the basis for the court granting summary judgment against Dickinson. Second, under well-established federal law, a case-terminating sanction is impermissibly harsh under the circumstances of this case.

### A.   THE JURY INSTRUCTION IS VAGUE, ILLOGICAL, AND PRESENTS AN UNRESOLVABLE PARADOX.

The Jury Instruction expressly uses the term "Parties' Agreement," (1-ER-207), but the district court did not define that term or make specific findings of fact as to the full scope of the parties' bargain. It is unclear whether the court intended the term "Parties' Agreement" to mean only the parties' written "Order Confirmation" (which does not contain a merger or integration clause, or all of the terms of the parties' bargain), or to comprise, more broadly, *every* term of the parties' bargain.

45670.0013.15530949.1

If the court intended "Parties' Agreement" to encompass every provision of the parties' bargain, including those not documented in the Order Confirmation, then the necessary result of the Jury Instruction was to terminate Dickinson's case. If the Jury Instruction precluded Dickinson from presenting evidence of the Freezer's performance failures, then Dickinson could not possibly prevail at trial because its theory of the case was that FPS breached the parties' agreement by providing a Freezer incapable of performing to the promised specifications. *See Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) (affirming that a non-rebuttable instruction would be inappropriately "tantamount to the entry of judgment"); *Nutrition Distrib. LLC v. PEP Research, LLC*, 16CV2328-WQH-BLM, 2018 WL 6323082, at *5 (S.D. Cal. Dec. 4, 2018) (citing *Flagg* and holding consequences of proposed jury instruction would be "tantamount to entry of judgment"). On the other hand, if the court intended "Parties' Agreement" to mean only the written "Order Confirmation," and if the court further intended to allow Dickinson to introduce evidence to the jury that FPS breached the promise that the Freezer would operate continuously for 20–22 hours/day, Dickinson could potentially still succeed on its claims.

The lack of clarity on this issue is central to the case, as the court's imprecision caused Dickinson to struggle literally for years to understand and adapt to the sanction imposed. For instance, Dickinson has always maintained that the parties' bargain consists of, at minimum, the Order Confirmation *and* the

January 2016 email from FPS's Mr. Lai promising the Freezer would operate continuously for 20–22 hours/day. However, when Dickinson sought clarification, the court erroneously (and *sua sponte*) held that the parol evidence rule barred Dickinson from introducing the email containing the "20–22 hours/day" promise. (1-ER-156). But the CISG, which governs Dickinson's claims, simply does not recognize the parol evidence rule and instead allows the parties to prove the terms of an agreement using *any* admissible evidence, including secondary written evidence or oral testimony. *See MCC-Marble Ceramic Ctr., Inc., v. Ceramica Nuova d'Agostino, S.p.A.*, 144 F.3d 1384, 1389 (11th Cir. 1998) (reversing trial court's grant of summary judgment where it excluded parol evidence in interpreting a contract governed by the CISG); CISG Advisory Council Opinion No. 3, Plain Meaning Rule, Contractual Merger Clause and the CISG, 17 Pace Int'l L. Rev. 61 (2005) (available at https://digitalcommons.pace.edu/pilr/vol17/iss1/3/) (stating that parol evidence rule does not apply to contracts under the CISG). Accordingly, the court committed reversible error in applying the parol evidence rule to bar Dickinson from introducing the promise that the Freezer would operate continuously for 20–22 hours/day.

The district court also repeatedly held, improperly, that Dickinson "waived" any argument that the parties' contract included the term that the Freezer would operate continuously for 20–22 hours/day, on the basis that the claim "was first raised in Dickinson's Reply brief in support of reconsideration, and was never

substantively addressed in the briefing on the Motion for Sanctions." (1-ER-156; *see also* 1-ER-51–53.) This finding is factually clearly erroneous.[13]

In fact, Dickinson expressly contended in its *original opposition* to FPS's motion for sanctions that FPS breached the contract by providing a Freezer incapable of operating continuously for 20–22 hours/day. (11-ER-3086 (describing Justin Lai's email as representing that the "Freezer could operate for at least 20–22 hours in succession"); 11-ER-3131–32.) Further, the court was certainly aware of Dickinson's position on this issue, given that in its First Order (i.e., ruling upon Dickinson's *original opposition*), the court expressly recognized that "***Dickinson also claims the FPS Freezer could only run for 6 hours or less at a time (<u>when it was intended to run for 20–22 hours per day</u>) and suffered from excessive ice and frost buildup.***" (1-ER-171 (emphasis added).)[14]

---

[13] Moreover, as a matter of law, Dickinson could not have "waived" the right to assert that FPS promised performance of 20–22 hours/day, because a substantive waiver occurs only where a party intentionally relinquishes or abandons a known right or privilege, and the record does not support that Dickinson intentionally relinquished or abandoned that position. *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."); *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011 (9th Cir. 2023) ("contractual waiver generally requires an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished[.]" (internal quotation omitted)).

