Case No. 22-35832

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

DICKINSON FROZEN FOODS, INC.,

Plaintiff-Appellant,

v.

FPS FOOD PROCESS SOLUTIONS CORPORATION,

Defendant-Appellee.

---

On Appeal from the United States District Court, District of Idaho
M. Miller Baker, District Judge, Case No. 1:17-CV-00519-MMB

---

# APPELLEE'S ANSWERING BRIEF

---

Elijah M. Watkins, ISB No. 8977
Email: *elijah.watkins@stoel.com*
W. Christopher Pooser, ISB No. 5525
Email: *christopher.pooser@stoel.com*
STOEL RIVES LLP
101 S. Capitol Blvd, Ste 1900
Boise, Idaho 83702
T: (208) 389-9000
F: (208) 389-9040

Attorneys for Appellee FPS Food Process
Solutions Corporation

118596564.7 0054388-00005

## CORPORATE DISCLOSURE STATEMENT

FPS Food Process Solutions Corporation is a Canadian professional corporation with its principal place of business in Richmond, British Columbia, Canada. No publicly held corporation owns 10% or more of its stock.

DATED:  April 28, 2023.

STOEL RIVES LLP


/s/ *W. Christopher Pooser*
Elijah M. Watkins
W. Christopher Pooser

Attorneys for Appellee FPS Food
Process Solutions Corporation

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES .................................................................. vi

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION...............................................................2

ISSUES PRESENTED FOR REVIEW ............................................................2

STATEMENT OF THE CASE...................................................................3

I.      Dickinson, FPS, and their contract for an industrial tunnel freezer. ...............3

II.     Problems with the freezer and refrigeration system. ......................................5

    A.      After the freezer and refrigeration system were installed,
       Dickinson was not satisfied with the freezer's performance. ...............5

    B.      FPS made modifications to the freezer, and Dickinson made
       modifications to the refrigeration system................................................6

III.    The parties' final pre-litigation efforts to cooperate......................................7

    A.      Dickinson purported to repudiate the contract but then accepted
       FPS's offer to continue to cooperate.....................................................7

    B.      The parties' continued cooperation lead to a September 20-22,
       2017 site visit.........................................................................................8

    C.      Dickinson rejects FPS's settlement offer and hires a litigation
       expert to test the freezer and the refrigeration system. ......................10

IV.     Dickinson's lawsuit and immediate removal of the freezer. .........................11

    A.      Dickinson sued FPS and informed FPS the freezer would be
       removed. ...............................................................................................11

    B.      Dickinson barred FPS from the site and refused to allow FPS to
       monitor the freezer's removal or retrieve the freezer. ........................12

C.      After discovery began, FPS learned Dickinson cut the freezer in half, altered the refrigeration system, and stored the freezer in a gravel parking lot................................................................................13

D.      The trial court granted FPS's motion for spoliation sanctions and found a mandatory adverse inference instruction was the least severe sanction available to mitigate the prejudice to FPS.................15

E.      As discovery continued, the trial court granted FPS's motion for a protective order and awarded it attorney fees and costs. ...................16

F.      The trial court denied Dickinson's motion for reconsideration of the spoliation order............................................................................17

G.      The trial court denied Dickinson's motion to amend.........................18

H.      The trial court granted FPS's motion for summary judgment and denied Dickinson's motion for summary judgment...........................19

SUMMARY OF ARGUMENT ................................................................19

STANDARDS OF REVIEW .....................................................................21

ARGUMENT ................................................................................................23

I.      Dickinson has waived challenges to the trial court's spoliation reconsideration, motion to amend, and summary judgment orders. .............23

A.      Dickinson fails to specifically and distinctly argue claims of error....24

B.      Dickinson supports claims of error based on a record that was not before the trial court when it entered its decision. ...............................28

II.     The trial court did not abuse its discretion by finding that Dickinson spoliated evidence and failed to discharge its duty to preserve the freezer and refrigeration system. ..................................................................30

A.      Dickinson does not challenge the trial court's findings that it willfully and recklessly destroyed the freezer and significantly altered the refrigeration system. ........................................................30

B.      The trial court correctly determined that Dickinson failed to discharge its duty to preserve the freezer and refrigeration system....31

1. The evidence supports the trial court's finding that Dickinson did not provide FPS an adequate opportunity to inspect the freezer or refrigeration system.................................31

2. *American Family Mutual Insurance Co. v. Golke* neither controls nor commands reversal. ................................35

3. The trial court did not err by distinguishing between FPS's troubleshooting and the opportunity to inspect evidence relevant to litigation. ................................................37

4. The evidence supports the trial court's finding that FPS did not inspect the freezer or refrigeration system.........................41

III. The trial court did not abuse its discretion in imposing a mandatory adverse inference instruction for Dickinson's spoliation of evidence. .........43

A. The adverse inference instruction only became case-ending years later, by Dickinson's own litigation strategy. .....................................43

1. The adverse inference instruction was not tantamount to a case-terminating sanction.........................................43

2. The adverse inference instruction was not itself case-terminating. ...............................................................48

B. The trial court correctly determined that FPS was significantly prejudiced by Dickinson's spoliation of evidence. ............................50

1. The evidence supports the trial court's findings of fact regarding the degree of prejudice suffered by FPS. .................50

(a) FPS demonstrated specific prejudice are supported by the record. ...................................................50

(b) Dickinson's tests and data did not preclude FPS's prejudice. .......................................................53

2. The evidence supports the trial court's finding that an adverse inference instruction was the least severe sanction under the circumstances.........................................54

iv

IV.     The trial court did not err in awarding FPS attorney fees and costs for
        Rule 37(a)(5) for making its motion for protective order. ...........................57

        A.      The trial court correctly found that FPS attempted in good faith to
                confer with Dickinson prior to filing the motion. ...............................57

        B.      The trial court did not err by enforcing Rule 32(a)(5)(A)'s 14-day
                notice obligation for third-party depositions......................................58

        C.      The trial court did not err by determining that Dickinson's
                position was not substantially justified. ..............................................60

CONCLUSION .......................................................................................................61

CERTIFICATE OF COMPLIANCE .......................................................................62

STATEMENT OF RELATED CASES ...................................................................62

118596564.7 0054388-00005

# TABLE OF AUTHORITIES

## Cases

*Akiona v. United States*,
938 F.2d 158 (9th Cir. 1991) ..............................................................22

*American Family Mutual Insurance Co. v. Golke*,
768 N.W. 2d 729 (Wis. 2009).....................................................35, 36, 37

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985).........................................................................23

*Anheuser-Busch, Inc. v. Nat. Bev. Distribs.*,
69 F.3d 337 (9th Cir. 1995) ...............................................................22

*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012)..............................30, 50, 54, 55

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
20 F.4th 1231 (9th Cir. 2021) .............................................................21

*Brownfield v. City of Yakima*,
612 F.3d 1140 (9th Cir. 2010) ............................................................26

*Casillas v. U.S. Navy*,
735 F.2d 338 (9th Cir. 1984) ..............................................................29

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*,
769 F. Supp. 2d 269 (S.D.N.Y 2011) ..................................................41

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)......................................................................21, 22

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*,
626 F.3d 483 (9th Cir. 2010) ........................................................24, 25

*Donell v. Kowell*,
533 F.3d 762 (9th Cir. 2008) ..............................................................23

*Fassett v. Delta Kappa Epsilon (N.Y.)*,
807 F.2d 1150 (3d Cir. 1986) .............................................................28

118596564.7 0054388-00005

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423 (2d Cir. 2001) ...................................................................22, 40, 55

*Glover v. BIC Corp.*,
    6 F.3d 1318 (9th Cir. 1993) ........................................................................passim

*Greenwood v. FAA*,
    28 F.3d 971 (9th Cir. 1994) .................................................................................26

*Holgate v. Baldwin*,
    425 F.3d 671 (9th Cir. 2005) ...............................................................................22

*Landis v. Galarneau*,
    No. 2:05-CV-74013, 2010 WL 446445 (E.D. Mich. Jan. 28, 2010)......59, 60, 61

*Leon v. IDX Sys. Corp.*,
    464 F.3d 951 (9th Cir. 2006) ..................................................................22, 23, 53

*Mezu v. Morgan State University*,
    Nos. WMN-11-3072 & WMN-09-2855, 2014 WL 12734011 (D.
    Md. May 13, 2014) ...............................................................................59, 60, 61

*Milhouse v. Warden Lewisburg USP*,
    700 F. App'x 158 (3d Cir. 2017) .........................................................................29

*Novato Fire Prot. Dist. v. United States*,
    181 F.3d 1135 (9th Cir. 1999) .............................................................................47

*Reinsdorf v. Skechers U.S.A., Inc.*,
    296 F.R.D. 604 (C.D. Cal. 2013).........................................................................43

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) .............................................................................27

*Ski Lifts Inc. v. Schaeffer Mfg. Co.*,
    No. C19-0062-JCC, 2020 WL 1492676 (W.D. Wash. Mar. 27,
    2020) ..............................................................................................................39, 40

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) .............................................................................23

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
    982 F.2d 363 (9th Cir. 1992) .......................................................................passim

vii

*United States v. Sanmina Corp.*,
  968 F.3d 1107 (9th Cir. 2020) ...............................................................23

*United States v. W.R. Grace*,
  504 F.3d 745 (9th Cir. 2007) ...............................................................28

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir. 1999) ...............................................................30

**Statutes**

28 U.S.C. § 1291 ...............................................................................2

**Rules**

Fed. R. App. P. 28 ........................................................................24, 25

Fed. R. App. P. 32 .............................................................................63

Fed. R. Civ. P. 37 ..........................................................21, 57, 58, 59, 60

Rule 26(c)(1)(B) .................................................................................59

118596564.7 0054388-00005

# INTRODUCTION

This case is about an industrial tunnel freezer that Appellant Dickinson Frozen Foods, Inc. (<u>Dickinson</u>) purchased from Appellee FPS Food Process Solutions Corporation (<u>FPS</u>). Dickinson maintains that the freezer did not meet the specifications of the parties' contract and sought $18 million in damages. But shortly after Dickinson filed the complaint, it cut the freezer in half, removed it, substantially altered the refrigeration system that supported it, and left it outside, in a gravel lot, in January, in Idaho.

The trial court found that Dickinson willfully and recklessly destroyed the freezer and the refrigeration system, despite having a duty to preserve such key evidence. It also found that Dickinson's spoliation prejudiced FPS, because Dickinson's expert was able to test the freezer and refrigeration system before the spoliation, while FPS's expert was not. To mitigate that prejudice, the trial court imposed a mandatory adverse inference jury instruction against Dickinson.

On appeal, Dickinson contends that the trial court abused its discretion in finding Dickinson spoliated the freezer and refrigeration system and in imposing the adverse inference instruction. In addition, Dickinson purports to appeal, but does not actually challenge, the trial court's later orders denying Dickinson's motion to reconsider the sanctions order, denying its motion to amend the complaint, and granting FPS's motion for summary judgment.

