No: 22-35832

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

DICKINSON FROZEN FOODS, INC.,

*Plaintiff/Appellant,*

v.

FPS FOOD PROCESS SOLUTIONS CORPORATION,

*Defendant/Appellee.*

On Appeal from the United States District Court
for the District of Idaho
D.C. No. 1:17-cv-00519-MMB
Hon. Chief Dist. Judge David Nye
Hon. Dist. Judge M. Miller Baker

_____

## APPELLANT'S REPLY BRIEF

_____

Dane A. Bolinger
HAWLEY TROXELL ENNIS &
HAWLEY LLP
P.O. Box 1617
Boise, ID 83701-1617
Telephone: (208) 344-6000

John F. Kurtz, Jr.
KURTZ LAW PLLC
910 W. Main Street, Suite 364
Boise, ID 83702
Telephone: (208) 287-8167
*Attorneys for Plaintiff/ Appellant
Dickinson Frozen Foods, Inc.*

# <u>TABLE OF CONTENTS</u>

Page

SUMMARY OF THE ARGUMENT ON REPLY ................................................... 1

ARGUMENT ..................................................................................................... 2

I.     FPS'S PROCEDURAL ARGUMENTS EACH FAIL. ....................... 2

       A.     Dickinson Properly Challenged the District Court's
                Orders Denying Reconsideration, Denying Leave to
                Amend, and Granting FPS Summary Judgment. ....................... 2

       B.     Because the First Order Was Interlocutory, This
                Court May Consider Evidence Submitted After It
                Was Issued but Before It Became Final. .................................... 6

       C.     FPS Fails to Offer Argument on Several
                Substantive Issues. ................................................................... 10

II.    EVEN ON THE ORIGINAL RECORD, THE FIRST
       ORDER CONTAINED REVERSIBLE ERROR. ............................. 11

       A.     Dickinson Discharged Its Duty to Preserve
                Evidence. ................................................................................... 11

       B.     The District Court Erred in Shifting the Burden as
                to Prejudice. ............................................................................. 15

       C.     FPS's Showing of Prejudice Was Insufficient to
                Support the Sanction Imposed. ................................................. 16

       D.     The Jury Instruction Was Inherently Improper. ....................... 18

III.   THE DISTRICT COURT ABUSED ITS DISCRETION
       BY FAILING TO GRANT RECONSIDERATION AND
       IN AWARDING FPS SUMMARY JUDGMENT ON
       THE JURY INSTRUCTION. ........................................................ 19

       A.     FPS Admits This Court Can and Should Consider
                Whether the District Court Erred in Failing to

45670.0013.15808836.1

Reconsider Its First Order for Clear Error or
Manifest Injustice.........................................................................19

B.    The District Court's Parol Evidence Ruling Was
Incorrect as a Matter of Law.....................................................20

C.    The Jury Instruction Was Case-terminating. ...........................21

IV.    THE EXPANDED FACTUAL RECORD
DEMONSTRATES THE DISTRICT COURT'S
REPEATED CLEARLY ERRONEOUS FACTUAL
FINDINGS REGARDING FPS'S PURPORTED
PREJUDICE. ....................................................................................23

A.    The District Court Erred in Relying on Eduardo
Ford's Misleading Affidavit Testimony. ..................................23

B.    FPS Witnesses Admitted that Their
"Troubleshooting" Investigated Whether the
Refrigeration System Was Performing Properly. ....................27

V.    FPS'S FEE AWARD SHOULD BE VACATED. ..............................29

CONCLUSION ..................................................................................................29

ii

# TABLE OF AUTHORITIES

Page

## Cases

*Am. Family Mut. Ins. Co. v. Golke*,
  768 N.W.2d 729 (Wis. 2009) ....................................................... 13, 14

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  888 F. Supp. 2d 976 (N.D. Cal. 2012) ........................................... 15, 22

*Cal. Pac. Bank v. FDIC*,
  885 F.3d 560 (2018) ...................................................................4

*Carlson v. Bos. Sci. Corp.*,
  856 F.3d 320 (4th Cir. 2017) ........................................................8

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) ...........................................25

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*,
  626 F.3d 483 (9th Cir. 2010) ....................................................4, 5

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
  254 F.3d 882 (9th Cir. 2001) ........................................................8

*Fassett v. Delta Kappa Epsilon (N.Y.)*,
  807 F.2d 1150 (3d Cir. 1986) .......................................................6

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
  247 F.3d 423 (2d Cir. 2001) ..................................................... 11, 25

*Holley v. Crank*,
  400 F.3d 667 (9th Cir. 2005) .....................................................3, 4

*Larez v. City of Los Angeles*,
  946 F.2d 630 (1991) ...................................................................4

*Lofton v. Verizon Wireless LLC*,
  308 F.R.D. 276 (N.D. Cal. 2015) .................................................16

*Melancon v. Texaco, Inc.*,
  659 F.2d 551 (5th Cir. 1981) ........................................................8

*Milhouse v. Warden Lewisburg USP*,
  700 F. App'x 158 (3d Cir. 2017)....................................................7

*Natural Res. Def. Council v. Cnty. of Los Angeles*,
  840 F.3d 1098 (9th Cir. 2016) ......................................................16

iii

*People of the Territory of Guam v. Reyes*,
    879 F.2d 646 (9th Cir. 1989) ............................................................................3, 4

*Santamarina v. Sears, Roebuck & Co.*,
    466 F.3d 570 (7th Cir. 2006) ............................................................................10

*Ski Lifts Inc. v. Schaeffer Mfg. Co.*,
    No. C19-0062-JCC, 2020 WL 1492676 (W.D. Wash. Mar. 27, 2020) ..............14

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
    982 F.2d 363 (9th Cir. 1992) ............................................................................12

*United States v. W.R. Grace*,
    504 F.3d 745 (9th Cir. 2007) ..............................................................................6