[14] This error was compounded when the court ignored that Dickinson also raised the issue in its *opening* brief on its motion for reconsideration (10-ER-2779; 10-ER-2783; 10-ER-2800) and then further compounded when subsequent decisions repeated the same error. (1-ER-50.)

In sum, these flawed legal rulings contributed to the problem that there is simply no way to interpret the Jury Instruction in a practically workable manner that does not then also paradoxically result in a *de facto* termination of Dickinson's case. The court's vague and confusing reference to the "Parties' Agreement" was not properly predicated on valid factual findings, its application of the parol evidence rule in this CISG case was incorrect as a matter of law, and it erred in holding Dickinson "waived" its argument that FPS promised the Freezer would operate continuously for 20–22 hours/day. Any of these errors individually warrants reversal, but the cumulative error of all of them ultimately resulted in the Jury Instruction becoming an improper *de facto* case-terminating sanction.

**B. UNDER BINDING NINTH CIRCUIT LAW, CASE-TERMINATING SANCTIONS ARE IMPROPER ABSENT A CULPABLE STATE OF MIND AKIN TO BAD FAITH.**

In the Ninth Circuit, case-terminating spoliations are impermissible unless the court finds that the spoliating party destroyed the evidence with "willfulness, fault, or bad faith." *Leon*, 464 F.3d at 958; *see also Pettit v. Smith*, 45 F. Supp. 3d 1099, 1112–1113 (D. Ariz. 2014) (discussing controlling precedent and concluding "case-terminating sanctions require conduct akin to bad faith" and that "negligence or intentional-but-innocent conduct normally will not justify case-ending orders.") In the spoliation context, "willfulness" does not mean merely volitional or purposeful conduct (as in criminal law and certain intentional torts); rather, the spoliating party must have acted with the specific "intent to gain a

litigation advantage by destroying material evidence." *MDB Trucking, LLC v. Versa Prod. Co., Inc.*, 136 Nev. 626, 632, 475 P.3d 397, 404 (2020) (reversing trial court's case-terminating sanction for relying on criminal law "willfulness" standard of merely volitional conduct instead of requiring an intent to deprive the other party of material evidence).[15]

Applying these standards here, the district court correctly found that Dickinson disassembled the Freezer from a good-faith desire to mitigate damages and did not act in bad faith. (1-ER-203.) Accordingly, under applicable law, if the Jury Instruction was a case-terminating sanction then it must be reversed.

### C.   THE JURY INSTRUCTION IMPERMISSIBLY TERMINATED DICKINSON'S CASE.

#### 1.   *In three separate orders, the district court stated the Jury Instruction was not case-terminating.*

Among the most glaring errors in this case is that on multiple occasions the district court held that the Jury Instruction was not case-terminating and Dickinson would be able to present evidence at trial, while with the same stroke of a pen conflictingly imposing a "non-rebuttable" and mandatory jury instruction that

---

[15] As of 2015, Federal Rule of Civil Procedure 37(e), governing sanctions for failure to preserve electronically stored information, authorizes case-terminating sanctions "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation[.]" Significantly, district courts within the Ninth Circuit have held that the post-2015 Rule 37(e)'s *scienter* requirement affects the applicability or ongoing validity of pre-2015 decisions. *See, e.g., Sherwood v. BNSF Ry. Co.*, No. 2:16-CV-00008-BLW, 2019 WL 1413747 (D. Idaho Mar. 28, 2019).

effectively required the jury to find against Dickinson on all its claims. (1-ER-198–99; 1-ER-204–06.) This irreconcilable paradox ultimately resulted in the court (by a different judge) holding that Dickinson could not introduce any evidence to avoid summary judgment and could not proceed to trial because of the consequences of the Jury Instruction. (1-ER-7–12.) That is clear reversible error.

In its First Order, the court found that Dickinson did *not* act in bad faith or "mount[] a knowing and concerted effort to destroy the FPS Freezer" and that a "drastic" sanction would therefore be inappropriate. (1-ER-203–05; 1-ER-208.) In the Second Order, the court reiterated that a "less harsh sanction than full dismissal was appropriate," that Dickinson "did not act in bad faith," and that the Jury Instruction "is not tantamount to dismissal." (1-ER-124; 1-ER-154–59.) But the court then "reject[ed]" the position that a non-rebuttable presumption ended Dickinson's case. (1-ER-157.)