1

In its opening brief, Dickinson rehashes the arguments it made to the trial court and asks this Court to reweigh the evidence and make its own findings of fact based on an expanded factual record. But the Court's role is not to conduct a *de novo* review. The trial court made substantial and well-supported findings of fact and did not base its decision on an erroneous view of the law. Because Dickinson has not demonstrated error, the Court should affirm.

## STATEMENT OF JURISDICTION

FPS agrees with Dickinson's jurisdictional statement. The trial court entered final judgment on October 7, 2022. 1-ER-2. Dickinson filed a notice of appeal on October 20, 2022. 13-ER-3610-12. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

FPS restates the issues on appeal as follows:

1.      Has Dickinson waived purported challenges to the trial court's orders denying its motion for reconsideration of the spoliation order, denying its motion to amend, and granting FPS's motion for summary judgment?

2.      Did the trial court abuse its discretion by deciding, based on the record before it, that Dickinson did not discharge its duty to preserve the freezer and refrigeration system?

3.      Did the trial court abuse its discretion by deciding, based on the record before it, that a mandatory adverse inference instruction was the appropriate and least severe sanction available to mitigate the prejudice from Dickinson's willful spoliation of evidence?

4.      Did the trial court err in awarding FPS the attorney fees and costs it incurred in making a motion for protective order?

## STATEMENT OF THE CASE

### I.      Dickinson, FPS, and their contract for an industrial tunnel freezer.

Dickinson owns and operates a vegetable processing plant located in Sugar City, Idaho. 1-ER-169; 13-ER-3594 (¶ 8). FPS designs and manufactures large industrial tunnel freezers and sells the freezers to the food processing industry. 1-ER-170; 12-ER-3421 (¶ 3). FPS's semi-truck-trailer-sized freezers are custom built to meet a customer's needs. 1-ER-170; 12-ER-3421 (¶¶ 4, 5). Food products enter the freezer at one end, travel on conveyor belts, are blast frozen, and are ready for packing by the time they exit. 1-ER-170; 12-ER-3422 (¶ 7).

But FPS's freezers cannot cool or freeze products by themselves. 1-ER-170; 14-ER-3803 (¶ 3). They must be supported and cooled by a refrigeration system that powers the unit. 1-ER-170; 14-ER-3803-04 (¶¶ 4-5). Thus the freezer is dependent on the interconnected refrigeration system to operate.

Refrigeration systems are complex and include compressors and many other parts. 1-ER-170 n.1; 14-ER-3803-04 (¶¶ 4, 7). Based on the customer's needs, FPS calculates the cooling output that the refrigeration system will need to produce, and the customer takes it from there. 1-ER-170; 14-ER-3736 (¶ 4); 14-ER-3804 (¶ 8). Thus, FPS does not design or install the refrigeration system. The customer does. 1-ER-170; 14-ER-3804 (¶ 8); *see also* 13-ER-3606.

In January 2016, FPS provided Dickinson an early quote for a freezer to replace Dickinson's existing freezer. *See* 11-ER-3131. In the email sending the quote, FPS stated the "tunnel is designed with all the freezer coils on sequential hot gas defrost to allow for continuous operation for up to 20-22 hours per day." 11-ER-3131. In March 2016, Dickinson and FPS executed a written contract for the purchase and sale of a different freezer, a model MT5-6 IQF Tunnel Freezer. 1-ER-171; 13-ER-3602. The contract consists of an "Order Confirmation" and a purchase order signed by Dickinson. 1-ER-171; 13-ER-3602-09.

The contract called for FPS to supply a freezer to process 8,000 pounds of diced or shredded potatoes an hour with an infeed temperature of 130°F and an outfeed temperature of 0°F. 1-ER-171; 13-ER-3602, 3607. Based on those requirements, FPS calculated the cooling output that the refrigeration system needed to produce to support the freezer: ammonia 4:1 liquid recirculation with

210 tons of refrigerant (TR) delivering -40°F of cooling "at the coil."[1] 1-ER-171; 13-ER-3607; 14-ER-3736 (¶¶ 4-5).

Again, pursuant to the contract, Dickinson was to supply the "[r]efrigeration equipment, piping, valves and refrigerant charge." 1-ER-170-71; 13-ER-3606. Dickinson agreed to pay $926,000 for the freezer. 1-ER-171; 13-ER-3603. The contract includes a 12 month warranty period. 13-ER-3605. The parties agree that the Agreement is governed by the CISG. *See* Opening Br. at 19.

## II. Problems with the freezer and refrigeration system.

### A. After the freezer and refrigeration system were installed, Dickinson was not satisfied with the freezer's performance.

FPS built the freezer in Canada, delivered it to FPS's Sugar City facility, and helped install it in July 2016. 1-ER-171; 11-ER-3117-18 (¶¶ 9-11). The freezer arrived in two halves and was moved into a building at the Sugar City facility, and FPS hired a third-party contractor to weld it together. 1-ER-171; 11-ER-3203; 11-ER-3118 (¶ 11). Dickinson hired Kemper Northwest, Inc. (Kemper) to design and to install the refrigeration system. 1-ER-171; 11-ER-3196 (¶ 18).

After starting the freezer, Dickinson informed FPS that the freezer was not performing to the contract's specifications. Dickinson claimed the freezer

---

[1] "At the coil" means the temperature the refrigeration system needs to deliver to the freezer, not the temperature output at the compressor. 14-ER-3804 (¶ 5).

produced around 4,000 pounds of product per hour, would run only six hours, and suffered from excessive ice and frost buildup. 1-ER-171; 11-ER-3118 (¶¶ 15-17). For the next year, through September 2017, FPS sent service technicians and representatives to the Sugar City facility to troubleshoot and service the freezer. 1-ER-172; 14-ER-3736-37 (¶¶ 6-7, 11); 11-ER-3119 (¶¶ 22-23).

During this time, Dickinson and FPS disagreed on the cause of the problems. 1-ER-172. Dickinson maintained the freezer itself could not meet the contract's performance specifications. 1-ER-172. FPS maintained the refrigeration system was incapable of delivering -40°F at the coil and that Dickinson was not operating the freezer or the refrigeration system properly. 1-ER-172.

### B. FPS made modifications to the freezer, and Dickinson made modifications to the refrigeration system.

Nevertheless, the parties worked cooperatively to improve the freezer and refrigeration system's performance. Dickinson engaged Kemper, and engineers from Nestle USA (Nestle) (a Dickinson customers), to access the freezer and refrigeration system. *See* 1-ER-172, 174 n.3. Dickinson made modifications to the refrigeration system and its operation. 11-ER-3163 (¶ 7); 11-ER-3059. FPS also made modifications to the freezer. 11-ER-3059. Despite those changes, Dickinson still maintained the freezer failed to properly perform. 12-ER-3377-84; 11-ER-3163 (¶ 8).

In June 2017, representatives of Dickinson, Kemper, Nestle, Colmac Coil (FPS's refrigeration coil supplier), and FPS met at the Sugar City facility to troubleshoot the freezer and refrigeration system. 1-ER-172; 11-ER-3164 (¶ 9); 12-ER-3385-90. While Kemper concluded the refrigeration system was sufficient, FPS disagreed and continued to maintain the refrigeration system was incapable of supporting the freezer. 11-ER-3164 (¶¶ 10-11).

**III.    The parties' final pre-litigation efforts to cooperate.**

### A.    Dickinson purported to repudiate the contract but then accepted FPS's offer to continue to cooperate.

On July 13, 2017, Dickinson's general counsel sent a letter to FPS purporting to reject the freezer and claim damages. 1-ER-173; 12-ER- 3430-31. Dickinson identified a list of defects, demanded a full refund within 10 days, and stated it would continue to operate the freezer to mitigate its damages until a replacement freezer could be found. 1-ER-173; 12-ER-3431. Dickinson also said it would "make arrangements for FPS to take back possession of the defective Freezer Machine." 1-ER-173; 12-ER-3431. As Dickinson acknowledged to the trial court, at this time it knew litigation against FPS was likely. 11-ER-3100.

FPS, however, did not. 1-ER-189. In a July 24, 2017 letter from its counsel, FPS rejected Dickinson's repudiation of the contract as unreasonable. 1-ER-173; 12-ER-3433-34. FPS also included an analysis of the freezer system prepared by James Peterson that countered Dickinson's list of defects. 1-ER-173; 12-ER-3433-

7

34. Peterson is a refrigeration engineer whom FPS had hired in November 2016 to consult on various FPS projects. 1-ER-173; SER-158, 160-62. Dickinson's FPS freezer was just one of the projects Peterson consulted on. 1-ER-173; SER-158, 160-62. Without visiting the Sugar City facility, Peterson noted problems with the refrigeration capacity and recommended additional tests. 1-ER-173 n.2; 12-ER-3306-08.

In rejecting Dickinson's repudiation of the contract, FPS suggested litigation would not result in a satisfactory outcome for either party and that the parties should continue their cooperation. 1-ER-173; 12-ER-3434.

## B. The parties' continued cooperation lead to a September 20-22, 2017 site visit.

Dickinson agreed that it would continue to cooperate with FPS. 1-ER-189. It shared Peterson's analysis with Nestle and Kemper, who suggested Peterson should visit the Sugar City facility. 1-ER-174; 11-ER-3091-92 (citing 12-ER-3211-12). After some back-and-forth, Dickinson's general counsel invited Peterson to visit the Sugar City facility to meet with representatives of Nestle and Kemper for an "impartial engineering discussion." 1-ER-174; 12-ER-3213-17.

Ultimately, the parties' continued cooperation proved unsuccessful. By August 2017, Dickinson was actively negotiating with GEA Food Solutions North America (GEA) to purchase a replacement freezer. 1-ER-175; 12-ER-3436-40; 14-ER-3737 (¶ 11). On September 19, 2017, Dickinson agreed to buy the new GEA

8

freezer for $1,446,400. [2] 10-ER-2823-34 (¶ 26). But that was unknown to FPS, and it agreed to visit the Sugar City facility with Peterson. 1-ER-175; 14-ER-3737 (¶ 11); SER-198-200).

From September 20 to 22, 2017, FPS and Peterson met with Dickinson and representatives from Nestle, Kemper, and Cormac Coil. 1-ER-174. Kemper and Cormac Coil ran tests on the freezer and refrigeration system. *See* 1-ER-174-75; 11-ER-3164-65 (¶¶ 12, 15). The September 20-22 visit was Peterson's only visit to the Sugar City facility, and he did not perform any testing of the freezer or refrigeration system. 1-ER-173 n.2; SER-210-14. Including travel time, Peterson spent 20 to 30 hours consulting on Dickinson's freezer system. SER-162.