*Whittaker Corp. v. Execuair Corp.*,
    953 F.2d 510 (9th Cir. 1992) ..........................................................................7, 8

*Yamada v. Nobel Biocare Holding AG*,
    825 F.3d 536 (9th Cir. 2016) ..............................................................................7

## Statutes and Rules

FED. R. APP. P. 28 ....................................................................................... 2, 3, 4

FED. R. CIV. P. 37(a)(5)(A) ..............................................................................29

FED. R. CIV. P. 54(b) ....................................................................................8, 10

FED. R. CIV. P. 60(b)..........................................................................................7

45670.0013.15808836.1

## SUMMARY OF THE ARGUMENT ON REPLY

Dickinson appeals to reverse a series of erroneous interlocutory decisions that culminated in the dismissal of Dickinson's claims. Specifically, the district court entered an initial reversible interlocutory decision sanctioning Dickinson for purportedly spoliating evidence (the First Order[1]) and subsequently reaffirmed and compounded the errors of that decision with interlocutory decisions denying Dickinson's motions for reconsideration and for leave to amend its complaint. Eventually, the district court granted FPS summary judgment based on the prior erroneous interlocutory decisions. Dickinson's Opening Brief details this procedural history and highlights the district court's errors at each step of the proceedings below.

In its Answering Brief, FPS offers specious procedural technicalities and fails to engage substantively on most of the case's critical issues. FPS's procedural arguments fail under Ninth Circuit law. However, even if those procedural arguments were correct (they are not), Dickinson should still prevail here given the factual and legal errors appearing in the First Order—which FPS admits are properly before this Court. Furthermore, FPS fails to substantively respond to many of the errors made by the district court in the decisions following the First Order, instead asking this Court to ignore those errors on pretextual procedural

_____

[1] Unless context indicates otherwise, capitalized terms are defined in Dickinson's Opening Brief.

1

grounds. Contrary to FPS's argument, this Court should consider the blatant errors made by the district court at all stages of this case, including those that followed the interlocutory First Order. Finally, FPS likewise fails to engage on the facts of the fee award decision. This Court should reverse all the district court's erroneous decisions properly presented on appeal.

**ARGUMENT**

## I. FPS'S PROCEDURAL ARGUMENTS EACH FAIL.

### A. DICKINSON PROPERLY CHALLENGED THE DISTRICT COURT'S ORDERS DENYING RECONSIDERATION, DENYING LEAVE TO AMEND, AND GRANTING FPS SUMMARY JUDGMENT.

Rather than focus on the substantive merits of Dickinson's appeal, FPS contends as the cornerstone of its opposition that Dickinson waived challenges to the district court's orders denying reconsideration, denying Dickinson leave to amend, and granting summary judgment to FPS because Dickinson allegedly did not specifically identify those orders in the "Issues Presented" portion of its opening brief. This argument fails both legally and factually.

FPS's argument distorts Federal Rule of Appellate Procedure 28 and associated case law by invoking a non-existent and hyper-technical standard. According to FPS, any issue (or sub-issue) that is not expressly set forth in an appellant's "Issues Presented" in painstaking detail is automatically waived. However, Rule 28(a)(5) requires only that opening briefs contain "a statement of the issues presented for review[.]" Dickinson's brief contains such a section,

2

Opening Br. 8–9,[2] but FPS argues that the *scope* of the issues described therein should result in waiver of some challenges to the district court's erroneous decisions. Not so.

Federal law rejects FPS's hyper-technical interpretation of Rule 28(a)(5). Indeed, this Court reads opening appellate briefs "liberally" in favor of preserving issues on appeal. *Holley v. Crank*, 400 F.3d 667, 670 (9th Cir. 2005) ("At the outset, we note that we read opening briefs liberally."); *People of the Territory of Guam v. Reyes*, 879 F.2d 646, 648 (9th Cir. 1989) ("appellate briefs are read liberally to ascertain the issues raised on appeal…") (citation omitted; cleaned up).

FPS concedes that Dickinson properly challenged subsequent orders relying on the First Order: "FPS does *not* contend that Dickinson forfeited issues that are solely predicated on the mandatory adverse inference instruction [i.e., the First Order], if they are properly raised." Ans. Br. 24 n.4 (emphasis added). In other words, FPS apparently agrees that Dickinson properly preserved its challenges to the district court's decisions that repeated or compounded the errors and consequences of its paradoxical Jury Instruction and First Order. That makes sense, given that Dickinson's Notice of Appeal expressed that it sought review of every related decision from the district court after the First Order, including the decisions

---

[2] Citations to the Opening Brief and Answering Brief are to the CM/ECF page number, not each brief's "internal" page number.

on reconsideration, amendment, summary judgment, and the entry of final judgment. 13-ER-3611.

Moreover, Ninth Circuit jurisprudence is replete with cases where less than strict compliance with Rule 28 did not result in dismissal of an appeal or abandonment of an issue. *E.g., Cal. Pac. Bank v. FDIC*, 885 F.3d 560 (2018) (declining to find waiver where appellant's argument was "abbreviated" but nonetheless "minimally preserved" based on references to applicable legal authorities and to the appellate record); *see also Larez v. City of Los Angeles*, 946 F.2d 630 (1991) (declining to dismiss appeal where, despite non-compliance with technical rules, "the issues could be gleaned from the argument headings listed in the opening brief's table of contents").

Indeed, in *Reyes*, this Court specifically rejected an overly strict and technical reading of Rule 28's "issues presented." 879 F.2d at 648. There, this Court held that Guam's equivalent to Rule 28 did not bar review of an appellant's challenge to an evidentiary issue, despite not being listed in the appellant's statement of issues, where the issue was otherwise appropriately raised and challenged in the appellant's brief. *Id.*; *see also Holley*, 400 F.3d at 670.