In the Third Order, the court *again* said the Jury Instruction was not a case-terminating sanction and did not bar Dickinson from introducing evidence at trial, before reiterating that both FPS and Dickinson would be allowed to present evidence regarding the performance of the Freezer and Refrigeration System to the jury.[16] (1-ER-110–11.)

---

[16] FPS did not appeal any of these issues.

### 2. *Every attempt by Dickinson to resolve the inherent paradox of the Jury Instruction was rebuffed.*

Dickinson moved the court to reconsider or clarify the paradox between the First Order and the language and scope of the Jury Instruction. While FPS's spoliation motion was pending, discovery remained open and, with the court's knowledge, Dickinson continued gathering evidence. After the First Order, Dickinson asked the court to reconsider the decision upon an expanded factual record or on the basis of a manifest injustice arising from a clear error of law. (8-ER-2221–34; 8-ER-2261–86; 10-ER-2770–2904; 10-ER-2692–2769.) The court refused to consider Dickinson's evidence, improperly applying the strict requirements of Federal Rule of Civil Procedure 59(e). (1-ER-118–66). That ruling was particularly erroneous given that the court also shifted the burden of proof from FPS being obligated to demonstrate its prejudice to Dickinson being required to disprove any material prejudice, but it then refused to consider Dickinson's admissible evidence to meet that burden. (1-ER-196; 1-ER-151–53.)

The court also erroneously denied Dickinson leave to amend its pleading to try to resolve the paradox. The Second Order acknowledged that "the Sanctions Order allowed Dickinson the opportunity to amend." (1-ER-157.) Dickinson accordingly moved for leave to amend its Complaint. (8-ER-2190–92.) But the district court erroneously denied that motion. (1-ER-29–67.) First, the court (through a reassigned visiting judge) held that the earlier decision holding that Dickinson's 20–22 hour/day run-time theory was barred by the parol evidence rule

meant that Dickinson could not amend its pleadings to specifically allege such a theory. (1-ER-34–36; 1-ER-56.) But as noted, the CISG does not bar parol evidence. Second, the court erred in holding that Dickinson's motion to amend was a bad faith and improper attempt to "circumvent" the Jury Instruction. (1-ER-29; 1-ER-50; 1-ER-56.) Dickinson, however, was merely trying to chart a path between the court's rulings and the Jury Instruction's language and scope. Third, the court erred in holding that Dickinson's motion for leave to amend was untimely under Federal Rule of Civil Procedure 16(b), even though Dickinson had filed its motion by the scheduling order's deadline. These errors meant that Dickinson's motion was not "futile," as the court incorrectly held. (1-ER-53–58.) (*Compare* 1-ER-60 *with* 8-ER-2215–16 *and* 8-ER-2193–2214.) The court's errors on these motions compounded the original errors in the spoliation rulings and contributed to an improper spoliation sanction.

Ultimately, the district court granted summary judgment to FPS on all of Dickinson's claims due to its interpretation of the Jury Instruction's consequences. Specifically, and contrary to the earlier rulings in the First, Second, and Third Orders, the court held that the Jury Instruction foreclosed Dickinson from presenting any evidence that FPS breached the parties' contract. (1-ER-7; 1-ER-11–12.) ("The jury instruction decides the issue."). The court refused to consider the abundance of admissible evidence Dickinson introduced into the record to oppose summary judgment that would have, at minimum, created a triable question

of fact on its breach of contract claim against FPS. (*Compare id. with* 2-ER-382 to 3-ER-654; 3-ER-698 to 6-ER-1648 (Dickinson's factual proof regarding triable questions filed with the district court in opposition to FPS's motion for summary judgment).) As such, and notwithstanding the repeated admonitions that the Jury Instruction was not case-terminating, the case was eventually terminated *based expressly on the Jury Instruction*. In light of the undisputed finding that Dickinson's disassembly of the Freezer was not in bad faith, it was therefore an improper sanction. Ninth Circuit law does not allow the sanction or the summary judgment to stand.

### D. REGARDLESS, THE "NON-REBUTTABLE" AND "MANDATORY" JURY INSTRUCTION WAS NOT THE LEAST HARSH SANCTION AVAILABLE TO CURE THE PURPORTED PREJUDICE.

Federal law is well-established that a spoliation sanction should be no "greater than necessary to cure the prejudice." *See* FED. R. CIV. P. 37(e)(1); *Apple II,* 888 F. Supp. 2d at 992 ("Courts should choose 'the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim.'")[17] (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)). A case-terminating sanction is a harsh remedy that should be imposed only in extraordinary circumstances where no alternative or less drastic

---

[17] The language of the Jury Instruction is substantively identical to the language proposed by FPS and which FPS disingenuously characterized as the "least severe of the available spoliation sanctions" that would "not fully cure [FPS's] prejudice,

sanction would suffice. *Id.* at 993.