On September 25, 2017, Kemper produced a report that concluded the refrigeration system supplied adequate compressor capacity and temperatures during the test. *See* 1-ER-175; 11-ER-3175, 3181-82; 12-ER-3309. Two days later, a Nestle engineer, on behalf of Dickinson, sent Kemper's report to FPS and asked, "When can we expect a response?" 1-ER-175; 12-ER-3330. He suggested that if FPS believed "the proper course of action is to modify the freezer, it should outline

---

[2] When FPS moved for spoliation sanctions, it understood that Dickinson bought the new GEA freezer in August 2017. 12-ER-3402; *see also* 1-ER-175. In its opposition briefing, Dickinson did not correct the record. 11-ER-3080-3115. Later, in seeking reconsideration of the spoliation order, Dickinson indicated it ordered the new freezer in September 2017. 10-ER-2807.

a plan what FPS intends to do, the time required and the effect it will have." 1-ER-175; 12-ER-3330.

### C. Dickinson rejects FPS's settlement offer and hires a litigation expert to test the freezer and the refrigeration system.

Until this time, FPS was not anticipating or preparing for litigation; it was working with a dissatisfied customer. SER-223-34 (¶¶ 3-4). But on October 17, 2017, FPS's counsel sent a pre-litigation settlement offer to Dickinson. 1-ER-175; 12-ER-3442-43. While admitting no fault, FPS offered Dickinson a full refund for the freezer and the opportunity to use the freezer for a time, and asked that it "exercise reasonable care to avoid injury or damage to the Freezer." 1-ER-175; 12-ER-3442-43. After the possession period, FPS would remove the freezer at its own expense. 1-ER-175; 12-ER-3442.

The next day, Dickinson's general counsel refused FPS's offer. 1-ER-176; 12-ER-3445-46. Dickinson claimed it had suffered substantial consequential damages and the refund was inadequate. 1-ER-176; 12-ER-3445. Dickinson also informed FPS that it "anticipated having the Freezer removed in January 2018" and "would seek FPS's full cooperation by coordinating the exact dates and being in agreement on the vendor FPS will use for the removal." 1-ER-176; 12-ER-3445.

By this time, Dickinson had already retained a litigation expert. On October 9, 2017, Dickinson hired Chuck Taylor of CRT Design and Engineering, Inc. to provide opinions on the operation of the freezer. *See* 1-ER-176; 11-ER-3055 (¶ 8).

A few weeks later, on November 18, 2017, Taylor visited the Sugar City facility and ran tests and examined the refrigeration system in detail. [3] 1-ER-176, 196-97, 201; 11-ER-3060, 3074.

## IV. Dickinson's lawsuit and immediate removal of the freezer.

### A. Dickinson sued FPS and informed FPS the freezer would be removed.

On December 21, 2017, Dickinson filed, but did not serve, a complaint against FPS, pleading breach of contract under the CISG and also breach of express warranty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. 1-ER-176; 13-ER-3592-3600. Concerning its contract claim, Dickinson alleged that the freezer could not freeze 8,000 pounds per hour. 13-ER-3594-97 (¶¶ 14, 18, 22-28). Dickinson claimed FPS was liable for $12 million in consequential damages but would eventually seek nearly $18 million. 12-ER-3463; 11-ER-3086.

The next day, December 22, Dickinson's counsel sent a letter informing FPS that Dickinson would remove the freezer on January 13, 2018, and planned to have it on site temporarily. 1-ER-176; 12-ER-3468-69. Dickinson invited FPS to

---

[3] The trial court found Taylor examined the freezer on November 10, 2017, 1-ER-201, and tested it on January 8, 2018, 1-ER-197. That is because, in his expert report, Taylor stated his site inspection occurred on November 10, 2017, and he tested the freezer system on January 8, 2018. *See* 11-ER-3060, 3074. He later clarified that the correct date of the inspection and testing was November 18, 2017. 10-ER-2759 (¶ 164).

11

arrange to pick up the freezer. 1-ER-176; 12-ER-3469. Dickinson also warned that once the freezer was in FPS's possession, FPS had a duty to preserve the freezer for litigation and that failure to do so may "constitute spoliation of evidence or subject FPS to sanctions." 1-ER-176; 12-ER-3469.

### B. Dickinson barred FPS from the site and refused to allow FPS to monitor the freezer's removal or retrieve the freezer.

But FPS never had the opportunity to preserve the freezer. On January 12, FPS informed Dickinson that it would monitor and record the freezer's removal and asked to arrange transportation to pick it up. 1-ER-177; 12-ER-3495. Dickinson refused, and instead removed the freezer from its facility on January 13, without FPS's involvement. 1-ER-177; 11-ER-3197 (¶ 27); 12-ER-3494; 13-ER-3542-44.

Even after the freezer was removed, Dickinson continued to bar FPS from the site to inspect or remove the freezer. On January 17, an independent contractor hired by FPS asked to get some photos "and assess pick up and storage of the unit." 1-ER-177; 12-ER-3494. Again Dickinson refused, stating "you or anyone associated with FPS are not allowed on site. No photos or access. When that changes FPS will be notified and things can move forward." 1-ER-177-78; 12-ER-3494.

118596564.7 0054388-00005

Six days after the freezer's removal, Dickinson served FPS with a copy of the complaint. SER-261-62. FPS filed an answer and counterclaim, SER-242-59; 13-ER-3559-88, which Dickinson answered three years later. SER-7-20.

### C. After discovery began, FPS learned Dickinson cut the freezer in half, altered the refrigeration system, and stored the freezer in a gravel parking lot.

In March 2018, the parties began discovery. 1-ER-121-22, 146. The trial court set deadlines in December 2018 for expert discovery, and January 2019 for fact discovery. 1-ER-121; SER-237-41. The parties served discovery in March and by May, FPS had produced approximately 5,800 documents to Dickinson. 1-ER-122; SER-227-28.

Having been denied access to the freezer, FPS asked Dickinson to describe how the freezer was removed and how it was being stored. 13-ER-3521-23; 13-ER-3539-41. In April and August 2018, Dickinson answered that it had severed all refrigeration lines, cut the freezer in half, cut its legs out, placed extra parts in crates, transported the freezer and crates to a gravel lot, sealed the freezer's openings with duct tape, tarped it, and stored it in a "commercially reasonable manner." *See* 1-ER-178-79; 13-ER-3521-23; 13-ER-3539-44.

As the trial court noted, the parties offered different accounts of the disassembly and storage of the freezer. 1-ER-178-80. According to Dickinson, it hired qualified contractors, who used accepted practices to disassemble the FPS

freezer. 1-ER-178; 11-ER-3120 (¶¶ 30-34). Dickinson also instructed its employees and the contractors to take special care in the disassembly process. 1-ER-178; 11-ER-3120 (¶ 36).

But on October 16, 2018, FPS was allowed to inspect the freezer and found otherwise. 1-ER-178-80; 12-ER-3426 (¶ 15); 13-ER-3556-67. By this time, FPS had retained a refrigeration expert, Eduardo Ford, who attended the inspection. 14-ER-3804 (¶ 9). FPS and Ford found the freezer significantly damaged from its removal and subsequent storage in the gravel lot, and the refrigeration system that once supported the freezer significantly altered. 1-ER-178-80; 14-ER-3804-06 (¶¶ 10-21); 14-ER-3737-39 (¶¶ 13-23); SER-220 (¶ 3).

For example, the freezer's refrigeration coil was damaged beyond repair, its conduit piping was cut and removed, its insulation shredded, and key components, including the computer control panel, were severed and weathered. 1-ER-179; 14-ER-3737-39 (¶¶ 13-23), 3740-3802. With the legs of the freezer cut off, the freezer's entire weight was resting on dirt and pallets. SER-220 (¶ 3). FPS also discovered many key components of the refrigeration system no longer existed. 1-ER-179-80; 14-ER-3804-06 (¶¶ 10-21), 3809-28.

Overall, FPS found the damage to the freezer and alteration of the refrigeration system so significant that critical testing and analysis were no longer possible. 1-ER-180; 14-ER-3806-07 (¶¶ 20-29). According to FPS's expert Ford,

there were multiple tests he would have run, but that was no longer possible. 1-ER-180; 14-ER-3806-07 (¶¶ 23-29).

### D. The trial court granted FPS's motion for spoliation sanctions and found a mandatory adverse inference instruction was the least severe sanction available to mitigate the prejudice to FPS.

On October 30, 2018, FPS moved for spoliation sanctions. 12-ER-3394-95. FPS sought dismissal, the exclusion of evidence, or an adverse jury instruction for Dickinson's destruction of the key evidence in the case. 12-ER-3411-16. During and after briefing on the motion, discovery continued. 1-ER-121-22. But Dickinson did not seek to supplement the record with its discovery or to stay a decision pending further discovery. 1-ER-122, 146-47.

In May 2019, relying on its inherent power, the trial court granted FPS's motion. 1-ER-169-209. Weighing the evidence, the trial court found FPS met its burden of proving spoliation of the freezer and refrigeration system, as well as prejudice, and that "significant sanctions are warranted." 1-ER-182-208, 123. As for a sanction, the trial court found dismissal and excluding evidence were not justified. 1-ER-199-206. The trial court also found a permissive presumption was inappropriate, "because it would leave Dickinson free to tell its own story, unchecked by the evidence it failed to preserve." 1-ER-207.

Thus the trial court found the least severe sanction available to mitigate the prejudice to FPS was a mandatory adverse inference jury instruction, stating:

> Dickinson has failed to preserve relevant evidence for FPS's use in this litigation. This is known as the "spoliation of evidence." Specifically, Dickinson destroyed the FPS Freezer and Refrigeration System after its duty to preserve this evidence arose. As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.

1-ER-207.

### E.     As discovery continued, the trial court granted FPS's motion for a protective order and awarded it attorney fees and costs.

Because Dickinson's case was not terminated, discovery continued 1-ER-125-27. That included Dickinson's depositions of three employees of Colmac Coil. 1-ER-127 n.11, 130, 69-70. Because the depositions were conducted without 14-day notices as required by Federal Rule of Civil Procedure 37(a)(5)(A), FPS objected and moved for a protective order. 1-ER-127, 70-71.

The trial court granted FPS's motion for a protective order to the extent it sought to preclude the three depositions of the Colmac Coil employees. 1-ER-132. Later, FPS moved for an award of attorney fees and costs incurred in making its motion for protective order. *See* 1-ER-68. The trial court awarded FPS some of its fees ($29,126.05) and costs ($2,152.18). 1-ER-68, 73-107.

**F.     The trial court denied Dickinson's motion for reconsideration of the spoliation order.**

In September 2019, Dickinson moved for reconsideration of the sanction order. 10-ER-2770-72. Dickinson filed over 7,000 pages of newly submitted evidence. 1-ER-127-28, 149-50; *see also* 10-ER-2611-2904; 9-ER-2311-2609; 8-ER-2287-2309. Given Dickinson's significant evidentiary submission, the trial court ordered the parties to brief the appropriate standard for reconsideration with respect to that evidence. 1-ER-167, 128-2.

Dickinson also raised new arguments for the first time. Recall that in January 2016, FPS emailed Dickinson an early quote for a freezer and stated the tunnel is designed "to allow for continuous operation for up to 20-22 hours per day." 11-ER-3131. Dickinson now claimed that FPS breached the parties' agreement because the freezer could not freeze 8,000 pounds per hour for 20 to 22 hours per day. 1-ER-155; 10-ER-2779, 2783. The second new argument was that FPS improperly designed the freezer. The trial court refused to consider the new arguments for the first time on reconsideration. 1-ER-159-61; 10-ER-2800-01.