Ignoring these standards, FPS instead quotes case law purportedly requiring that claims in an opening brief be "clearly articulated" and "argued specifically and distinctly." Ans. Br. 33 (quoting *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010)). But this appeal does not implicate

4

*Christian Legal*, which involved an attempt to preserve arguments that were never made: "CLS's opening brief made no pretext argument" and its "statement of the issue does not fairly encompass a selective application argument." *Id.* at 485. *Christian Legal* is also inapposite because Dickinson *did* make specific and distinct arguments challenging the district court's decisions on reconsideration, amendment, and summary judgment. And Dickinson's Issues Presented "fairly encompass" these issues. Dickinson's second issue referred to the district court "*repeatedly* and paradoxically *holding* that a case-terminating sanction would be inappropriate…" Opening Br. 8 (emphasis added). Dickinson's "Issues Presented" thus challenged multiple decisions, not just the First Order.

This conclusion is well-supported by the rest of Dickinson's opening brief. Dickinson's "Statement of the Case" devoted four pages to discussing its "repeated but unsuccessful attempts to reconcile the jury instruction," which identified each challenged order and asserted error in each. Opening Br. 21–24 ("the court denied Dickinson's Motion for Reconsideration" but "made numerous erroneous findings and holdings"; "Judge Baker issued an Order denying Dickinson's motion to amend…" that "contained several errors…"; "the court granted FPS summary judgment" but "refused to consider any of Dickinson's evidence."). Dickinson's "Summary of the Argument" also reiterated its challenges to the errors in these specific orders. *Id.* 25.

Further, Dickinson's "Standard of Review" section expressly discussed the

standards for motions to reconsider, motions for leave to amend, and summary judgment. *Id.* 10–11. Within its "Argument" section, Dickinson then specifically and distinctly articulated its legal reasoning for challenging those precise orders, discussing in detail how the district court repeated and compounded its errors. *Id.* 45–47, 54–55, 56–57.

The foundational premise of Dickinson's appeal is that the district court erred by issuing an improper sanction, which error was compounded with each subsequent order. It cannot reasonably be disputed that Dickinson has consistently challenged that original order, and if that order is overturned then the subsequent orders relying on it cannot stand.

## B. BECAUSE THE FIRST ORDER WAS INTERLOCUTORY, THIS COURT MAY CONSIDER EVIDENCE SUBMITTED AFTER IT WAS ISSUED BUT BEFORE IT BECAME FINAL.

FPS suggests that this Court's review of the First Order is inherently limited to consideration of the record that was before the district court when it issued that order. Ans. Br. 37–39. But the cases FPS cites are inapposite, as they all deal with evidence that was not presented to the district court before final judgment. *United States v. W.R. Grace*, 504 F.3d 745 (9th Cir. 2007), dealt with the appellee's motion to strike documents that were never before the district court but presented in an appellate reply brief. *Fassett v. Delta Kappa Epsilon (N.Y.)*, 807 F.2d 1150, 1165 (3d Cir. 1986), dealt with "deposition transcripts that were not on the record before [the district court] at the time its final decision was rendered." And in

6

*Milhouse v. Warden Lewisburg USP*, 700 F. App'x 158, 159 (3d Cir. 2017), the appellant sought to include in the appellate record documents that "were not before the District Court when it entered its decision" but had been submitted with a post-judgment motion brought under Federal Rule of Civil Procedure 60(b). Thus, none of these cases addressed whether an appellate court may consider evidence presented to a district court after entry of an interlocutory order but before that order becomes final.

Rather, this Court has repeatedly held that so long as an issue was adequately raised to the district court and ruled upon, the issue is properly within the scope of the appeal. *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016). Indeed, this Court applies a "workable standard" by assessing whether an argument was raised sufficiently for the trial court to rule on it and, if so, it is adequately preserved for appeal. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). In *Whittaker*, which should control this Court's decision, the district court entered a contempt order against the defendants and adopted the plaintiffs' requested remedies. *Id.* at 512. The defendants moved the district court to reconsider and, for the first time, contested the scope of the relief imposed. *Id.* at 514–515. The district court denied that motion, and the defendants appealed. *Id.* at 515.

On appeal, the plaintiffs argued (just as FPS does here) that this Court could not consider the arguments raised by the defendants on their motion for

7

reconsideration. *Id.* This Court rejected that argument, reasoning that by moving to reconsider below, the defendants "gave the district court a clear opportunity to review the validity of its order." *Id.* Therefore, the issues were not raised for the first time on appeal and had been adequately preserved. *Id. Whittaker* thus establishes that a party sufficiently preserves issues for appeal by moving for reconsideration and raising those issues and arguments to the trial court. The same principle should apply to evidence presented to the district court on reconsideration, which also gives "the district court a clear opportunity to review the validity of its order." *See id.*

Moreover, it is beyond dispute that the First Order was interlocutory, as the district court itself acknowledged. 1-ER-137. The First Order "adjudicate[d] fewer than all the claims or the rights and liabilities of fewer than all the parties" under Federal Rule of Civil Procedure 54(b). Accordingly, it was subject to "revis[ion] at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Id.*; *see also City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 889 (9th Cir. 2001) ("as long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order[.]) (quoting *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981)); *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (holding district court should reconsider interlocutory orders in the face of "substantially different evidence").

8

Because the First Order was interlocutory and therefore subject to revision at any time before final judgment, it logically follows that the factual record on that order was likewise subject to revision prior to final judgment. Thus, Dickinson was entitled to introduce additional and different evidence, which it did both on reconsideration and at summary judgment. To the extent that Dickinson's subsequently-introduced evidence is relevant to the First Order, such evidence should be considered when reviewing that order for error. Regardless, as described *infra*, the First Order is subject to reversal even when considering only the record before the district court when it was issued.