Upon finding spoliation, courts in the Ninth Circuit generally consider three factors in issuing an appropriate sanction: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Id.* at 992 (citation omitted). The sanction imposed by the court here was impermissible under this test.[18]

As discussed *supra*, the court found that Dickinson's removal of the Freezer was not in bad faith and, therefore, "a less harsh sanction than dismissal is appropriate." (1-ER-203–05.) Thus, under the test enunciated in *Apple II*, the first factor does not favor a harsh sanction. The remaining factors require more thorough discussion, in light of the court's errors on these issues.

1. ***The district court erred in evaluating the degree to which FPS was prejudiced by the Freezer's disassembly.***

Under federal law, the prejudice prong of a spoliation inquiry is designed to assess the potential harm to the non-custodial party's ability to go to trial or interference with the rightful decision of the case. *U.S. for Use and Ben. of Wiltec Guam, Inc. v. Kahaluu Const. Co., Inc.*, 857 F.2d 600, 604 (9th Cir. 1988). A case-

---

but [would] at least puts FPS on a slightly more level playing field[.]" (12-ER-3416.)

[18] The district court did not apply this test, which has not been adopted by the Ninth Circuit. The Court is invited to adopt this (or some other) test to give guidance to district courts and litigants in this area.

terminating sanction for spoliation is only justified where the prejudice is "extraordinary" and completely denies the non-spoliating party the ability to adequately litigate its case. *S.E.C. v. Mercury Interactive LLC*, 3:07-CV-02822-WHA, 2012 WL 3277165, at *9 (N.D. Cal. Aug. 9, 2012). The party seeking spoliation sanctions must prove prejudice with "plausible, concrete suggestions" as to how the lost evidence would have been unfavorable to the spoliating party, and mere vague, generalized, or speculative allegations of prejudice are insufficient to demonstrate substantial prejudice. *Sharp*, 872 F.3d at 41 (criticizing non-custodial party's "vague" and "generalized" allegations that it suffered prejudice when it failed to explain what evidence an additional inspection would have revealed that it could not glean from secondary evidence); *Schmid*, 13 F.3d at 80 ("While Electric Tool speculates that an earlier examination of the saw might have provided some evidence helpful to it on the causation issue, it has not come forward with plausible, concrete suggestions as to what that evidence might have been.").

Here, the court made several independent errors in its analysis of prejudice, including by improperly (1) shifting the burden of proof; (2) crediting vague and conclusory allegations that were disproven by the evidence; and (3) ignoring the abundance of relevant data available to FPS. More fundamentally, it erred by issuing a Jury Instruction far broader than the degree of prejudice allegedly suffered by FPS or established by the evidence.

45670.0013.15530949.1

a) **The district court erred in shifting the burden of proof on prejudice from FPS to Dickinson and in not applying a "clear and convincing evidence" standard.**

The court erred in expressly shifting the burden of proof on FPS's motion for sanctions from FPS being required to prove prejudice to Dickinson being required to *disprove* prejudice. (1-ER-151–53; 1-ER-196.) Such a rule has not been and should not be recognized by this Court, and the federal decisions suggesting such a rule are of dubious validity. The court primarily relied upon *Apple II*, 888 F. Supp. 2d at 998, in shifting the burden of proof from FPS to Dickinson. However, the authority relied upon in *Apple II* for the burden-shifting principle, *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006) ("*Hynix I*"), is of questionable applicability, if not outright overturned or modified.

*Hynix I* cites no legal authority for its assertion that "if spoliation is shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation." *Id.* On appeal, the U.S. Court of Appeals for the Federal Circuit, exercising its direct appellate jurisdiction over patent claims, reversed and vacated the sanction decision. *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336 (Fed. Cir. 2011) ("*Hynix II*"). The *Hynix II* court noted it was simultaneously deciding a "companion case" involving overlapping facts, *Micron II*, including related spoliation claims against the same party in a separate action pending in the U.S. District Court for the District of Delaware. *Compare Hynix II*, 645 F.3d at 1354 (noting that on remand the district court should apply *Micron II*),

43

*with Micron II*, 645 F.3d at 1315 (discussing *Hynix II*). The *Hynix II* court expressly held that the case was "remanded for reconsideration of the spoliation issue <u>under the framework set forth in *Micron II*</u>." *Hynix II*, 645 F.3d at 1355 (emphasis added).