In June 2020, the trial court denied the reconsideration motion. 1-ER-118-66. The court found none of Dickinson's evidence new, refused to consider "Dickinson's belatedly submitted evidence," and found an "expanded factual record" was not an appropriate basis for reconsideration of a discovery order. 1-

17

ER-140-51. The trial court also found it did not clearly err in finding FPS was prejudiced by Dickinson's willful conduct. 1-ER-151-54, 161-65.

After the trial court issued the spoliation reconsideration order, discovery still continued. The court extended the discovery deadline and the deadline to file motions to amend the pleadings. 8-ER-2215-16.

### G. The trial court denied Dickinson's motion to amend.

On August 5, 2020, two and a half years after filing its complaint and on the last day permitted by the court's scheduling order, Dickinson moved to amend its complaint. 8-ER-2190-92. Dickinson also moved to supplement its motion. SER-27-28, 24-25. Dickinson's proposed amendments reworked its four claims and added six new claims to specifically allege FPS contractually promised the freezer would run 20 to 22 hours per day and that the freezer was defectively designed. *See* SER-80-115; SER-35-74.

The trial court denied Dickinson's motions to amend and supplement for four independent reasons. 1-ER-29-67. It found (1) the motion was a bad faith attempt to circumvent the sanctions orders; (2) the proposed claims were futile because they were precluded by those orders; (3) the motion was untimely because of Dickinson's undue delay in filing the motion; and (4) the motion was prejudicial to FPS given the extensive discovery already completed and the additional discovery required by the proposed amendments. 1-ER-50-67.

### H.   The trial court granted FPS's motion for summary judgment and denied Dickinson's motion for summary judgment.

In October 2021, both FPS and Dickinson moved for summary judgment. FPS moved for summary judgment on each of Dickinson's claims and also on each of its remaining counterclaims. 6-ER-1649-78. So did Dickinson. 3-ER-655-68.

The trial court granted FPS's motion on Dickinson's claims. 1-ER-3-28. The court found Dickinson continued to base its breach of contract claim on the allegation that the freezer failed to comply with the parties' agreement, and as such, the adverse inference instruction decided the claim. 1-ER-7-12. Dickinson did not contest summary judgment on its claims for breach of express warranty and breach of good faith and fair dealing. 1-ER-5-7 (citing 2-ER-355-56). On the promissory estoppel claim, the trial court held the claim was precluded because it was either based on the contract or precluded by the jury instruction. 1-ER-12-15.

As for FPS's counterclaims, the trial court denied FPS summary judgment and granted Dickinson summary judgment on two of FPS's remaining claims. 1-ER-15-28. After FPS voluntarily withdrew the remaining counterclaim, SER-4-5, the trial court entered judgment, 1-ER-2. This appeal followed. 13-ER-3610-16.

## SUMMARY OF ARGUMENT

On appeal, Dickinson purports to challenge the trial court's spoliation order, spoliation reconsideration order, motion to amend order, order on attorney fees and costs, and summary judgment order. But in its opening brief, Dickinson only

advances arguments related to the spoliation order and order on attorney fees and costs. In addition, Dickinson asks the Court to find error in the spoliation order based on evidence that was either excluded by the trial court on reconsideration or presented years later. Accordingly, the Court should limit the scope of this appeal to those issues specifically and distinctly argued and strike or decline to consider the expanded record on which Dickinson relies.

Dickinson argued in the trial court and now before this Court that it discharged its duty to preserve the freezer and refrigeration system by notifying FPS of its dissatisfaction with the freezer and intent to remove it. In rejecting Dickinson's arguments, the trial court conducted a thorough review of the record, made substantial findings of fact, and rejected Dickinson's arguments based on an accurate view of the law. Accordingly, the trial court's determination that Dickinson failed to discharge its duty to preserve the freezer and refrigeration system was well within the court's discretion.

Nor did the trial court abuse its discretion by imposing a mandatory adverse inference instruction against Dickinson. The court carefully considered the degree of Dickinson's fault, the prejudice caused by Dickinson's spoliation, and the variety of available sanctions before determining that dismissal was not warranted. Contrary to Dickinson's arguments, the adverse inference jury instruction was not case-terminating. When the sanction was ordered, Dickinson had remaining

claims, and could move to amend, unaffected by the instruction. Dickinson's subsequent litigation choices do not render the adverse inference instruction case-terminating, and the trial court's order was well within its broad discretion.

Finally, the trial court correctly awarded FPS attorney fees and costs incurred in filing its motion for a protective order pursuant to Federal Rule of Civil Procedure 37. Dickinson's arguments disregard the unambiguous text of Rule 32(a)(5)(A) and the trial court's well-supported findings of fact. The Court should affirm the trial court's award of fees and costs to FPS.

## STANDARDS OF REVIEW

In an ordinary appeal, the appellant "bears the burden of persuasion." *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021). Here that means that Dickinson must contend with the trial court's inherent authority to sanction a party who has spoiled evidence. Inherent authority is derived "'not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

Pursuant to this authority, district courts have "the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.

1993). "Generally, a trier of fact may draw an adverse inference from the destruction of evidence relevant to a case." *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991). This Court reviews for abuse of discretion a district court's decision to impose sanctions pursuant to its inherent authority. *Anheuser-Busch, Inc. v. Nat. Bev. Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995).

"A primary aspect of [the district court's] discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45. Thus, both the decision to impose sanctions as well as the determination of which sanction to impose are reviewed for abuse of discretion and are assessed on a case-by-case basis. *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).

In applying this deferential standard, the Court should affirm unless the district court based its decision "on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Holgate v. Baldwin*, 425 F.3d 671, 675 (9th Cir. 2005). "The district court's factual findings, including findings of bad faith and prejudice, are reviewed for clear error," and the "district court's credibility determinations are entitled to special deference." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (internal quotation marks and citation omitted). The clear error standard is not met unless the reviewing court is left with "a 'definite and

firm conviction that the district court committed a clear error of judgment.'" *Id*. at 961 (citation omitted).

Put another way, a finding is clearly erroneous only "'if it is illogical, implausible, or without support in the record.'" *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (citation omitted). The clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). Rather "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

Similarly, this Court "review[s] the denial of a motion for reconsideration for abuse of discretion." *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1100 (9th Cir. 2004). To the extent Dickinson meaningfully challenges the trial court's summary judgment order, this Court reviews that order *de novo*. *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008).

## ARGUMENT

### I. Dickinson has waived challenges to the trial court's spoliation reconsideration, motion to amend, and summary judgment orders.

At the outset, the scope of Dickinson's appeal must be addressed because it dictates the scope of the relief available. Two preservation topics drive this discussion. Both derive from the principle that claims in an opening brief must be

"clearly articulated." *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626

F.3d 483, 485 (9th Cir. 2010) (citing Fed. R. App. P. 28). That includes "a

statement of the issues presented for review" and "appellant's contentions and the

reasons for them, with citations to the authorities and parts of the record." Fed. R.

App. P. 28(a)(5), (8)(A). Compliance with Rule 28 is "not a mere formality" and

failure to comply is "'sufficient ground to justify dismissal of an appeal.'"

*Christian Legal*, 626 F.3d at 485 (citation omitted). The Court reviews "'only

issues that are argued specifically and distinctly in a party's opening brief.'" *Id.*

(citation and brackets omitted).

### A. Dickinson fails to specifically and distinctly argue claims of error.

The first topic involves the limited issues Dickinson argues on appeal.

Dickinson identifies three issues in its statement of the issues. Opening Br. at 1-2.

The first two issues concern the trial court's spoliation order.[4] 1-ER-169-209. The

third issue concerns an award of attorney fees and costs to FPS and is not

implicated here.

Based on its statement of the issues, Dickinson does not appeal key aspects

of the trial court's spoliation reconsideration order, 1-ER-136-51, the motion to

---

[4] By implication, FPS does not contend that Dickinson forfeited issues that
are solely predicated on the mandatory adverse inference instruction, if they are
properly raised. For instance, Dickinson's appeal of the spoliation order may
include limited portions of the spoliation reconsideration order where the trial court
reviewed for clear error or to prevent manifest injustice. *See* 1-ER-151-65.

amend order, 1-ER-29-67, or the summary judgment order, 1-ER-3-28. Yet Dickinson purports to challenge those decisions. In its argument, Dickinson states that the trial court's refusal to consider its new evidence on reconsideration of the spoliation order was "erroneous." Opening Br. at 38, 47. It also states that the trial court "erroneously denied" leave to amend its complaint and that "Ninth Circuit law does not allow … the summary judgment to stand." *Id*. at 38-40. And in its conclusion, Dickinson seeks reversal of all three orders.[5] *Id*. at 56.

But that is the extent of Dickinson's argument. Dickinson has thus failed to preserve key challenges to the spoliation reconsideration order and waived attacks on the motion to amend and the summary judgment orders. Its "statement of the issues presented for review" required by Rule 28 only lists two challenges to the spoliation order, nothing more. That failure alone warrants denial of any appeal of the spoliation reconsideration order, the motion to amend order, or the summary judgment order. *See Christian Legal*, 626 F.3d at 485.

Worse, Dickinson's passing mention of alleged errors in the three orders does not contain contentions, reasons, legal argument, or citations to the record, as required by Rule 28. Dickinson's cursory references to errors in the order are not enough to raise issues "specifically and distinctly" for the Court's review. *Id.* at

---

[5] Dickinson makes similar assertions elsewhere, including in its statement of the case, *see* Opening Br. at 14-16, and summary of the argument, *id*. at 18. It also addresses the standards of review for decisions on those motions. *Id*. at 18-19.

485-88 (refusing to address a claim that was not raised); *see also Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010).

Consider the spoliation reconsideration order. In that order, the trial court first addressed the appropriate legal standard for reconsideration and the evidence it would consider. 1-ER-136-40. From there, the trial court refused to consider Dickinson's "expanded factual record," 1-ER-40-46, and found that its evidence was not "newly discovered," 1-ER-146-51. While Dickinson makes passing allegations of error in those decisions, *see* Opening Br. at 38, 47, it provides no explanation or argument on how the trial court erred under the standard of review.

Dickinson's challenge to the motion to amend order fares no better. Dickinson sought to amend its complaint to specifically allege that FPS promised the freezer would run 20 to 22 hours per day and to plead a design defect claim. *See* SER-80-115; SER-35-74. In addition to denying the motion based on the adverse inference instruction, 1-ER-50-58, the trial court also denied the motion for reasons that had nothing to do with the instruction: the motion was untimely due to Dickinson's undue delay and the proposed amendments were prejudicial to FPS. 1-ER-58-67.

Not only has Dickinson failed to provide a specific and distinct argument on how the trial court erred in denying it leave to amend, it does not challenge the trial

court's alternative reasons for denying the motion. *See* Opening Br. at 38-39. The "failure of a party in its opening brief to challenge an alternate ground for a district court's ruling *given by the district court* waives that challenge." *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 n.6 (9th Cir. 2010).