Finally, FPS's attempt to unduly limit the scope of this Court's review to *solely* the evidence before the district court on the initial motion for spoliation should be rejected as unjust policy. FPS apparently believes that after a district court issues an *interlocutory* order—a *non-final* decision—neither the district court nor the appellate court can *ever* consider additional evidence showing error in that order. Per FPS, the facts become conclusively established for all subsequent stages of the case, the party seeking to demonstrate error in factual findings with additional evidence has no remedy, and no federal court can review it, even where the district court's factual findings are demonstrably incorrect.

FPS's position "would condemn the parties to the unedifying prospect of continued litigation when they knew that a possibly critical ruling was in error and, unless it became moot in the course of the proceedings, would compel a reversal of

45670.0013.15808836.1

the final judgment at the end of the case." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006) (Posner, Circuit J.). This Court should reject FPS's interpretation, which is both unjust and inconsistent with Rule 54(b) .

### C. FPS FAILS TO OFFER ARGUMENT ON SEVERAL SUBSTANTIVE ISSUES.

FPS declines to address several issues critical to this appeal. Most significantly, FPS does not discuss the legal standards by which a party may fulfill its duty to preserve evidence, how the balance between the competing duties to preserve evidence and to mitigate damages should be weighed, or when the burden as to prejudice should shift in the context of a spoliation motion.

FPS also notably fails to acknowledge several material facts, either by omission or by conclusory and unsubstantiated allegations. The most significant of these, discussed *infra*, is that the deposition of Eduardo Ford was materially inconsistent with his earlier declaration in support of the spoliation motion, which the district court relied on heavily to find sanction-worthy prejudice. In disputing Dickinson's contention that Ford contradicted himself regarding FPS's claims of prejudice, FPS's only response was "Not so. The trial court directly refuted those claims." Ans. Br. 61. No analysis is provided; FPS merely doubles down on the district court's decision without explanation.

FPS also fails to address the key facts that FPS's counsel spoke with Dickinson's counsel three days before the Freezer's disassembly without mentioning it or requesting its postponement, and that it would have been

10

impossible for Dickinson to preserve the Refrigeration System after the Freezer's removal without suffering millions of dollars in lost revenue. These facts are not fairly subject to dispute, and FPS's silence on them is telling.

## II. EVEN ON THE ORIGINAL RECORD, THE FIRST ORDER CONTAINED REVERSIBLE ERROR.

FPS has not shown that this Court's review of the First Order is limited to the record as of the date the order was entered. But even if the Court does limit its review to that initial record, the First Order is still subject to reversal.

### A. DICKINSON DISCHARGED ITS DUTY TO PRESERVE EVIDENCE.

As discussed in its Opening Brief (pp. 27–38), Dickinson discharged its duty to preserve evidence by providing FPS timely notice and an opportunity to inspect the Freezer and Refrigeration System prior to their alteration. Moreover, in addition to FPS having had an "adequate and meaningful opportunity to inspect," *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 435–436 (2d Cir. 2001), it in fact *did* extensively inspect the evidence prior to its alteration.

FPS disingenuously disputes that it "inspected" the Freezer and Refrigeration System by repeating the district court's arbitrary distinction between pre-litigation "troubleshooting" and post-filing "inspections." Ans. Br. 46–50. But neither FPS nor the district court ever articulated any meaningful difference between "troubleshooting" and "inspection," and the case law does not support any such distinction. Significantly, both FPS and the district court quoted *Unigard Security Insurance Company v. Lakewood Engineering & Manufacturing*

45670.0013.15808836.1

*Corporation*, 982 F.2d 363, 368 (9th Cir. 1992), for the proposition that such a distinction "is logical where, as here, a party's spoliation of evidence precludes the other party's expert from inspecting relevant evidence." Ans. Br. 46; 1-ER-162. But in *Unigard*, the non-custodial party never received any notice the evidence would be destroyed. 982 F.2d at 369.

Here, Dickinson notified FPS of issues with the Freezer immediately after delivery, and the parties communicated extensively for months about the problems. Opening Br. 11–16. Moreover, FPS repeatedly had its own engineers and experts inspect the Freezer—including after Dickinson expressly threatened litigation. *Id.* *Unigard* thus has no relevance here and the district court abused its discretion in holding otherwise.

FPS attempts to distinguish between troubleshooting for performance and investigating for litigation, but neither FPS nor the district court articulate how any such distinction is meaningful. The district court stated that "FPS's visits … to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed," 1-ER-186, but no actual distinction is ever described—or defensible. There is no real dispute that FPS's "troubleshooting" involved investigating the exact same facts that would later become its theory of defense in the case.

Dickinson contends the Freezer failed to perform due to its inherently flawed design; FPS contends the Freezer failed to perform because of the Refrigeration

45670.0013.15808836.1

System's defective performance. Dickinson and FPS took their respective positions at least six months before the lawsuit was filed, kept those positions after the lawsuit was filed, and maintain those same positions even today. Those positions have never changed, so the district court's distinction between troubleshooting and investigation was utterly unsupportable. It was therefore clear error for the district court to find that FPS's pre-litigation "troubleshooting" did not suffice for Dickinson to discharge its duty to preserve evidence.

FPS also disputes that *American Family Mutual Insurance Co. v. Golke*, 768 N.W.2d 729 (Wis. 2009), applies to this case. Ans. Br. 44–46. However, as previously explained (Opening Brief 28–30), *Golke* is instructive both because it details public policy considerations regarding the duty to preserve evidence and because it establishes a reasonable standard for evaluating whether a duty to preserve has been discharged. Per *Golke*, a party discharges its duty to preserve evidence when it has a legitimate reason to destroy evidence, it provides reasonable notice of a possible claim, it discloses the basis for that claim, it identifies the existence of evidence relevant to the claim, and it provides a reasonable opportunity to inspect the evidence. 768 N.W.2d at 403.