In *Micron II*, the Federal Circuit held that shifting the burden to show prejudice is only appropriate "[i]f it is shown that the spoliator acted *in bad faith*[.]" 645 F.3d at 1328 (emphasis added). The *Micron II* court also relied on the Third Circuit's decision in *Schmid*, 13 F.3d at 80, in holding that bad faith is assessed by whether the custodial party altered or destroyed evidence with the intent "to impair the ability of the potential defendant to defend itself." *Id.* at 1326.

On remand, the district court further clarified the standard the Federal Circuit handed down in *Micron II*:

> If the spoliation was not done in bad faith, then the burden lies with the non-spoliating party to show prejudice. On the other hand, if the spoliation was done in bad faith, the burden shifts to the spoliating party to show lack of prejudice.

*Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 319 (D. Del. 2013) ("*Micron III*").

Thus, in context, *Hynix I*'s suggestion that the burden of proof may shift to the custodial party upon a mere showing that spoliation occurred (i.e., a knowing failure to sufficiently preserve relevant evidence despite a duty to do so) was overruled or called into serious question by *Micron II* and *Micron III*. Instead, a

court may *only* shift the burden of proof onto the custodial party upon expressly finding that the party destroyed evidence *with the bad-faith intent to deprive the other party of evidence*. *Micron II*, 645 F.3d at 1328; *Micron III*, 917 F. Supp. 2d at 319. But here, the district court *expressly found* that Dickinson did *not* act in bad faith. (1-ER-203.) Accordingly, it was reversible error for the court to shift the burden of proof to Dickinson to disprove prejudice.

Given the unjust result of the district court's burden-shifting, this Court should also take this opportunity to formally adopt the standard applied in other federal courts that a case-terminating sanction cannot be imposed absent *clear and convincing* evidence of both bad faith and prejudice. *See Micron II*, 645 F.3d at 1328–29; *Garcia v. Vitus Energy, LLC*, 600 F. Supp. 3d 975, 983 (D. Alaska 2022). Such a precedent would help guide district courts and prevent the kinds of errors that occurred in this case.

>    **b)** **FPS's allegations of prejudice were vague, conclusory, and disproven by the evidence.**

FPS has never adequately shown what evidence it requires but cannot now obtain; instead it relied on vague or generalized allegations of prejudice. The record does not substantiate these allegations, and the court erred by finding FPS was significantly prejudiced.

The First Circuit's decision in *Sharp* is again relevant here. The *Sharp* court criticized the defendant's "vague reference to the generalized prejudice it suffered from being 'precluded from presenting a valid defense'" because the defendant

45670.0013.15530949.1

failed to provide a sufficient explanation of what it could have discovered from further inspections that could not be gleaned from its prior inspection or alternative evidence. 872 F.3d. at 42. *See also Brackett v. Walmart Inc.*, No. 20-CV-01304-KLM, 2021 WL 1749975, at *3 (D. Colo. May 4, 2021) ("The burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause."); *Herrmann v. Rain Link, Inc.*, No. 11-1123-RDR, 2013 WL 4028759, at *3 (D. Kan. Aug. 7, 2013) ("the moving party has the burden to demonstrate actual prejudice rather than theoretical prejudice.") (citing *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1150 (10th Cir. 2009)).

Like in *Sharp* and the other cited cases, FPS's assertions of prejudice were extraordinarily vague. In essence, FPS argued that Dickinson's disassembly of the Freezer prevented its purported "litigation expert" Eduardo Ford from conducting his own tests on the Refrigeration System while the Freezer was installed, which FPS claimed was inherently prejudicial. But this cannot be a sufficient basis to demonstrate prejudice because, if that were the law, severe prejudice *would always exist* anytime evidence has been lost or altered.

Instead, the law required FPS to make a *specific showing* of what the lost evidence would have been likely to show that would be helpful to FPS. But it never made such a showing. Instead, it suggested merely Mr. Ford's testing *might*

45670.0013.15530949.1

have yielded helpful data, without any foundation or explanation as to how this hypothetical data would have been likely to show that the Refrigeration System was not working properly. (*See* 12-ER-3407; 14-ER-3806–07.) The court erred in accepting FPS's generalized theory of prejudice without requiring it to explain scientifically or even rationally how Mr. Ford's "new performance data" could possibly be materially different than the vast quantities of accurate and reliable data gathered during earlier investigations by qualified engineering professionals— including FPS's own in-house and third-party engineers. (1-ER-153; 1-ER-197– 99.) That decision should be reversed.