Next consider the summary judgment order. The trial court dismissed Dickinson's breach of contract claim, finding it was decided in FPS's favor based on the adverse inference instruction. 1-ER-7-12. But Dickinson's remaining claims were dismissed for reasons unrelated to the instruction. The trial court found Dickinson tacitly admitted that its breach of express warranty and breach of good faith and fair dealing claims were without merit. 1-ER-5-7. And the trial court held its promissory estoppel claim was precluded because of the instruction and alternatively because it was based on a contract. 1-ER-12-15. Dickinson does not argue the trial court erred in that second holding. *See* Opening Br. at 39-40.

At this point, Dickinson has one remaining claim, its original breach of contract claim. 13-ER-3597 (¶ 26). Dickinson's appeal is likewise limited to that claim and to the trial court's spoliation order, specifically its findings on Dickinson's duty to preserve and the imposition of the mandatory jury injunction. Nothing more.

**B.    Dickinson supports claims of error based on a record that was not before the trial court when it entered its decision.**

The limited issues on appeal related to the spoliation order lead to the second topic: the evidentiary record Dickinson uses to assert its claims of error. On review, the Court normally "consider[s] only the record that was before the district court." *United States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007); *see also Fassett v. Delta Kappa Epsilon (N.Y.)*, 807 F.2d 1150, 1165 (3d Cir. 1986) ("The only proper function of a court of appeals is to review the decision below on the basis of the record that was before the district court."). Yet Dickinson asks the Court to find error in the spoliation order based on a completely different record than the one that was before the trial court at that time.[6]

For example, as to the first issue on appeal (regarding its duty to preserve), Dickinson argues the evidence shows that FPS "objectively should have anticipated litigation by the Summer of 2017," Opening Br. at 27, and "had an

---

[6] Dickinson's Excerpts of Record are organized as follows:

- the summary judgment motion record is found at 2-ER, 3-ER, 4-ER, 5-ER, 6-ER, and portions of 14-ER (14-ER-3641-81);
- the spoliation reconsideration motion record is found at 8-ER, 9-ER, and 10-ER; and
- the original spoliation motion record is found at 11-ER, 12-ER, 13-ER, and portions of 14-ER (14-ER-3682-3831).

*See* Excerpts of Record Index Vol.

adequate opportunity to inspect the evidence," *id*. at 30. But Dickinson's evidentiary support for the alleged error is the spoliation reconsideration record (which, again, the trial court refused to consider) and the summary judgment record (which was submitted years later). *See id*. at 27, 30.

Other examples pertain to Dickinson's second issue on appeal (regarding the adverse inference instruction). Dickinson argues that FPS's allegations of prejudice were disproven by the evidence, *id*. at 45-50, that "an abundance of accurate and reliable data" was available to FPS, ameliorating any prejudice, *id*. at 51-52, and that, at most, a permissive jury instruction is a more appropriate sanction since FPS can rely on the "voluminous amount of secondary evidence" to mitigate any prejudice, *id*. at 52-53. For those arguments too, Dickinson relies on the excluded spoliation reconsideration record and the later summary judgment record.

Dickinson does not explain how a trial court can commit error based on a record that was not before it. Indeed it cannot. Nor can the Court review potential error based on a new, expanded factual record. The Court should not consider documents or other evidence that was not before the trial court when it entered its decision. *See Milhouse v. Warden Lewisburg USP*, 700 F. App'x 158, 159 (3d Cir. 2017) (refusing to consider documents that were not before the district court when it entered its decision); *see also Casillas v. U.S. Navy*, 735 F.2d 338, 343 (9th Cir.

1984) (observing that the Court "will not ransack the record, searching for mistakes"). Dickinson has failed to carry its burden on appeal for this reason too.

## II. The trial court did not abuse its discretion by finding that Dickinson spoliated evidence and failed to discharge its duty to preserve the freezer and refrigeration system.

Dickinson's first issue contends the trial court should have found it discharged its duty to preserve the freezer and refrigeration system. Opening Br. 1, 20-31. Dickinson argues that it provided FPS adequate notice that the freezer was being removed and that FPS inspected the freezer and refrigeration system beforehand. The trial court did not clearly err in finding otherwise.

### A. Dickinson does not challenge the trial court's findings that it willfully and recklessly destroyed the freezer and significantly altered the refrigeration system.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). To determine whether spoliation occurred, the trial court considered if Dickinson had an obligation to preserve the evidence, the evidence was destroyed with a culpable state of mind; and the evidence was relevant to a claim or defense. 1-ER-184-93. Neither party objected to this test, which has been widely adopted. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 996-97 (N.D. Cal. 2012).

30

Notably, Dickinson does not challenge the trial court's findings that it "willfully destroyed relevant evidence it had a duty to preserve." 1-ER-208; *see also* 1-ER-173, 182-84, 191, 206. The trial court found that Dickinson willfully and recklessly spoiled evidence by removing the freezer, failing to allow FPS to observe the disassembly or store the freezer, damaging the freezer, significantly altering the refrigeration system—all prior to allowing FPS's expert an opportunity to inspect the evidence—and storing the freezer where it was exposed to the elements and deterioration. 1-ER-206.

Therefore, the only question to be answered is whether the trial court abused its discretion by determining that Dickinson did not discharge its duty to preserve the freezer and refrigeration system. Because the trial court's determination that Dickinson did not discharge its duty to preserve evidence is premised neither on an erroneous view of the record nor on an erroneous application of law, the Court should affirm.

**B.** **The trial court correctly determined that Dickinson failed to discharge its duty to preserve the freezer and refrigeration system.**

**1.** **The evidence supports the trial court's finding that Dickinson did not provide FPS an adequate opportunity to inspect the freezer or refrigeration system.**

Dickinson argues that it discharged its duty to preserve the freezer and refrigeration system by notifying FPS that the systems would be removed from

Dickinson's facility and disassembled. *See* Opening Br. at 23-25. Dickinson

identifies its July 17, October 17, and December 22, 2017 letters as evidence it

provided FPS with adequate notice that the freezer would be removed, thereby

discharging its duty to preserve the evidence. The trial court did not agree, pointing

to evidence contradicting Dickinson's contentions. Dickinson has not shown error.

First, Dickinson points to its July 2017 letter wherein Dickinson stated it

rejected or revoked acceptance of the freezer. *See* 12-ER-3431. Relevant to this

argument, the trial court found that, following FPS's July 24 response, FPS

reasonably believed that Dickinson was not pursuing litigation because it accepted

FPS's offer to continue to cooperate to resolve performance issues to avoid

litigation. 1-ER-174 (citing 12-ER-3216-17). From this finding, the trial court

reasoned that FPS was not on notice that the freezer or refrigeration system would

be destroyed. 1-ER-188.

These findings are supported by the record. FPS's July 24 response to

Dickinson's July 13 letter did not accept Dickinson's repudiation and suggested the

parties continue to work together to fix the "relatively minor issues" with the

freezer. 12-ER-3433-34. And the parties did, participating in Dickinson's

"impartial engineering discussion." 12-ER-3216. That evidence supports the trial

court's finding that FPS believed Dickinson had retracted its prior repudiation of

the parties' agreement and accepted FPS's offer that the parties continue to cooperate to fix the "relatively minor issues" with the freezer. *See* 1-ER-189.

Second, the trial court correctly determined that Dickinson's October 2017 letter did not notify FPS of the freezer's impending destruction because Dickinson expressly requested FPS's cooperation in the removal of the freezer. 1-ER-190. That finding is also fully supported by the evidence. In the October letter, Dickinson sought "FPS's full cooperation by coordinating the exact dates and being in agreement on the vendor *FPS will use for the removal*." 12-ER-3445 (emphasis added). By its own terms, the letter only notified FPS that, at some point in the future, Dickinson planned to coordinate with FPS so that FPS could remove the freezer—a far cry from notifying FPS that Dickinson planned to destroy the freezer without FPS's involvement whatsoever.

Given the express language of the October letter, the trial court did not err by finding that "Dickinson cannot be said to have given notice of *its* impending removal and disassembly of the freezer and refrigeration system by requesting that the parties work together to coordinate a date for *FPS to remove the unit*." 1-ER-190. Dickinson's argument on appeal does not undermine the trial court's finding here. Rather, Dickinson recasts the trial court's finding as one relating to whether FPS was on notice of impending litigation and misapprehends the court's finding as relating to FPS's subjective beliefs. Opening Br. at 24.

The trial court's findings related to the notice provided by the October letter is clear and unrelated to either of those supposed issues. The trial court found that the letter notified FPS that Dickinson "anticipated having the Freezer removed in January, 2018," and that Dickinson was "requesting that the parties work together to coordinate a date for *FPS to remove the unit*." 1-ER-190. Thus, the trial court did not base its finding on FPS's subjective beliefs concerning whether litigation was impending, but rather on the unambiguous language of Dickinson's own October letter.

Finally, Dickinson argues that the trial court erred by finding that Dickinson's December 2017 letter did not provide adequate notice to FPS. Opening Br. at 25. But Dickinson does not explain how this finding is clearly erroneous, and instead suggests that the trial court's spoliation order consists merely of vague insinuations about the adequacy of Dickinson's notice. *See id*. This is plainly incorrect and ignores the trial court's express findings.

Quoting the December letter, the trial court found that "Dickinson, through counsel, sent FPS's in-house counsel a letter stating: . . . 'that beginning on January 13, 2018, Dickinson will have a crane and initiate the multi-day process of removing the defective Freezer Machine from its facility'" and "'invit[ing]'" FPS "'to arrange for pick-up of the uninstalled Freezer Machine.'" 1-ER-176 (quoting 12-ER-3469). Also, the day before the freezer was to be removed, FPS emailed

34

Dickinson and asked to have people on site to monitor and record the dismantling of the freezer and requested that FPS be permitted to "arrange transportation to pick up the freezer" after it was moved. 1-ER-177 (quoting 12-ER-3495).

Despite Dickinson's representations that FPS would be responsible for the removal and transportation of the freezer, Dickinson ultimately removed the freezer without FPS's participation and then refused to permit FPS to access or even view the disassembled freezer. 1-ER-177-78 (citing 12-ER-3494), 180 (finding that "Dickinson barred FPS access to the Sugar City facility" to inspect the disassembled freezer). The trial court's fact findings concerning the December letter, bolstered by Dickinson's direct communications to FPS and mere three-week warning, support the determination that Dickinson did not provide FPS an adequate opportunity to inspect the evidence. 1-ER-180, 190-91.

Given its consideration of the evidence, the trial court did not clearly err in making these findings of fact, when Dickinson prohibited FPS from monitoring, assessing, or picking up the freezer.

### 2. *American Family Mutual Insurance Co. v. Golke* neither controls nor commands reversal.

Dickinson also cites *American Family Mutual Insurance Co. v. Golke*, 768 N.W. 2d 729 (Wis. 2009), to argue that the July, October, and December 2017 letters discharged its duty to preserve evidence. Opening Br. at 21-23. *Golke* does not control the Court's decision in this case. First, and most apparently, this case

arises under federal law, not Wisconsin state law. But on the merits, *Golke* does not control or demand reversal here because, in effect, the trial court faithfully applied the standard announced in *Golke*.