Dickinson met this standard. It had a legitimate reason to disassemble the Freezer because it was losing millions of dollars in lost profits while the Freezer

13

was failing to perform.[3] 11-ER-3207. Moreover, Dickinson promptly notified FPS of the Freezer's failure, and Dickinson's attorney sent a rejection and repudiation to FPS's trial lawyer in July 2017, seven months prior to the Freezer's disassembly. Opening Br. 11, 14. That letter described the basis for Dickinson's claims and clearly faulted FPS's Freezer for the problems. *Id.* Subsequent communications between the attorneys led to the Second Engineering Summit,[4] four months before the Freezer's disassembly, during which FPS gathered even more data about the Freezer and the Refrigeration System. *Id.* at 15. Dickinson thus satisfied *Golke*, and under it or any reasonable standard, the district court abused its discretion by concluding Dickinson did not discharge its duty to preserve evidence.

FPS's argument that it did not *subjectively* contemplate litigation prior to October 2017 cannot change that result. Firstly, FPS's subjective perspective on whether litigation was likely is simply irrelevant. Opening Br. 33–34. But more importantly, FPS's contention is neither credible nor supported by the factual

---

[3] Thus, this case is readily distinguishable from *Ski Lifts Incorporated v. Schaeffer Manufacturing Company*, No. C19-0062-JCC, 2020 WL 1492676 (W.D. Wash. Mar. 27, 2020), relied upon by FPS and the district court, in which the evidence at issue was hydraulic pumps that presumably would not have been expensive or difficult to preserve. *See* Ans. Br. 48–49.

[4] FPS's contention that Dickinson "accepted FPS's offer to continue to cooperate," Ans. Br. 16–17, is disingenuous, as Dickinson merely did what it said it would in its original letter—"retain possession of the Freezer Machine and continue to operate it" until it could be replaced. 10-ER-2835.

45670.0013.15808836.1

record. Indeed, FPS admits that "FPS suggested litigation would not result in a satisfactory outcome." Ans. Br. 17. That "suggestion" appears in the July 24, 2017 letter FPS's attorney sent Dickinson's attorney. 12-ER-3433–34. There can be no reasonable dispute that FPS was <u>objectively</u> aware of the possibility of litigation no later than that date, given that its attorney acknowledged Dickinson's express threat of litigation.[5] The district court's finding to the contrary[6] is clear error. This Court should find that Dickinson discharged its duty to preserve evidence, which would necessitate reversal of all of the challenged decisions below and resolve this appeal without the need for further analysis.

**B.** **THE DISTRICT COURT ERRED IN SHIFTING THE BURDEN AS TO PREJUDICE.**

Dickinson previously argued that the district court committed reversible error when it relied on *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976 (N.D. Cal. 2012), to shift the burden of proof as to prejudice from FPS to Dickinson. Opening Br. 50–52. Significantly, FPS does not discuss this legal issue in its Answering Brief, instead reiterating the district court's scant and conclusory

---

[5] Dickinson also maintains that its July 2017 letter threatening litigation was enough, standing alone, to cause FPS to reasonably anticipate litigation. Further, there can be no doubt that in sum, Dickinson's letters from July, October, and December 2017 absolutely put FPS on notice that the Freezer would be removed.

[6] The First Order stated that "FPS did not reasonably anticipate litigation until a month after the September 2017 visit…" 1-ER-189.

45670.0013.15808836.1

findings of fact—which were undermined or outright disproven by the subsequent record. Ans. Br. 59–61.

But regardless of the supportability of those factual findings (discussed *infra*), it was clear error for the district court to hold that "the finding of spoliation shifts the burden of proof 'to the guilty party to show that no prejudice resulted from the spoliation…'" 1-ER-196. The court likewise erred by stating that "Dickinson's attempt to instead shift the burden to FPS to definitely prove prejudice is inappropriate," given the court's acknowledgment that "[t]he party requesting spoliation sanctions bears the burden of proving all three elements of the claim." 1-ER-185 (quoting *Lofton v. Verizon Wireless LLC*, 308 F.R.D. 276, 287 (N.D. Cal. 2015)). Improperly shifting a burden of proof constitutes reversible error. *Natural Res. Def. Council v. Cnty. of Los Angeles*, 840 F.3d 1098, 1104 (9th Cir. 2016).

### C.   FPS's Showing of Prejudice Was Insufficient to Support the Sanction Imposed.

The district court's prejudice findings are subject to reversal, and the Jury Instruction worked a case-terminating sanction. But even if the findings are upheld and the Jury Instruction is not found to be case-terminating, the First Order must still be reversed due to the abuse of discretion in the severity of the sanction imposed. Spoliation sanctions must be tailored based on the prejudice suffered. *See* Opening Br. 47. Here, the district court held that "a non-rebuttable inference is appropriate" and it indicated it would instruct the jury "to presume that had

16

Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." 1-ER-207.

The court further expressly held that "[a] rebuttable presumption would not be an effective alternative because it would leave Dickinson free to tell its own story, unchecked by the evidence it failed to preserve." *Id.* But nowhere in the First Order did the court explain how or why a rebuttable presumption would have been insufficient.[7] Dickinson's "story" has always been that it removed the Freezer— only after FPS had inspected it working in tandem with the Refrigeration System for literally *months*—because Dickinson was hemorrhaging profits due to the Freezer's non-performance. 11-ER-3207.

A rebuttable presumption would have allowed FPS to make the same arguments to the jury that it made to the district court as to the effect of the Freezer's removal on FPS's defense, which would enable the jury to reach its own conclusion about the significance, if any, of that removal. The "check" on the evidence would have been the jury's duty to weigh and decide the facts of the case,

---

[7] Nor did it acknowledge that "substantial prejudice" would exist in nearly *every* case if the standard is that all potentially-relevant evidence must be preserved until after litigation is commenced and opposing experts have an opportunity to inspect it. Litigants must have a reasonable way to discharge their duty to preserve evidence.

subject to the court's supervision of how the evidence came in at trial.[8] Thus, the district court abused its discretion by making the Jury Instruction non-rebuttable without adequately articulating any factual or legal basis for the alleged insufficiency of a rebuttable presumption.