Moreover, the district court erroneously refused to consider Dickinson's evidence that Mr. Ford substantially contradicted himself regarding FPS's purported prejudice. For instance, inconsistent with his prior declaration, Mr. Ford testified at his deposition that he was unaware of the existence of a remarkable quantity of existing performance data from the Freezer and Refrigeration System gathered during prior inspections, apparently because FPS's counsel never gave it to him. (*See* 9-ER-2372; 9-ER-2522–25; 9-ER-2528–2532; 9-ER-2575 to 10-ER-2691; 10-ER-2890–2904; 14-ER-3803–31.) In addition, Mr. Ford declared that he could not rely on prior data without knowing whether the sensors that obtained the data were properly calibrated, but he later admitted there was no reason to believe that any data was inaccurate due to calibration issues, and the evidence affirmatively shows that the equipment used *was* highly calibrated. (*Compare* 9-

47

ER-2406–07, 9-ER-2436–39, 10-ER-2890–2904, *and* 14-ER-3803–31 *with* 4-ER-825–27, 4-ER-838–41, 4-ER-843–44, 4-ER-853–54, 4-ER-860–64, 4-ER-874, 4-ER-890, 4-ER-893–97, 4-ER-901–2, 6-ER-1417–21, 6-ER-1426–27, 6-ER-1429–31, 6-ER-1434, 6-ER-1448–50, 6-ER-1454, 6-ER-1456–1458, 14-ER-3644–51, *and* 14-ER-3676–78.) In addition, Mr. Ford took the unreasonable position that the data was useless if not properly calibrated, while a more reasonable approach would have been to evaluate the existing data and apply a margin of error, if necessary, based on a potential lack of calibration. (*Compare* 9-ER-2438–39, 10-ER-2890–2904, and 14-ER-3803–31 *with* 4-ER-899–902.) Perhaps most significantly, Mr. Ford could not identify a *single test* that he would have performed in his proposed inspection that had not already been performed during the prior inspections. (*See* 9-ER-2393–97; 9-ER-2434–35; 9-ER-2442–45; 10-ER-2890–2904; 14-ER-3803–31.) This evidence seriously called into question whether FPS was prejudiced *at all*, regardless of where the burden lies. Yet the district court categorically refused to consider it. (1-ER-3–28.)

The *scope* of the Jury Instruction also goes far beyond the purported prejudice FPS suffered from Mr. Ford's inability to investigate the *Refrigeration System* by giving FPS the windfall of a conclusive finding that the *Freezer* functioned properly. The district court correctly described as an affirmative defense FPS's theory that the Freezer's failure to achieve throughput capacity was due to defects in the Refrigeration System. (1-ER-20–22.) Yet, FPS's primary

45670.0013.15530949.1

prejudice argument was that its *refrigeration engineering expert* Mr. Ford was unable to test the Refrigeration System (i.e., that FPS was purportedly prejudiced in mounting its *affirmative defense* that the Refrigeration System did not work). (12-ER-3394 to 13-ER-3558; 14-ER-3803–31.) While FPS never articulated its prejudice adequately, FPS apparently convinced the court that *had* Mr. Ford been allowed to conduct his own tests of the Refrigeration System, Mr. Ford's tests would have shown that the Refrigeration System was not capable of producing the contractually-specified 210 TR in Cooling Capacity. (1-ER-169–209; 12-ER-3394 to 13-ER-3558; 14-ER-3803–31.)

Yet, the Jury Instruction goes far beyond telling the jury merely to presume (conclusively) that FPS could have shown that the Refrigeration System was not functioning properly; instead, it improperly and far more broadly *mandates* a finding that the *Freezer* "was capable of performing at the levels specified by the Parties' Agreement." (1-ER-207.) Thus, the scope of the Jury Instruction goes well beyond remedying the purported prejudice to FPS in asserting its theory that the *Refrigeration System* did not work properly and instead impermissibly gives FPS a windfall of the jury being required to find that the *Freezer* worked correctly, a theory upon which FPS *never* claimed prejudice and as to which it introduced *zero* evidence of prejudice.

This is particularly egregious when looking at other undisputed facts of the case. Mr. Ford admitted that he is a refrigeration expert, *not a freezer design*

*expert*, and that he had not reached any opinions regarding whether FPS's design of the Freezer was adequate. (9-ER-2323–24; 9-ER-2494–95; 14-ER-3803–31.) However, Dickinson introduced substantial evidence, including evidence from its freezer design expert Charles Taylor, that the Freezer's design inherently meant that it would never have been able to achieve the specified throughput capacity *regardless* of the performance capabilities of the Refrigeration System. (3-ER-794–96; 3-ER-807; 4-ER-813–23; 4-ER-887–88; 4-ER-897–99; 4-ER-902–03.) FPS never disclosed any expert witness to opine on Mr. Taylor's design defect opinions. (4-ER-823; 4-ER-887–88.)