In *Golke*, the trial court found an insurer spoliated evidence by failing to preserve a fire-damaged roof and dismissed the insurer's claim as a sanction for spoliation. 768 N.W.2d at 731. *Id.* The Wisconsin Supreme Court reversed, concluding that the insurer discharged its duty to preserve the evidence by mailing a letter to the defendants stating, "[t]o provide adequate time for yourself or your liability carrier to conduct a proper investigation, any destruction of the fire damaged building will not take place until April 1, 2000." *Id.* at 732-33.

While *Golke* may support the proposition that a party may discharge its duty to preserve evidence by providing the opposing party adequate notice, that principle is undisputed. Here, our trial court expressly considered this argument and found that Dickinson did not provide adequate notice that it was going to destroy the key evidence in this case. 1-ER-189-91. Dickinson's letters stand in stark contrast to the one in *Golke*. They did not inform FPS of the freezer's destruction but that it would be removed and that FPS should cooperate in that process. 12-ER-3431, 3445, 3468-69. Thus, unlike *Golke*, Dickinson's letters never informed FPS that key evidence would be destroyed and unavailable for examination.

36

Therefore, *Golke*, while perhaps informative as to the standard to be applied, does not control because the particular notices Dickinson sent are materially different. The Court should reject Dickinson's argument that the trial court abused its discretion by failing to follow a non-binding state court decision with distinguishable facts. As the Court observed in *Unigard*, a "factually specific, case-by-case analysis [is] necessary to determine [the] proper penalty for destruction of evidence." 982 F.2d at 369

Rather than grappling with the trial court's ample fact findings, Dickinson ignores them and asks the Court to weigh the evidence anew. That is not the Court's role in this appeal. For the reasons discussed above, the trial court did not err by determining that Dickinson's July, October, and December 2017 letters failed to provide adequate notice and opportunity to inspect the crucial evidence Dickinson destroyed.

### 3. The trial court did not err by distinguishing between FPS's troubleshooting and the opportunity to inspect evidence relevant to litigation.

Dickinson faults the trial court for making a "distinction between a pre-litigation and post-ligation [sic] 'opportunity to inspect.'" Opening Br. at 26 (quoting 1-ER-162). But, as the trial court explained, such a distinction "is logical where, as here, a party's spoliation of evidence precludes the other party's expert from inspecting relevant evidence." 1-ER-162 (citing *Unigard*, 982 F.2d at 368).

More specifically, the trial court found that "FPS's [pre-litigation] visits to the Sugar City facility to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed." 1-ER-186.

This distinction drawn by the trial court is logical, rational, and supported by the evidence. The court found that, prior to Dickinson destroying the freezer, FPS employees and agents visited Dickinson's facility to troubleshoot the freezer in an attempt to get the system running to Dickinson's standards. 1-ER-171-76. However, the trial court found that "FPS's visits to [Dickinson's] facility to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed," because those troubleshooting visits were made "to work with Dickinson to resolve problems with the freezer and refrigeration system, not in the anticipation of litigation." 1-ER-186. This distinction is eminently reasonable here, particularly because Dickinson's litigation expert tested the freezer and refrigeration system just prior to the spoliation, and the trial court found that FPS's expert could and would have run additional tests that would have produced evidence relevant to FPS's defenses in this litigation. 1-ER-197-98.

Moreover, as the trial court recognized, courts in this circuit have "delineated a pre-litigation and post-litigation distinction in determining whether a party has had an adequate opportunity to inspect evidence." 1-ER-163 n.29 (collecting cases). The trial court's delineation here was therefore not premised on

an erroneous view of the law, and therefore the Court should reject Dickinson's argument.

Take for example one of the cases the trial court relied on, *Ski Lifts Inc. v. Schaeffer Mfg. Co.*, No. C19-0062-JCC, 2020 WL 1492676, at *5 (W.D. Wash. Mar. 27, 2020). In *Ski Lifts*, the plaintiff's snowcats began displaying problems with their powertrains, and suspecting the defendant's hydraulic fluid was the cause, the plaintiff gathered the hydraulic pumps from the failed snowcats and stored them in a bin. *Id*. at *1. The plaintiff contacted the defendant, who sent agents to visit the plaintiff and inspect one of the damaged hydraulic pumps. *Id.* at *2. The plaintiff retained the damaged pumps for another two years, before sending the pumps to be scrapped. *Id.* at *2-3.

After the litigation commenced, the defendant moved to dismiss the plaintiff's claims for the destruction of the hydraulic pumps. *Id.* at *3. The plaintiff argued, in part, that sanctions were not warranted because the defendant had an opportunity to inspect the hydraulic pumps prior to the litigation. *Id.* at *5. The district court rejected this argument, explaining that it "impermissibly attempts to shift [the plaintiff's] duty to preserve evidence onto Defendant in the form of a duty to inspect potentially relevant evidence before litigation has commenced." *Id.* The defendant's "disinterest in inspecting the [damaged hydraulic pumps] more

than two years before Plaintiff filed suit did not relieve Plaintiff of its duty to preserve relevant evidence." *Id.*

The same can be said here. Dickinson does not dispute that it was obliged to preserve the freezer and refrigeration system as relevant evidence and does not dispute that it did not do so. It cannot shift that obligation to FPS by arguing that because FPS troubleshot the freezer pre-litigation to work with a dissatisfied customer, FPS was required to run every test it could run to produce evidence for use in litigation. Like the defendant's pre-litigation visit in *Ski Lifts*, "FPS's visits to the Sugar City facility to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed." *See* 1-ER-186.

The cases Dickinson cites in support of its argument that there ought to be no difference between pre-litigation and post-litigation notices concerning the destruction of evidence are factually inapposite. *See* Opening Br. at 26. In *Fujitsu*, the Second Circuit affirmed the denial of a request for spoliation sanctions because the district court found the moving party did not request to inspect the shipping container after being notified of the damage or thereafter. 247 F.3d at 435-36. The same cannot be said here. Dickinson refused FPS's requests to be present at and participate in the removal of the freezer and even to arrange for the return of the freezer so that it could be safety stored. 1-ER-177-78, 182-84, 190-91.

40

Nor does *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*, 769 F. Supp. 2d 269 (S.D.N.Y 2011) help Dickinson. In *Cedar*, the district court declined to impose spoliation sanctions in large part because tests had already been run on the destroyed evidence, and the moving party could not establish that further testing would produce relevant evidence. *Id.* at 294. Those are not the circumstances here. Our trial court found that FPS had "detail[ed] not only a number of tests that could not be run due to the destruction of the unit, but also why such tests are relevant to FPS's defense." 1-ER-197.

The trial court was well within its discretion to recognize the distinction between FPS's troubleshooting of the freezer for customer service and a fulsome analysis of the freezer and refrigeration system performed by an expert to support FPS's position in this litigation. Dickinson's unilateral decision to destroy this evidence deprived FPS of the opportunity to conduct such testing and analysis, regardless of whether FPS had some evidence regarding the freezer prior to its destruction. The Court should reject Dickinson's argument.

### 4. The evidence supports the trial court's finding that FPS did not inspect the freezer or refrigeration system.

Next, Dickinson directly challenges the trial court's finding of fact that FPS did not run tests on the freezer or the refrigeration system. Opening Br. at 28-31. But Dickinson impermissibly expands the record beyond that which was before the trial court, relying on its summary judgment evidence filed years after the court

41

made its spoliation determination. This evidence should not be considered on appeal. *See supra* § I.B. Even so, Dickinson's argument fails to identify clear error.

Before the trial court, Dickinson similarly argued that FPS inspected and conducted tests on the freezer and refrigeration system. 11-ER-3099. The trial court disagreed, finding that "FPS's visits to [Dickinson's] facility to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed." 1-ER-186. The trial court also found that FPS did not run its own tests or analysis prior to the destruction of the freezer. 1-ER-186-89, 158 (citing, e.g., SER-176). Dickinson has not shown any clear error in the trial court's findings or that FPS's modifications to the freezer included or otherwise constituted an "inspection" for purposes of litigation.

The trial court also rejected Dickinson's argument that FPS and its consultant Peterson "participated in both Engineering Summits and gathered voluminous performance data relating to both the Freezer and the Refrigeration System." Opening Br. at 30. Dickinson continues to ignore the key distinction the trial court found between the information gathered to troubleshoot the freezer and information FPS could have gathered had Dickinson not destroyed the evidence. 1-ER-186, 158, 162-63. Moreover, the trial court found that Dickinson's destruction of the freezer deprived FPS of the opportunity to inspect the freezer. 1-ER-187, 197-8 (citing, e.g., 12-ER 3356-58).

42

Dickinson cannot show that these findings are clearly erroneous, and instead seeks to have this Court make its own findings of fact based on evidence Dickinson failed to present to the trial court. The Court should reject Dickinson's invitation to conduct a *de novo* review, and affirm the trial court's findings.

## III. The trial court did not abuse its discretion in imposing a mandatory adverse inference instruction for Dickinson's spoliation of evidence.

Dickinson's second issue on appeal relates to the trial court's choice of sanction. Opening Br. at 1-2, 31-53. The trial court's adverse inference instruction requires the jury to presume that "FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." 1-ER-207. Dickinson argues the trial court's mandatory adverse inference instruction is "tantamount to the entry of judgment" and impermissibly terminated its case, and was not the least severe sanction based on FPS's evidence of prejudice from the spoliation. Opening Br. at 31-53. The trial court did not clearly err in exercising its discretion finding otherwise.

### A. The adverse inference instruction only became case-ending years later, by Dickinson's own litigation strategy.

#### 1. The adverse inference instruction was not tantamount to a case-terminating sanction.

To decide which spoliation sanction to impose, the trial court considered, the degree of Dickinson's fault, the degree of prejudice to FPS, and the least severe sanction to mitigate FPS's prejudice. 1-ER-181 (citing *Reinsdorf v. Skechers*

43

*U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013)), 193-207. Dickinson does not take issue with that test and instead challenges the mandatory instruction as a *de facto* case-terminating sanction. Opening Br. at 31-35.

But Dickinson does not show the trial court abused its discretion in its choice of sanction or evaluation of its scope. Trial courts have "the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party. . . responsible for that behavior." *Glover*, 6 F.3d at 1329. The record simply does not support Dickinson's contention that the adverse inference instruction could only result in the dismissal of its case. From the start, the trial court found dismissal was inappropriate under the facts of the case. 1-ER-193-205; *see also* 1-ER-157. It also refused to exclude evidence regarding the freezer and refrigeration system as a sanction precisely because that would be tantamount to dismissal. 1-ER-205-06. Only then did the trial court consider an adverse inference and land on the mandatory instruction as an appropriate sanction. 1-ER-206-07.