### D. THE JURY INSTRUCTION WAS INHERENTLY IMPROPER.

The First Order is subject to reversal on its face because the Jury Instruction ordered by the district court was inherently improper. Most readily apparent, there is an inherent paradox in the district court repeatedly holding that a case-terminating sanction was inappropriate based on the facts and then issuing a jury instruction that effectively prevented Dickinson from ever succeeding at trial on any of its claims.[9] The Jury Instruction mandated the jury find that the Freezer met its performance requirements. 1-ER-207. But the four causes of action asserted in Dickinson's Complaint (breach of contract, breach of express warranty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel) ***all*** necessarily depended on being able to show that the Freezer failed to perform as

---

[8] Incidentally, making the instruction rebuttable or even deferring until trial whether to make it rebuttable or not would have ensured the district court had the benefit of the full evidentiary record when considering whether the sanction imposed would be case-terminating.

[9] It is particularly paradoxical that Judge Nye's First Order expressly stated that Dickinson would be allowed to present its evidence to a jury, but Judge Baker then held that the *Jury Instruction* precluded Dickinson from presenting evidence to a jury.

promised. *See* 13-ER-3592–98. At summary judgment, the district court expressly ruled that the Jury Instruction precluded Dickinson from introducing evidence at trial about the Freezer's performance, fatally undermining every single one of Dickinson's claims. There was thus no way Dickinson could possibly prove any of its claims in light of the Jury Instruction—which made it *de facto* case-terminating.

This conclusion is apparent even on the record that existed when the First Order was issued. Indeed, the district court itself eventually recognized the conclusive effect of the Jury Instruction, when it ultimately granted FPS summary judgment on the basis that "[u]nder the jury instruction, whatever the terms of the 'Parties' Agreement' were, *the freezer was capable of performing as required by those terms*." 1-ER-11 (emphasis in original). The First Order must be reversed.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO GRANT RECONSIDERATION AND IN AWARDING FPS SUMMARY JUDGMENT ON THE JURY INSTRUCTION.

### A. FPS ADMITS THIS COURT CAN AND SHOULD CONSIDER WHETHER THE DISTRICT COURT ERRED IN FAILING TO RECONSIDER ITS FIRST ORDER FOR CLEAR ERROR OR MANIFEST INJUSTICE.

FPS erroneously contends that this Court must limit its review of the First Order to solely those arguments and evidence presented to the court prior to its interlocutory ruling. As noted *supra*, that argument fails. But FPS admits that this Court can and should review whether the district court erred in denying reconsideration of the First Order based on clear error or manifest injustice. Ans. Br. 33 n.4. Dickinson has articulated numerous clear errors and unjust findings and

holdings in the First Order. Opening Br. 26–43. Thus, the parties apparently agree this Court can and should review the entire record to assess whether the district court abused its discretion in declining to reconsider the First Order based on clear error or manifest injustice.

**B.    THE DISTRICT COURT'S PAROL EVIDENCE RULING WAS INCORRECT AS A MATTER OF LAW.**

In the Second Order (which denied reconsideration of the First Order), the district court stated that "Dickinson does not address how Lai's email could revise the express terms of the Agreement under the limits of the parol evidence rule." 1-ER-156. As explained in Dickinson's Opening Brief (pp. 39–40), Dickinson's breach of contract claim was brought under the CISG, which does not recognize the parol evidence rule. The district court committed a clear error of law by applying the parol evidence rule to Dickinson's CISG claim.

Moreover, the Second Order was expressly predicated on this legal error. One page earlier, the court held that "[t]he Court's adverse inference instruction only presumptively ends Dickinson's ability to establish its breach of contract claim because … the Parties' Agreement … does not contain a clause requiring the FPS Freezer to operate 20-22 hours per day." 1-ER-155. Dickinson's argument was (and is) that the 20-22 hour promise was an enforceable term of the contract,

20

so the court's improper rejection of parol evidence drastically affected the outcome below.[10]

### C. THE JURY INSTRUCTION WAS CASE-TERMINATING.

As noted *supra*, the Jury Instruction in the First Order was case-terminating because all of Dickinson's claims required it to prove that the Freezer failed to perform. The Second Order's statement that the instruction "only presumptively ends Dickinson's ability to establish its breach of contract claim," 1-ER-155, is neither logical nor supported by the record. Indeed, the court indicated in the same decision that "even if the non-rebuttable presumption did directly impact all four of Dickinson's claims" it still did not "effectively end[]" Dickinson's case, in part because "the Court has already declined to dismiss Dickinson's case in its entirety." 1-ER-157. This is the very model of circular logic, and it ignores the practical consequences of the court's own order.

The court also reiterated that it "declined to preclude all evidence of the FPS Freezer and Refrigeration System from coming in during trial," but it offered no explanation as to what evidence Dickinson could possibly introduce to establish

---

[10] Nor is the court's alternative holding that Dickinson "waived" the parol evidence argument sustainable. Dickinson first raised that term in its opposition to the sanctions motion, not (as the district court incorrectly stated) in its reply in support of reconsideration. 11-ER-3086 ("…noting that Freezer could operate for at least 20-22 hours in succession"), 11-ER-3088 ("the Freezer could only run 6 hours or less (instead of the required substantially longer time period) before it would have to be shut down").

liability. *Id.* Next, the court distinguished outright dismissal from "the opportunity to amend, to attempt to negotiate a settlement, or to seek reconsideration." *Id.* But if those options comprised the only available options, *that meant the case had essentially been terminated.*[11]

FPS suggests that Dickinson somehow "blame[s] the trial court for its own litigation choices or missteps, particularly its belated attempt to amend its complaint." Ans. Br. 57. This misrepresents the timing of Dickinson's motion to amend, which was filed by its deadline and just two months after the court's denial of reconsideration. More importantly, this assertion suffers from the same flawed premise that captivated the district court—the idea that Dickinson could have brought some other claim against FPS that was not premised on the Freezer's performance. FPS never explains what "litigation choices" Dickinson either did make or could have made differently.