Furthermore, Mr. Taylor testified that no tests were necessary for him to reach his design defect opinions, and that such opinions could be reached (or challenged) based on the sufficiency of the Freezer's designs and schematics alone. (4-ER-887–88.) Accordingly, any prejudice to FPS from not being able to investigate the Refrigeration System is disconnected from defending Dickinson's design defect theory. In other words, the court relied on the prejudice FPS asserted regarding its purported inability to prove the Refrigeration System did not work properly (an affirmative defense), but it then issued the improper and overly broad Jury Instruction mandating the jury find that the *Freezer* worked properly—conclusively foreclosing Dickinson's claims, including on its design defect theory. This was reversible error.

45670.0013.15530949.1

      c)     **The abundance of data available to FPS, most of which it was actively involved in gathering, precludes a finding of prejudice.**

The existence of secondary and alternative evidence may reduce the prejudice caused by the loss of primary evidence. *E.g., Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.,* 306 F.3d 806, 825 (9th Cir. 2002) (purported prejudice from loss of medical slides ameliorated by secondary evidence); *Sharp*, 872 F.3d at 42 (alternative evidence of photographs and other measurements of vessel's defective boom supported not issuing drastic spoliation sanction); *Schmid*, 13 F.3d at 79–80 (3d Cir. 1994) (photographs of saw as it existed prior to disassembly ameliorated purported prejudice).

Here, an abundance of accurate and reliable data exists regarding the performance of the Freezer and the Refrigeration System, substantially ameliorating any prejudice to FPS. For instance, just limiting the discussion to the First and Second Engineering Summits, well-qualified engineers from Kemper, Nestlé, Colmac, and FPS itself (including its third-party refrigeration engineer, James Peterson) utilized well-calibrated and reliable data-gathering sensors and instruments to collect literally gigabytes worth of digital performance data regarding the performance of the Freezer and the Refrigeration System, and those inspections also led to extensive photographs and written reports. (4-ER-825–27; 4-ER-829–30; 4-ER-839; 4-ER-841; 4-ER-850–51; 4-ER-856–68; 4-ER-871; 4-ER-874; 4-ER-879; 4-ER-882–83.) There is absolutely no logical or valid

scientific or engineering reason why FPS cannot rely on that data to completely ameliorate the purported prejudice from not being able to inspect the Freezer after its disassembly. Nor has FPS ever provided any reasonable explanation why Mr. Ford cannot rely on this testing data in assessing whether the Refrigeration System was functioning properly.

**2.** ***The district court's sanction was unduly harsh, as a lesser sanction than the Jury Instruction would avoid substantial unfairness to FPS.***

As discussed in Argument § II(A), *supra*, a mandatory and non-rebuttable jury instruction *requiring* the jury to deem dispositive facts or issues admitted is tantamount to the entry of judgment and akin to issuing the highest sanction reserved only for bad faith. Under the circumstances, the most severe sanction the district court should have issued here was a permissive and rebuttable jury instruction. This conclusion is illustrated by the *Apple II* case cited herein. In *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132 (N.D. Cal. 2012), the magistrate court ordered, as a spoliation sanction, a jury instruction containing a mandatory presumption and a non-rebuttable finding that the spoliating party failed to preserve evidence. On appeal to the district court, the magistrate's instruction was overturned as too harsh. *Apple II*, 888 F. Supp. 2d at 995.

The *Apple II* court held that the non-spoliating party's prejudice was "not particularly strong" due to the availability of a massive volume of secondary and alternative evidence. *Id.* at 994. Accordingly, the court held that the non-spoliating

45670.0013.15530949.1

party "'should have been able to glean' much material evidence 'from the documents actually produced, the extensive deposition testimony, and the written discovery between the parties.'" *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010)). Thus, the *Apple II* court concluded that the non-custodial party had not made a sufficient showing of prejudice to warrant such a strong adverse instruction that it could possibly result in a "determinative" jury ruling against the spoliating party on all issues in the case; accordingly, it modified that instruction to a less-harsh and merely permissive instruction. *Id.*

Here, as in *Apple II*, there is a voluminous amount of secondary evidence regarding the performance of the Freezer and Refrigeration System that FPS can rely on to mitigate any purported prejudice it suffered. Thus, in *Apple II's* terms, it is "difficult to conclude that [FPS's] 'ability to go to trial' was significantly hampered where discovery in this case has been so voluminous." *Apple II*, 888 F. Supp. 2d at 994. Accordingly, assuming that any spoliation sanction is even merited in the first instance, this Court should reverse the trial court's Jury Instruction and remand the matter to impose a more appropriate sanction. For instance, the record may support a permissive instruction that does not preclude Dickinson from presenting its evidence and that limits FPS's purported prejudice to its affirmative defense regarding the Refrigeration System (not the Freezer's *design*).