At the time the spoliation order was entered, dismissal was hardly inevitable. *See* 1-ER-157. Discovery continued for another two years. And in denying Dickinson's motion for reconsideration of the spoliation order, the trial court rejected the notion that the mandatory instruction was unclear or effectively ended Dickinson's case. 1-ER-154-57. While the trial court held that Dickinson would be

44

"presumptively" unable to establish its breach of contract claim to the extent it was based on the performance of the freezer, the court did not foreclose it from arguing breach on other grounds. *Id*. Nor did it prevent Dickinson from pursuing its other claims for breach of express warranty, breach of the covenant of good faith and fair dealing, and promissory estoppel. *Id*.

While Dickinson argues otherwise, it mostly argues that the trial court erred in refusing to consider its new claim, based on FPS's January 2016 email, that FPS breached the parties' agreement because the Freezer was not capable of freezing for 20-22 hours per day. 10-ER-2783, 2800. Using the 20 to 22 hour per day performance metric, Dickinson manufactured an argument that the mandatory instruction was unclear and tantamount to a case-terminating sanction. The trial court was not convinced, in part because it found Dickinson had waived its new claim for purposes of reconsideration. 1-ER-156. It would not, on reconsideration, construe the contract as requiring the freezer to operate 20-22 hours per day. *Id*.

On appeal Dickinson argues that the trial court's waiver finding was reversible error, Opening Br. at 31-35, and somehow resulted in the mandatory adverse jury instruction "becoming an improper *de facto* case-terminating sanction," *id*. at 35. In particular, Dickinson argues there was no waiver because that it "has always maintained that the parties' bargain consists of" the contract and

the January 2016 email and that the trial court wrongly invoked the parol evidence rule. *Id*. at 32-34. None of that is true.

While the trial court questioned the parol nature of the January 2016 email, it found the parol evidence rule did not matter. 1-ER-156. In its complaint, as well as in its opposition to the spoliation motion, Dickinson had maintained that FPS breached the contract because the freezer could not freeze 8,000 pounds per hour. *Id*. (citing 13-ER-3594-96 (¶¶ 14, 18); *see also* 11-ER-3088, 3089, 3099, 3102). But on reconsideration, for the first time, Dickinson claimed its breach of contract claim rested not on the freezer's inability to freeze 8,000 pounds per hour but on whether the freezer could operate continuously for 20 to 22 hours per day. 1-ER-156 n.25 (citing 8-ER-2229-30 n.4).

While Dickinson claimed it raised the 20 to 22 hours per day performance metric in its original opposition to FPS's motion for sanction, Opening Br. at 34 (citing 11-ER-3086), the trial court correctly debunked that contention, 1-ER-156 n.25. Dickinson simply referred to the January 2016 email in a parenthetical. *See* 11-ER-3086. It never argued FPS breached the parties' contract because it required the freezer to operate 20 to 22 hours per day. 1-ER-156 n.25. Thus the trial court did not abuse its discretion in finding Dickinson waived the new claim.[7] *Id*. n.25;

---

[7] Dickinson also argues the trial court erred in finding waiver because it did not intentionally relinquish or abandon a known right. Opening Br. at 34 n.13.

*see also Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1141 n.6 (9th Cir. 1999) ("A district court has discretion to decline to consider an issue raised for the first time in a motion for reconsideration.").

Dickinson also argues that the mandatory instruction was improper because the trial court found it did not act in bad faith in spoiling the freezer and refrigeration system. Opening Br. at 35-36. But for this argument Dickinson again maintains the instruction was case-terminating, which it was not. Moreover, a finding of bad faith is not required to impose an adverse inference; simple notice of the potential relevance of the evidence is sufficient. *Glover*, 6 F.3d at 1329 (citing *Unigard*, 982 F.2d at 368-70 n.2). Just as in *Unigard*, the trial court exercised its discretion to determine that a mandatory presumption was appropriate to cure FPS's prejudice under the facts here. *See* 982 F.2d at 368-69.

In the end, Dickinson's contention that the mandatory instruction is unclear and tantamount to a case-terminating sanction is wrong. As the trial court observed on reconsideration, Dickinson remained free to pursue its three other claims for breach of express warranty, breach of the covenant of good faith and fair dealing, and promissory estoppel. 1-ER-156-59; *see also* 1-ER-111 n.15. Dickinson also

---

However, Dickinson's waiver was based on a failure to preserve for raising a new claim for the first time on a motion for reconsideration, not a substantive waiver.

could seek to amend its complaint. 1-ER-157. Dickinson has not shown that the trial court abused its discretion in its choice of sanction.

### 2. The adverse inference instruction was not itself case-terminating.

Dickinson also maintains that, while the trial court repeatedly found the adverse inference instruction was not case-terminating, the instruction "effectively required the jury to find against Dickinson on all its claims." Opening Br. at 36-37. Dickinson contends the trial court's failure to resolve this "paradox" eventually led the court to dismiss its claims on summary judgment. *Id*. at 36-40. But that is not what happened. Dickinson cannot blame the trial court for its own litigation choices or missteps, particularly its belated attempt to amend its complaint.

Dickinson ignores the state of its case by suggesting that the trial court erred in denying its motion for reconsideration and motion to amend and in granting FPS's motion for summary judgment. Opening Br. 38-40. As explained before, Dickinson has waived those argument. *See supra* § I.A.

Against that backdrop, the trial court did not err in dismissing Dickinson's breach of contract claim. *See* 1-ER-7-12. The claim alleged that FPS "breached the Agreement by failing to perform its duties and obligations therein, including by failing to provide a freezer that conformed with the Agreement's specifications." 13-ER-3597 (¶ 26). And Dickinson "self-limited" its breach of contract theory to the freezer's failure to comply with the contractual specifications, and it offered no

48

evidence that FPS breached the contract through some other means. 1-ER-8. Further, the trial court did not allow Dickinson to amend its complaint to allege the freezer was promised to operate for 20 to 22 hours per day. 1-ER-54-56.

But Dickinson was not only foreclosed from making its new claim based on FPS's January 2016 email, the claim itself sought to establish that the parties agreed the freezer would operate for a specified period of time, and that if it did not, FPS breached that agreement. *See*, *e.g.*, 2-ER-322-23. Thus, even if Dickinson could maintain a breach of contract claim based on the 20 to 22 hour per day performance metric, the jury would be instructed to "presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." 1-ER-207.

Accordingly, whether Dickinson could maintain a breach of contract claim based on the alleged 20 to 22 hours per day specification or not, the result was the same. 1-ER-10-11. In the end, there was no genuine dispute on the issues before the trial court on summary judgment. As the trial court held, whatever the terms of the parties' agreement, whether they be written or established by parol evidence, "the freezer was capable of performing *as required by those terms*," and no reasonable jury could find otherwise. 1-ER-11. The trial court did not err and must be affirmed based on Dickinson's litigation choices.

**B.** **The trial court correctly determined that FPS was significantly prejudiced by Dickinson's spoliation of evidence.**

Dickinson next contends that the trial court should have found that FPS did not demonstrate prejudice from the destruction of the freezer and refrigeration system. Dickinson again invites the Court to reweigh the evidence. Because the trial court's findings are well-supported by the record and rational, the Court should reject the invitation.

**1.** **The evidence supports the trial court's findings of fact regarding the degree of prejudice suffered by FPS.**

**(a)** **FPS demonstrated specific prejudice are supported by the record.**

Dickinson raises two arguments regarding prejudice that must be taken together. Dickinson first contends the trial court improperly shifted the burden of prejudice from FPS to Dickinson. Opening Br. at 43-45. Dickinson, however, ignores the trial court's actual analysis. The trial court did not simply hold that Dickinson's willful spoliation shifted the burden of proof to Dickinson to show FPS had not been prejudiced. 1-ER-196-97. The trial court found that "FPS has demonstrated specific prejudice it has suffered due to Dickinson's spoliation." 1-ER-197. Thus the entire premise of Dickinson's contention is wrong.[8]

---

[8] Dickinson also attempts to undercut the trial court's reliance on *Apple*, which holds that a spoliation finding shifts the burden of proof "'to the guilty party to show that no prejudice resulted from the spoliation.'" 888 F. Supp. 2d at 998 (citation omitted) (reasoning that the guilty party "'is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing'"

That leads to Dickinson's' next argument: that FPS's evidence of prejudice was vague and disproven. *Id*. at 45-50. Dickinson contends that FPS relied on vague or generalized allegations of prejudice and that "the record does not substantiate these allegations." *Id*. at 45. But this is another argument where Dickinson seeks to attack the trial court's findings with the spoliation reconsideration record (which was excluded) and the summary judgment record (which was developed years later). *See id*. at 47-48, 50. The Court should not consider that evidence. *See supra* § I.B.

That leaves the trial court's findings of fact, which are fully supported. Nevertheless, Dickinson raises the same complaints it raised to the trial court: that FPS did not make a specific showing of what it could have discovered by testing the freezer and refrigeration system or show how its new data would be different than the existing data. *Id*. at 46-47. The trial court, however, disagreed. It found that FPS's expert Ford, as well as other FPS witnesses, detailed a number of tests that could have been run and explained why the tests were relevant to FPS's defense. 1-ER-197.

The record supports that finding. FPS's evidence showed there were multiple tests it would have run, including verifying the accuracy of the data

---

(citation omitted)). The trial court's defense of *Apple*'s holding is sound. *See* 1-ER-151-53.

recorded from the freezer and refrigeration system, running both independent from one another, and having the freezer tested in a third-party facility using the same refrigeration configuration required under the contract. 1-ER-180, 197 (citing, *e.g.*, 14-ER-3806-07 (¶¶ 23-29); 12-ER-3356-58. But, as the trial court found, that was no longer possible. 1-ER-197.

Dickinson's additional arguments are also disproven by the trial court's findings. Based on the spoliation reconsideration and summary judgment records, Dickinson contends Ford contradicted himself regarding FPS's claims of prejudice and that the trial court refused to consider that evidence. Opening Br. at 47. Not so. The trial court directly refuted those claims. 1-ER-153-54 (citing 8-ER-2298-2309; 9-ER-2311-2574). Dickinson also argues there was disconnect between the adverse inference instruction and FPS's prejudice.[9] Opening Br. at 48-50. But again, Dickinson misses the point and does not show clear error. The trial court identified specific prejudice FPS would face given its inability to test the freezer *and* the refrigeration system, whether together or alone. 1-ER-180, 197 (citing, *e.g.*, 14-ER-3806-07 (¶¶ 23-29).

---

[9] Oddly, Dickinson also argues that FPS did not show prejudice because no tests were required for Dickinson's design defect theory. Opening Br. at 49-50. It does not explain how that theory somehow eliminates FPS's compromised defense of the breach of contract claim. In any event, Dickinson no longer has a design defect theory given the denial of its motion to amend. It has not appealed the loss of that claim.

52

Dickinson has not shown that the trial court clearly erred in finding FPS was prejudiced by Dickinson's conduct. *See Leon*, 464 F.3d at 960 ("Because of the obvious relevance of [destroyed evidence] . . . to the litigation and the harm to IDX caused by Leon's destruction of [this evidence], the district court did not clearly err in its finding of prejudice.").