But, once again, this case was *always* about the Freezer's failed performance and what was causing it, and it was never about anything else. The speculation by the court and FPS that Dickinson could have brought some other claim(s) was inaccurate, not supported by the evidence, and certainly never articulated in any of the relevant decisions or briefing. More fundamentally, even if Dickinson could

---

[11] The court also quoted *Apple*, 888 F. Supp. 2d at 994, for the proposition that "an adverse inference instruction is a 'lesser' sanction than dismissal or default," 1-ER-157, but that is of course inaccurate when an adverse inference instruction itself effectively terminates the case.

45670.0013.15808836.1

have brought alternative claims, that does not change the inescapable fact that the Jury Instruction terminated those claims Dickinson *did* bring—which made it case-terminating and therefore a reversible abuse of discretion.

The First Order terminated Dickinson's case, as was clear upon its issuance and even more clear when the district court decided the Second Order. Both orders should be reversed.

## IV. THE EXPANDED FACTUAL RECORD DEMONSTRATES THE DISTRICT COURT'S REPEATED CLEARLY ERRONEOUS FACTUAL FINDINGS REGARDING FPS'S PURPORTED PREJUDICE.

### A. THE DISTRICT COURT ERRED IN RELYING ON EDUARDO FORD'S MISLEADING AFFIDAVIT TESTIMONY.

The district court relied on testimony and opinions from FPS's expert Eduardo Ford to find in its First Order that Dickinson's disassembly of the Freezer prejudiced FPS.[12] That testimony included that Ford "would have run the FPS Freezer attached to the refrigeration infrastructure under controlled conditions to identify any and all deficiencies occurring between the refrigeration infrastructure and the FPS Freezer interfacing together[,]" and, according to Ford, because the Freezer and Refrigeration System were altered before FPS retained him as an

---

[12] The district court also faulted Dickinson for having its expert Charles Taylor conduct testing prior to the Freezer's disassembly, but that testing was de minimis and Dickinson volunteered to exclude it. 1-ER-154; 10-ER-2759–2761, 10-ER-1791. The court rejected that offer and found, inexplicably, that Taylor's willingness to rely on prior data somehow prejudiced FPS by forcing its expert to

expert, "[r]elevant information necessary to conduct a sound engineering analysis of the FPS freezer and refrigeration infrastructure that supported it during the reported period of operation, cannot be secured." 14-ER-3806–07; 1-ER-180; 1-ER-197–198. This testimony implied, incorrectly, that *no* relevant data existed upon which a refrigeration engineer could assess the Refrigeration System's performance, and the district court appears to have assumed as much in finding Ford's inability to conduct his own tests prejudiced FPS. *Id.*

It is critical to understand that FPS's theory of the case centers on alleged flaws in the <u>Refrigeration System</u>, *not the Freezer*. Indeed, FPS acknowledges that as early as June 2017, it "maintain[ed] the refrigeration system was incapable of supporting the Freezer," Ans. Br. 16, and the First Order noted that "the Refrigeration System is the basis of FPS's defense." 1-ER-185. FPS concedes that the Freezer never produced 8,000 pounds of potato product for 20-22 hours per day. Instead, FPS argues that the Freezer failed to perform properly because the *Refrigeration System* failed to provide 210 Tons of Refrigeration in cooling power. In other words, FPS suggests the Freezer would have performed properly with an adequate Refrigeration System.

Per FPS, because Ford could not test the Refrigeration System while it was operating with the Freezer under factory conditions, FPS can never know if the

---

also rely on the same prior data. 1-ER-154. That conclusion does not follow, as each expert independently decides which evidence to credit.

45670.0013.15808836.1

Refrigeration System worked properly. Thus, FPS's asserted prejudice relates *solely* to a purported inability to test the *Refrigeration System* while working in tandem with the Freezer during factory-operating conditions—not inspection of the disassembled Freezer or the Refrigeration System as modified for a different replacement freezer. Therefore, FPS's arguments and the district court's findings regarding Dickinson's disassembly of the *Freezer* (including FPS's purported inability to observe the Freezer's disassembly[13] or condition post-removal) are red herrings: those facts have absolutely nothing to do with FPS's purported inability to prove that the *Refrigeration System* did not work when hooked up to the Freezer under operating conditions. Accordingly, this Court need not heed any of the district court's factual findings or FPS's arguments about those facts. Ans. Br. 59–63. Regardless, it is critical that FPS's alleged prejudice is that Ford did not get to run tests of the *Refrigeration System* while it was installed and operating with the Freezer.

As such, this Court can and should consider that Ford's deposition testimony contradicts his prior affidavit testimony that FPS was prejudiced by his inability to conduct his own tests. Ford testified at his deposition that, when he provided his

---

[13] This is why FPS's attempt to distinguish the cases of *Fujitsu*, 247 F.3d at 435–436, and *Cedar Petrochemicals, Incorporated v. Dongbu Hannong Chemical Company*, 769 F. Supp. 2d 269 (S.D.N.Y. 2011), fails—FPS requested to observe the Freezer's disassembly but did not request to test or measure it. *See* Ans. Br. 49–50, 21 ("FPS informed Dickinson that it would *monitor and record* the freezer's removal" (emphasis added)).

45670.0013.15808836.1

affidavit and expert report to the district court, he was unaware of the remarkable quantity of existing data showing the Refrigeration System's performance during prior inspections. At his deposition, Ford testified that he had not seen:

- compressor calibration documentation, despite ample documentation and testimony showing such calibration (9-ER-2435–36);
- compressor performance data from the First Engineering Summit (9-ER-2522–25);
- more than the first few of hundreds of pages of data gathered during the First Engineering Summit (9-ER-2526–27); or
- extensive Refrigeration System data gathered during the Second Engineering Summit[14] (9-ER-2528–32).