## III. THE DISTRICT COURT ERRED IN AWARDING FEES AND COSTS TO FPS ON ITS DISCOVERY MOTION.

On August 8, 2019, FPS moved for a protective order regarding the depositions Dickinson had noticed of Colmac's employees, arguing that Dickinson had exceeded the default-maximum ten depositions allowed under Federal Rule of Civil Procedure 30(a)(2)(A)(i) and arguing (for the first time, and having never "met and conferred" regarding the objection) that FPS was not provided the fourteen-days' notice of these depositions specified under Rule 32(a)(5)(A). Dickinson opposed the motion and moved for leave to exceed the ten-deposition limit. (10-ER-2905 to 11-ER-2919; 11-ER-2924–3052.) On June 15, 2021, the Court ruled on these motions, denying FPS's motion in relation to Dickinson allegedly exceeding the ten-deposition limit but granting FPS's motion on the issue that Rule 32(a)(5)(A)'s 14-day notice requirement was mandatory and required strict compliance. (1-ER-68–117.) The court awarded FPS $36,181.50 in attorneys' fees and $2,152.18 in costs pursuant to Rule 37(a)(5)(A) as a discovery sanction. (*Id.*) This Court should vacate the award of fees and costs for three reasons.

First, contrary to the court's finding, FPS filed its motion without first conferring with Dickinson's counsel regarding its fourteen-day notice objection. Pursuant to Rule 37(a)(5)(A)(i), a district court *must* not order an award of attorneys' fees, if "the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action[.]" FPS's counsel did not raise with Dickinson's counsel the insufficient notice objection or request to

postpone the Colmac depositions, instead raising the issue *for the first time* in FPS's motion. (7-ER-1958; 11-ER-2953.) FPS thus failed to comply with Rule 37(a)(5)(A)(i), and the court's decision to the contrary should be reversed. *See Santiago v. Select Portfolio Servicing*, No. CV 07-262-S-EJL, 2008 WL 130922, at *2 (D. Idaho Jan. 10, 2008) (denying fees under Rule 37(a)(5) for issues that the moving party failed to raise in a meet and confer conference before filing a motion).

Second, the court erred in holding that Rule 32(A)(5)(A)'s fourteen-day notice obligation for third-party depositions *mandates* exclusion and that the court had no discretion in deciding whether or not to allow the depositions to stand under the circumstances. (1-ER-81–84.) While this Court has not ruled on the issue, the weight of authority and the better rationale is that, like most matters involving discovery, the district court has discretion under Rule 32(a)(5)(A) to allow the discovery and the rule does not mandate the exclusion of short-noticed depositions. *See Mezu v. Morgan State Univ.*, CV WMN-09-2855, 2014 WL 12734011, at *1 (D. Md. May 13, 2014); *Landis v. Galarneau*, 2:05-CV-74013, 2010 WL 446445, at *2 (E.D. Mich. Jan. 28, 2010).

Third, given that Dickinson cited case law supporting its position that Rule 32(a)(5)(A) is discretionary, the district court erred in holding that under Rule 37(a)(5)(A)(ii), Dickinson's opposition to the motion was not substantially justified. *See Ulrich v. Schweiker*, 548 F. Supp. 63, 65 (D. Idaho 1982).

45670.0013.15530949.1

Accordingly, the district court's award of attorneys' fees and costs to FPS was in error and should be reversed.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's decision finding spoliation should be reversed. In the alternative, the district court's decision on spoliation sanctions should be reversed, as should its decisions denying reconsideration, denying leave to amend, and granting FPS summary judgment, as well as the final judgment entered thereon. This Court should also vacate the district court's award of attorneys' fees and costs to FPS.

DATED THIS 1st Day of March 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP


By /s/ Dane A. Bolinger
    Dane A. Bolinger, ISB No. 9104
    Attorneys for Defendants Dickinson
    Frozen Foods, Inc.

45670.0013.15530949.1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 22-35832

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature /s Dane A. Bolinger     Date March 1, 2023**
*(use "s/[typed name]" to sign electronically filed documents)*

57

45670.0013.15530949.1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-33832

I am the attorney or self-represented party.

**This brief contains <u>13,472</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature /s/ Dane A. Bolinger**      **Date March 1, 2023**
*(use "*s/[typed name]*" to sign electronically filed documents)*

45670.0013.15530949.1

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

**9th Cir. Case Number(s)**:   __22-33832__

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

not applicable

**Description of Document(s)** *(required for all documents)***:**

APPELLANT'S OPENING BRIEF

**Signature** /s/ Dane Andrew Bolinger **Date:** March 1, 2023

45670.0013.15530949.1