### (b) Dickinson's tests and data did not preclude FPS's prejudice.

Dickinson next argues the trial court should not have found prejudice because of the "abundance of accurate and reliable data" available to FPS. Opening Br. at 51-52. Citing again to the later summary judgment record, Dickinson points to the inspections and testing performed by Kemper, Nestle, and others. *Id*.

This argument is no different than Dickinson's earlier challenge to the trial court's finding that FPS's "inspections" did not discharge Dickinson's duty to preserve evidence. *See supra* § II.B.4. And it should be rejected for the same reasons. As the trial court found, FPS did not run its own tests or analysis prior to the destruction of the freezer or to defend against Dickinson's litigation claims. 1-ER-186-89, 158 (citing, *e.g.*, SER-176).

There was also additional evidence supporting the trial court, including evidence that called into question the reliability of the data gathered. *Id*. (citing, *e.g.*, SER-166, 186-88. Moreover, the trial court held that "because FPS's expert cannot test the key evidence at issue in this suit, 'it matters not that other entities

may have already [tested] it[.]'" *Id.* (citation omitted). The trial court's findings of fact were neither illogical nor implausible. They are supported by the record and must be affirmed.

> **2.** **The evidence supports the trial court's finding that an adverse inference instruction was the least severe sanction under the circumstances.**

Dickinson's final argument is that the trial court imposed the most severe discovery sanction possible and that, at most, it should have issued a permissive adverse inference instruction. *See* Opening Br. at 52-53. Dickinson again presumes that the mandatory instruction was a case-terminating sanction, which it was not. As for a permissive instruction, Dickinson relies on *Apple*, where the district court overturned the magistrate's mandatory instruction as too harsh because "evidence of Apple's resulting prejudice is not particularly strong." 888 F. Supp. 2d at 994.

The *Apple* district court reasoned that the voluminous discovery already produced by the party facing sanctions did not justify a determinative adverse inference instruction. *Id.* The situation here is far different.

One way is that the district court in *Apple* reviewed the propriety of the sanction imposed by the magistrate as the presiding judge, who would ultimately determine the jury instructions to be given. *See id.* at 992. That leads to a recurring problem with Dickinson's argument—it does not address or apply the standard of review. *See* Opening Br. at 52-53. Dickinson does not address the trial court's

broad discretion to determine an appropriate sanction for spoliation on a case-by-case basis. *Unigard*, 982 F.2d at 367-68; *Fujitsu*, 247 F.3d at 436. Dickinson has not shown that the trial court abused its discretion or committed clear error in weighing the degree of its fault, the degree of prejudice suffered by FPS, or the availability of lesser sanctions.

Again, Dickinson relies solely on its conclusive argument that FPS can mitigate any prejudice given the "voluminous amount of secondary evidence regarding the performance of the Freezer and Refrigeration System." Opening Br. at 53. That argument has been dispelled above. Moreover, Dickinson does not mention the trial court's consideration or analysis of the available sanctions, 1-ER-193-207, and finding that a mandatory adverse inference instruction was the "least onerous sanction" corresponding to Dickinson's fault and the prejudice suffered by FPS. 1-ER-207-08; *see also* 1-ER-124, 155 n.24.

Ultimately, based on the record before it, the trial court found that Dickinson acted willfully and recklessly in failing to preserve crucial evidence and that "[s]uch conduct constitutes sufficient culpability to justify an adverse inference." 1-ER-206, 208. It found dismissal and the exclusion of evidence inappropriate under the circumstance. 1-ER-205-07. And after weighing Dickinson's conduct in spoiling the key evidence and "the significant prejudice to FPS resulting from

Dickinson's conduct," the trial court found a mandatory inference was appropriate. 1-ER-205-08.

Dickinson does not take issue with the trial court's reasoning, other than contending FPS already had adequate information on the freezer and refrigeration system's performance. That, as explained, is not enough to show clear error. The trial court reasoned that a rebuttable presumption would not be an effective alternative because it would "leave Dickinson free to tell its own story, unchecked by the evidence it failed to preserve," 1-ER-207, and would be "manifestly unjust to FPS under such circumstances," 1-ER-159. The trial court refused to allow a permissive adverse inference instruction that could work as a non-rebuttable instruction against FPS. 1-ER-158-59.

The trial court carefully weighed the evidence before it and is entitled to broad deference in its findings. Just as in *Unigard*, the trial court exercised its discretion to determine that a rebuttable presumption against Dickinson would have been insufficient to cure FPS's prejudice under the facts here. 892 F.2d at 368-69; *see also Glover*, 6 F.3d at 1329 (recognizing trial court's discretion to permit adverse inference instruction as spoliation sanction in lieu of excluding disputed evidence). The trial court did not abuse its discretion and should be affirmed.

**IV.    The trial court did not err in awarding FPS attorney fees and costs for Rule 37(a)(5) for making its motion for protective order.**

Dickinson's third issue on appeal concerns the trial court's award of attorney fees and costs to FPS for making its motion for protective order. Opening Br. at 3, 54-56. The trial court granted FPS's motion and precluded the three depositions of the Colmac Coil employees (Pope, Nelson, and Fazzari) because they were conducted without proper notice under Federal Rule of Civil Procedure 32(a)(5)(A). 1-ER-129-36. None of the three reasons raised by Dickinson require the award to be vacated.

### A.    The trial court correctly found that FPS attempted in good faith to confer with Dickinson prior to filing the motion.

Federal Rule of Civil Procedure 37(a)(5)(A) provides that if a motion for protective order is granted, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." But the court may not order such payment if "the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action." Fed. R. Civ. P. 37(a)(5)(A)(i). Dickinson contends FPS's award was barred by that rule.

Here, the trial court expressly found that "FPS attempted to confer with Dickinson in good faith in order to resolve its objection to the Nelson, Pope, and

Fazzari depositions before filing the Third Motion for Protective order." 1-ER-80.

That finding is well-supported and not clearly erroneous. The parties agreed that

they made multiple attempts to resolve FPS's opposition to the Pope, Nelson, and

Fazzari depositions. 1-ER-77-80; 1-SER-133-34 (¶¶ 27-30), 139-45. These

attempts included at least one phone call, and throughout these discussions FPS

contended that the depositions were improper and should not be held. 1-ER-77-80;

1-SER-133-34 (¶¶ 27-30), 139-45.

From this evidence, the trial court reasonably and rationally found that FPS

attempted to confer in good faith with Dickinson prior to filing its motion for a

protective order. 1-ER-80. Dickinson has not shown that this finding was clearly

erroneous, and therefore the trial court did not err by rejecting Dickinson's

contention that fees and costs were barred by Rule 37(a)(5)(A)(i).

### B. The trial court did not err by enforcing Rule 32(a)(5)(A)'s 14-day notice obligation for third-party depositions.

Federal Rule of Civil Procedure 32(a)(5)(A) is clear:

> A deposition must not be used against a party who,
> having received less than 14 days' notice of the
> deposition, promptly moved for a protective order under
> Rule 26(c)(1)(B) requesting that it not be taken or be
> taken at a different time or place—and this motion was
> still pending when the deposition was taken.

Dickinson does not dispute that the prerequisites for the application of this rule

apply here: FPS received less than 14 days' notice of the depositions of the three

employees, FPS promptly moved for a protective order, and the motion was pending when the employees' depositions were taken. By the plain language of Rule 32(a)(5)(A), the trial court correctly determined that the depositions "must not be used against" FPS. 1-ER-81.

Dickinson cites two out-of-circuit, unpublished district court decisions for the proposition that district courts are permitted to ignore the plain language of Rule 32(a)(5)(A). But these cases do not support Dickinson's arguments for the very reasons explained by the trial court. In both *Mezu v. Morgan State University*, Nos. WMN-11-3072 & WMN-09-2855, 2014 WL 12734011 (D. Md. May 13, 2014), and *Landis v. Galarneau*, No. 2:05-CV-74013, 2010 WL 446445 (E.D. Mich. Jan. 28, 2010), the district court was able to rule on the motion prior to the short-noticed deposition taking place. *See Mezu*, 2014 WL 12734011, at *2 (explaining that the court informed the parties by telephone that the motion was denied prior to the deposition occurring that same day); *Landis*, 2010 WL 446445, at *1-3 (order on motion issued January 28, 2010, depositions scheduled for January 28 and January 29, 2010).

It follows that neither *Mezu* nor *Landis* supports Dickinson's argument that the mandatory language of Rule 32(a)(5)(A) is anything other than mandatory. Rather, the cases stand for the unremarkable proposition that, absent the factual predicate for application of Rule 32(a)(5)(A), a district court has discretion to

permit a party to take and use depositions on short notice. Accordingly, the trial court did not err by applying Rule 32(a)(5)(A) and excluding the challenged depositions.

### C. The trial court did not err by determining that Dickinson's position was not substantially justified.

Rule 37(a)(5)(A)(ii) provides that a court should not award attorneys' costs and fees where "the opposing party's nondisclosure, response, or objection was substantially justified." Dickinson argues that it was substantially justified in failing to provide 14 days' notice of the depositions of the three employees because "Dickinson cited case law supporting its position that Rule 32(a)(5)(A) is discretionary." Opening Br. at 55. This argument is unavailing.

The case law Dickinson cited to the trial court simply did not stand for the proposition Dickinson advanced. As discussed above, neither *Mezu* nor *Landis* supports Dickinson's argument that a trial court has discretion to allow a party to use a short-noticed deposition when such deposition was taken while a motion for a protective order was pending. Rather, *Mezu* and *Landis* held that a trial court has discretion to decide a motion for a protective order *prior to* the deposition occurring, and in so deciding, may permit the short-noticed deposition to occur. *Mezu*, 2014 WL 12734011, at *2; *Landis*, 2010 WL 446445, at *1-3. Dickinson's citation to cases that do not support its argument cannot provide "substantial justification" for its discovery violation.

60

The Court must affirm FPS's award of attorney fees and costs.

## CONCLUSION

For the foregoing reasons, the Court should affirm the trial court's orders granting FPS's motion for spoliation sanctions and granting FPS's motion for fees and costs.

DATED:  April 28, 2023.

STOEL RIVES LLP

/s/ *W. Christopher Pooser*
Elijah M. Watkins
W. Christopher Pooser

Attorneys for Appellee FPS Food
Process Solutions Corporation

118596564.7 0054388-00005

## CERTIFICATE OF COMPLIANCE

This brief contains 13,843 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Circuit Rule 32-1.

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Respondent FPS Food Process Solutions Corporation is not aware of any related case pending in this Court.

DATED: April 28, 2023.

STOEL RIVES LLP

/s/ *W. Christopher Pooser*
Elijah M. Watkins
W. Christopher Pooser
Andrea S. Carone

Attorneys for Respondent FPS Food Process Solutions Corporation

62

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2023, I electronically filed the foregoing

**APPELLEE'S ANSWERING BRIEF** with the clerk of the court for the United

States Court of Appeals for the Ninth Circuit using the CM/ECF system of the

court. I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the CM/ECF system.

s/ *W. Christopher Pooser*
W. Christopher Pooser

63