This appears to have been a result of Ford analyzing only those materials that FPS's counsel provided him.[15] 9-ER-2327.

After learning of the existing data, Ford failed to identify a *single test* he would perform that had not <u>already been performed</u> with FPS's involvement. *See* 9-ER-2393–97; 9-ER-2434–35; 9-ER-2442–45; 10-ER-2890–2904; 14-ER-3803–31. When deposed specifically about data indicating the Refrigeration System performed *better* than contractually required, Ford testified: "I can't tell you exactly what specific test I would have conducted had I had the opportunity to test that freezer at that time." 9-ER-2435.

---

[14] Again, FPS was integrally involved in both Engineering Summits. Opening Br. 12–16.

[15] It is unclear why Ford was not provided existing data, but that fact alone drastically undermines the district court's reliance on his testimony.

45670.0013.15808836.1

Thus, the record on reconsideration shows that Ford testified he would have run *the exact same kinds of tests* as those run during the Engineering Summits, although he suspects the data from his tests *might* have been different. *See* 9-ER-2479–81. That factual reality—which, critically, FPS does not even try to dispute in its Answering Brief—is irreconcilable with the district court's finding that Dickinson's disassembly of the Freezer precluded FPS from ever having any data to assess the Refrigeration System. In actuality, FPS had substantial data that its counsel simply did not provide to Ford.

As a result, the district court's First Order was based on clear error, which also constituted a manifest injustice. Either way, the expanded factual record warranted reconsideration by the district court and warrants reversal here.

## B. FPS WITNESSES ADMITTED THAT THEIR "TROUBLESHOOTING" INVESTIGATED WHETHER THE REFRIGERATION SYSTEM WAS PERFORMING PROPERLY.

FPS also points to other FPS witness testimony that the Freezer's disassembly prevented it from gathering data regarding the Refrigeration System's performance. Specifically, FPS cites executive Justin Lai's conclusory declaration that FPS never "anticipate[d] litigation" until after the Second Engineering Summit, and that the district court relied on FPS's refrigeration engineer Jason Kwok that FPS only visited Dickinson's facility to "troubleshoot" and not to inspect the refrigeration infrastructure. Ans. Br. 19; SER-223; 1-ER-175. As noted *supra*, labeling FPS's pre-litigation inspections as "troubleshooting" and not in

anticipation of litigation is a meaningless and false legal distinction. Moreover, FPS's witnesses admitted in deposition testimony that, irrespective of the label, FPS repeatedly tested and helped gather massive amounts of data regarding the Refrigeration System's performance.

Kwok testified that FPS's president wanted "more information on the refrigeration package," including data on air temperature and pressure sensor readings, in order to compare that with data collected at the First Engineering Summit. FER 4–6. Kwok further testified that the Second Engineering Summit's purpose was to allow FPS's consultant James Peterson to assess the Refrigeration System's performance. FER 7–9. Indeed, Kwok *admitted* that at that Summit, Peterson determined the Refrigeration System was performing properly—and Kwok agreed:

> Q. I'm asking if, at [the Second Engineering Summit], do you recall Mr. Peterson telling the group that the refrigeration system was hitting 240 tons of refrigeration and negative 40 degrees Farenheit [*sic*] at the coils?
>
> A. Yes.
>
> Q. You do recall that?
>
> A. Yes.
>
> Q. Okay. What was your response to that?
>
> A. I don't have to respond; right?
>
> Q. Okay. Did you agree with him?
>
> A. Based on what we see, this is the fact.

45670.0013.15808836.1

Q. So that's a yes?

A. That's a yes, yeah.

FER 10. Kwok's testimony makes clear that regardless how FPS's investigations are classified, its experts visited Dickinson's facility to inspect and gather data regarding the Refrigeration System's performance—the exact activities Ford claimed he needed to conduct to form expert opinions regarding whether the Refrigeration System functioned properly. Labeling FPS's efforts "troubleshooting" or "pre-litigation" misses the point and creates a meaningless and arbitrary distinction that cannot be sustained considering Kwok's testimony.

## V.   <u>FPS'S FEE AWARD SHOULD BE VACATED.</u>

Federal Rule of Civil Procedure 37(a)(5)(A) precludes a fee award on a discovery motion if there was no good faith attempt to meet and confer or if the opposing party's position was substantially justified. Here, FPS *did not meet and confer with Dickinson on the only issue as to which it obtained relief*—whether FPS had timely notice of the subject depositions. 7-ER-1958. FPS does not dispute this fact. Accordingly, the district court abused its discretion in awarding fees and costs, and that order should be reversed.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the district court's decision finding spoliation, and its decisions denying reconsideration, denying leave to amend, and granting FPS summary judgment, as well as the final

29

judgment entered thereon. This Court should also reverse the district court's award of attorneys' fees and costs to FPS.

DATED THIS 19TH Day of May 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By */s/ Dane A. Bolinger*
    Dane A. Bolinger, ISB No. 9104
    Attorneys for Plaintiff/Appellant
    Dickinson Frozen Foods, Inc.

30

45670.0013.15808836.1

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 22-33832

I am the attorney or self-represented party.

**This brief contains <u>6,984</u> words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature /s/ Dane A. Bolinger    Date May 19, 2023**
*(use "*s/[typed name]*" to sign electronically filed documents)*

31

45670.0013.15808836.1

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

**9th Cir. Case Number(s)**: _____**22-33832**_____

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

| |
|---|
| not applicable |

**Description of Document(s)** *(required for all documents)*:

| |
|---|
| APPELLANT'S REPLY BRIEF |

**Signature** */s/ Dane Andrew Bolinger*   **Date:** May 19, 2023

45670.0013.15808836.1